## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS; and STUDENT DOE 4 | Case No. 25-cv-11109-PBS |
| *Plaintiffs*, | |
| *v.* | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; the DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in his official capacity as Secretary as Secretary of State; and the DEPARTMENT OF STATE, | Date: June 27, 2025 |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION

1.     For more than a century—since Congress passed the Emergency Immigration Act of 1921 and the Immigration Act of 1924 that paved the way for the exchange of international students in the United States—the federal government has supported and encouraged foreign students in coming to the United States to pursue undergraduate or graduate degrees from institutions of higher education. And these institutions, working with the government, have built a system that allows for the predictable and orderly admission and tracking of these students. As a result, foreign students receive a world-class education, while our higher education institutions (and their domestic students) benefit immensely from the myriad contributions that international students provide to their campuses and local communities. The nation sees untold benefits in the form of innovation, research breakthroughs, economic growth, entrepreneurship, soft diplomacy, and cultural exchange.

2.     Yet, in its first few months, the current administration has adopted arbitrary and unlawful policies that, especially when taken together, rip that well-settled system apart and replace it with chaos and instability. The government—specifically, the Department of State ("DOS") and the Department of Homeland Security ("DHS"), acting in close coordination—has abruptly cancelled visas en masse without warning or individualized review; manipulated and undermined the administrative system that allows students to demonstrate their lawful status (the Student and Exchange Visitor Information System ("SEVIS")); and intentionally misled students about the legal consequences of its actions. Each of these unprecedented actions is not only unlawful but also threatens to deprive the United States of a generation of talented international students, who are likely to pursue their higher education in a more hospitable or welcoming country. Plaintiffs the Presidents' Alliance on Higher Education and Immigration (the "Presidents' Alliance") and the Association of Independent Colleges and Universities in

Massachusetts ("AICUM") bring this suit to set aside this unlawful and arbitrary agency action, which has harmed and continued to harm Plaintiffs and their member institutions.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the present action based on 28 U.S.C. § 1331 (federal question).

4.      Venue is properly with this Court pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which Defendants are employees or officers of the United States, acting in their official capacity; and because Plaintiffs represent member institutions impacted by the government policy who reside in this district, or a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and there is no real property involved in this action.

## PARTIES

5.      Plaintiff Presidents' Alliance on Higher Education and Immigration is a nonprofit, nonpartisan association of American college and university leaders across the United States and the institutions they represent, and is a sponsored partner project of the National Center for Civic Innovation.[1] The Presidents' Alliance brings together leaders and their institutions to address immigration issues impacting students, campuses, and communities; it supports the educational access, success, and post-graduate pathways of immigrant, refugee, and international students at U.S. colleges and universities; and it aims to increase policymaker and public understanding of immigration issues impacting higher education and how immigrant-origin and international students contribute to our communities, states, and nation. The Presidents' Alliance represents close to 600 public and private colleges and universities of all sizes and institutional types,

---

[1] The Presidents' Alliance's website can be found at: https://www.presidentsalliance.org/.  Its membership, as of the time of publication, can be found in its 2024 Annual Impact report, which is accessible through its website at: https://www.presidentsalliance.org/annual-impact-reports/.

including doctoral, master's level, baccalaureate, community college, and special focus institutions, from across the United States. Altogether, member institutions enroll more than five million students and are located in forty-two states, Washington D.C., and Puerto Rico. Forty-nine members of the Presidents' Alliance are located in the Commonwealth of Massachusetts.

6.     Plaintiff Association of Independent Colleges and Universities of Massachusetts is a policy advocacy organization representing 57 private colleges and universities across the Commonwealth of Massachusetts.[2] AICUM's member institutions collectively educate more than 280,000 students annually and employ nearly 100,000 Massachusetts residents. AICUM advocates on behalf of its members on numerous issues, including increased funding for need-based financial aid programs, economic and workforce development support, incentives for college savings programs, additional funding for research and innovation, tax policies that preserve the tax-exempt status of colleges and universities,  and protecting the interests of international students on its member campuses. AICUM is headquartered in Belmont, Massachusetts.

7.     Plaintiff Student Doe 4 graduated from a private university in Massachusetts in January 2024 from the Master's degree program in Financial Mathematics as an F-1 student.  On April 3, 2025, he was working full-time pursuant to his STEM OPT employment authorization document earning $30 per hour, when he received an email from the director of his university's international students office. In the email, Student Doe 4 was notified that his SEVIS record was terminated for "Otherwise Failing to Maintain Status – Individual identified in criminal records check and/or has had their VISA revoked." Since his SEVIS record was terminated, Student Doe

---

[2] AICUM's website can be found at: https://aicum.org/.  A list of AICUM's members can also be found on its website at: https://aicum.org/member-list/.

#4 had to quit his job at a financial services firm. Student Doe #4's SEVIS record was reactivated twenty-three days later, on April 27, 2025. But his prior company had filled his position and was not able to bring him back into his prior job. Since that date, he has been searching for a new job but has not yet been successful in obtaining a new position. Under the requirements of his student status, Student Doe #4 must find a new job by July 29, 2025, or he must depart the United States, despite the harm he suffered due to the government's actions and the twenty-three days his SEVIS status was improperly terminated. Student Doe #4 has invested $73,849 per year in his undergraduate education. He has not had any contact with the police or the criminal justice system at any time.

8. Defendant Kristi Noem is the Secretary of DHS and has ultimate authority over the Department. In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of immigration laws. Defendant Noem is sued in her official capacity.

9. Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE") and has authority over the operations of ICE. In that capacity and through his agents and officers, Defendant Lyons has broad authority over the operation and enforcement of the immigration laws. ICE is responsible for the termination of SEVIS records and managing the Student Exchange Visitor Program ("SEVP") database. Defendant Lyons is sued in his official capacity.

10. Defendant DHS is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes numerous sub-agencies, including ICE.

11.     Defendant Marco Rubio is the Secretary of State and has ultimate authority over the operations of DOS.  In that capacity, and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws, including the administration and revocation of student visas. Defendant Rubio is sued in his official capacity.

12.     Defendant DOS is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DOS is responsible for issuing and revoking student visas.

## FACTUAL BACKGROUND

### *International Students and Higher Education*

13.     The United States has a long history of embracing international students. The passage of the Emergency Immigration Act of 1921 and the Immigration Act of 1924 allowed for the exchange of international and American students. At the end of World War II, Congress created the Fulbright Program at the end of World War II to create peace and understanding through educational exchange and enacted the 1947 Aliens and Nationality Act to allow nonresident foreign national students to work as part of their educational programs. With the passage of the Immigration and Nationality Act ("INA") in 1952, Congress established the F-1 visa program for nonresident students. This framework for a robust system of international education has made the United States the most desirable country for higher education in a highly competitive global market—allowing American institutions to attract the most talented students and scholars in the world.[3]

14.     International students are not only a fundamental, vibrant part of American higher education, but also crucial contributors to the U.S. economy and local communities. There are

---

[3] Among others, the United States competes with the U.K., Australia, Germany, Canada, France, Netherlands, Switzerland, China, and Singapore to attract this talent.

currently more than one million international students at U.S. colleges and universities, with approximately 250,000-300,000 new students arriving annually. Students from around the globe chose to come to the United States to study and earn degrees in a wide range of fields, including sciences, technology, engineering, mathematics, the humanities, and social sciences.

15.     International students are so important to American institutions of higher education that each year colleges and universities invest significantly to recruit the best talent from around the world to apply and, if accepted, enroll at their institutions. At many institutions, the annual investment in recruitment alone exceeds $200,000. Before their international students depart for the United States and after they arrive on campus, member universities provide extensive support to help them fully acclimate to university life in the United States. These efforts include: international student and parent orientations; briefings on visa and immigration-related regulations; engagement in campus-wide activities for all new students; and programs to build familiarity with the full range of services offered through the international student and scholar services offices on campus, career services, and counseling centers.

16.     Universities, their American students, local communities, and the United States economy receive a great deal in return for this investment. The presence of international students and scholars enables U.S. institutions to retain their top spot in global university rankings and well-earned reputation as the world's premier destination for higher education. These students also contribute to the economic well-being of many institutions, especially those with large graduate programs, by paying full tuition without financial aid, which, in turn, can subsidize in-state or reduced tuition for domestic students. On average, for every additional international

student enrolled at a public university, two more in-state students enroll as well.[4] And for every three international students enrolled in the United States, one additional job is created.[5] In total, international students are estimated to add $43.8 billion to the U.S. economy annually, supporting more than 378,000 jobs.[6]

17.     International students are also essential to the fabric of U.S. higher education institutions, contributing rich experiences, perspectives, and skills to academic and campus life at colleges and universities across the United States. These students become woven into the fabric of university campuses, as they participate in cultural activities and exchanges, student associations, athletics, extracurriculars, and all other facets of student life. Some international students serve as teaching or research assistants, and many go on to have careers in the United States, contributing to the advancement of knowledge, innovation, and entrepreneurship here in long-lasting ways.

18.     This exchange—from which universities, international students, American students, and the U.S. economy benefit—depends on a stable and predictable system that allows these students to come to the United States and remain here to pursue their studies. Institutions, faculty, classmates, researchers, and employers rely on international students and expect that they will be able to complete a course of study or post-graduate training. In the typical course, universities support these international students with minimal disruption to their studies so as to ensure their success and that they maintain their immigration status in the United States. In the

---

[4] Madeline Zavodny, *The Importance of Immigrants and International Students to Higher Education in America*, NFAP, https://nfap.com/research/new-nfap-policy-brief-the-importance-of-immigrants-and-international-students-to-higher-education-in-america/ (May 2025).

[5] Erica Stewart, *International Students Contribute Record-breaking Level of Spending and 378,000 Jobs to the U.S. Economy*, NAFSA (Nov. 18, 2024), https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.

[6] *Id.*

rare event international students might depart their programs early, it is usually due to personal, financial, or medical reasons, or—in a limited number of circumstances—because students have failed to comply with the conditions of their F-1 status.

### *Student Visa Framework and SEVIS*

19. The path for international students begins with the application to a U.S. college or university. Once notified of admission, international students must then apply for an F-1 visa to obtain entry into the United States. The basis for student visas is statutorily established in 8 U.S.C. § 1101(a)(15)(F)(i), which creates a class of nonimmigrant aliens for "bona fide student[s] qualified to pursue a full course of study." To be admitted into the country, international students must present an F-1 student visa and proof of admission to a sponsoring educational institution at a port-of-entry. Once admitted, international students are granted permission to remain in the United States for the duration of their studies so long as they continue to meet the requirements established by the regulations governing their visa classification in 8 C.F.R. § 214.2(f), such as maintaining a full course of study and avoiding unauthorized employment.

20. To manage information on nonimmigrant students and exchange visitors and track compliance with the terms of these individuals' status, ICE's SEVP division established a centralized database called SEVIS. Designated School Officials ("DSOs") at SEVP-certified schools play a crucial role in this system. Under 8 C.F.R. § 214.3(g)(2), DSOs must report specific events via SEVIS within 21 days, including if a student fails to maintain status such as by falling below full-time status or failing to register for classes. An institution's compliance with SEVIS reporting requirements is necessary to maintaining its SEVP certification and, by extension, its ability to enroll foreign students.

21.     The SEVIS record is not a passive tracking tool, but the operational mechanism through which student status is managed and validated by the DSO. "[T]he SEVIS record is the *definitive record of student or exchange visitor status* and visa eligibility." 9 FAM 402.5-4(B) (emphasis added). And the government relies on an active SEVIS record as the indicator that a student is maintaining their nonimmigrant (or non-permanent immigration) status. An active SEVIS record, therefore, determines a student's ability to work or participate in Curricular Practical Training ("CPT") or Optional Practical Training ("OPT")—programs that allow a student admitted on an F-1 visa to work either during or after their course of study—and ensures that students can continue making progress toward their degrees, access on-campus work, CPT, and OPT. When a SEVIS record is terminated, these opportunities may no longer be available, and students may face other immigration consequences.

22.     Therefore, an active SEVIS record is indispensable to—or, as some courts have recently held, "the equivalent of"[7]—an international student's F-1 status, as it allows a student to demonstrate that they remain in lawful student status, certify their eligibility to participate in work programs, transfer institutions, and travel internationally with the expectation of readmission. In contrast, the absence of an active SEVIS record signifies that a student is not lawfully present in the United States and may not pursue these opportunities.

23.     The general requirements for an international student to maintain his or her status (as shown by his or her active SEVIS record) include the following: (a) the student must be

---

[7] *Doe v. Trump*, 2025 WL 1467543, at *6 (N.D.Cal. May 22, 2025) (quoting *Liu v. Noem*, 2025 WL 1233892, at *6 (D.N.H. April 29, 2025)); *see also Doe #1 v. Noem*, 2025 WL 1555382, at *7 (W.D. Wis. June 2, 2025) (citing, among others, *Isserdasani v. Noem*, 2025 WL 1330188, at *6 (W.D. Wis. May 7, 2025) ("[D]efendants' argument that changing a student's SEVIS record to 'terminated' does not also have the effect of terminating their F-1 status is 'semantics.'")); *Oruganti v. Noem*, 2025 WL 1144560, at *4 (S.D. Ohio April 18, 2025).

enrolled in an "academic" educational program, a language-training program, or a vocational program; (b) the sponsoring school or university must be approved by the SEVP; (c) the student must be enrolled as a full-time student at the sponsoring institution; (d) the student must be proficient in English or be enrolled in courses leading to English proficiency; (e) the student must have sufficient funds available for self-support during the entire proposed course of study; and (f) the student must maintain a residence abroad which they have no intention of giving up. *See generally* 8 C.F.R. § 214.2(f), (m).

24. DHS regulations distinguish between two separate ways an international student's F-1 status may be lost: (1) through an agency-initiated "termination of status," an uncommon occurrence historically, and (2) when a student "fail[s] to maintain status." 8 C.F.R. §§ 214.1(d)-(g). These are the only regulatory pathways by which a student may fall out of lawful F-1 status under the law.

25. The first category—termination of status by DHS—can occur only under the limited circumstances set forth in 8 C.F.R. § 214.1(d): **(1)** revocation of a waiver previously granted under 8 U.S.C. § 1182(d)(3) or (4) to permit temporary entry of an alien otherwise inadmissible under 8 U.S.C. § 1182(a); **(2)** "a private bill to confer lawful permanent resident status" is introduced in Congress; or **(3)** DHS publishes a notification in the Federal Register identifying "national security, diplomatic, or public safety reasons" for termination. *Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019). Aside from

these enumerated reasons, DHS cannot otherwise unilaterally terminate an international student's F-1 nonimmigrant status. *Id.*[8]

26.     The second category—failure to maintain status—involves circumstances where an international student falls out of compliance with the F-1 visa requirements. Title 8 of the C.F.R., subsections 214.1(e) to (g), outline specific circumstances where conduct by an international student "constitutes a failure to maintain status." These circumstances include engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence that carries a potential sentence of more than a year.

27.     An international student cannot be deprived of his or her SEVIS status (under either category noted above) for a criminal conviction unless they have been convicted specifically of "a crime of violence for which a sentence of more than one year imprisonment may be imposed." *See* 8 C.F.R. § 214.1(g).

28.     Similarly—although a student may be prevented from entering the country if his or her visa is revoked prior to arrival in the United States—a SEVIS record may not be terminated solely because of a visa revocation ***after*** a student has been admitted into the United States, because an international student on an F-1 visa can retain a valid SEVIS record as long as they maintain lawful student status, which is dictated by 8 U.S.C. § 1101(a)(15) and 8 C.F.R. § 214.1. Non-revocation of a student visa is not a prerequisite to maintaining lawful student status listed in 8 U.S.C. § 1101, and visa revocation is not a valid legal basis for F-1 status termination enumerated in 8 C.F.R. § 214.1(e)-(g).

---

[8] *See also, e.g.*, *Doe #1*, 2025 WL 1555382, at *2; *Ajugwe v. Noem*, 2025 WL 1370212, at *4 (M.D. Fla. May 12, 2025); *Parra Rodriguez v. Noem*, 2025 WL 1284722, at *5 (D. Conn. May 1, 2025); *Doe No. 1 v. Noem*, 2025 WL 1224783, at *5 (E.D. Pa. Apr. 28, 2025); *Doe #1 v. Trump*, 2025 WL 1192826, at *2 (D. Ariz. Apr. 24, 2025); *Madan B. K. v. Noem*, 2025 WL 1171572, at *7 (W.D. Mich. Apr. 23, 2025).

29.     ICE's previous policy guidance issued in 2010 drew on existing regulations to confirm that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."[9] Historically, it has not been uncommon for a student with a visa revocation to continue their studies and maintain active SEVIS status. Rather, if the visa is revoked, the student is permitted to pursue their course of study in school, but upon departure, the SEVIS record is terminated, and the student must obtain a new visa from a consulate or embassy abroad before readmission into the United States.[10] Thus, the revocation of a visa does not constitute—nor has it ever constituted—failure to maintain status and cannot therefore be a basis for SEVIS termination.

30.     The termination of a SEVIS record by DHS, including termination based on student visa revocations, constitutes final agency action for purposes of APA review. *See Fang*, 935 F.3d at 185. There is no way to administratively challenge students' terminations before DHS, and legal consequences flow from the terminations. On its website, DHS states that when a SEVIS record is terminated, "Immigration and Customs Enforcement (ICE) agents may investigate to *confirm the departure* of the student."[11]

### *Student Criminal Alien Initiative*

31.     On or about mid-March 2025, DHS, working in concert with DOS, undertook an initiative to which it referred internally as the "Student Criminal Alien Initiative." Although,

---

[9] U.S. Immigr. & Customs Enf't, *Policy Guidance 1004-04 – Visa Revocations* (June 7, 2010), https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

[10] U.S. Dep't of State Bureau of Educ. and Cultural Affs. Priv. Sector Exch., Guidance Directive 2016-03, 9 FAM 403.11-3 – VISA REVOCATION (Sept. 2, 2016), https://www.aila.org/library/dos-guidance-directive-2016-03-on-visa-revocation.

[11] Dep't of Homeland Sec., *Terminate a Student*, Study in the States (last updated May. 19, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (emphasis added).

according to DHS testimony, this initiative was not memorialized in writing, it consisted of 10 to 20 ICE employees working for multiple weeks to run the names of the all international students currently in the United States, a staggering 1.3 million individuals, through the National Crime Information Center ("NCIC") database.[12] NCIC is a federal database operated by the U.S. Federal Bureau of Investigation ("FBI") that includes individuals who have come into contact with law enforcement due to a variety of circumstances, including not only individuals who have been convicted of a criminal offense but also individuals who have been arrested but never charged, individuals who have received citations (e.g., for speeding), individuals whose cases were dismissed, and even individuals who are considered missing persons.

32. Of the 1.3 million names of international students that ICE ran through the NCIC database, ICE identified just over 6,400 students whose names were in the database—less than half of one percent of the total nonimmigrant student population in the United States. Of the roughly 6,400 students, over 3,000 of these students were in valid visa status at the time ICE conducted this search.

33. Students who appeared on this list—and against whom various actions described below were taken as a result—include individuals with no criminal history; students who are survivors of domestic violence or sexual assault and were wrongly charged; students who were arrested for minor offenses but never charged in court; students who were charged with minor offenses but never convicted; and students whose only infractions consist of minor offenses such as speeding tickets. These students include a Pennsylvania undergraduate who was issued a speeding ticket for going 70 mph in a 65-mph zone and a Michigan domestic violence survivor

---

[12] *See* Hr'g Tr., *Patel v. Lyons*, No. 1:25-cv-01096, Dkt. 18 (D.D.C. Apr. 29, 2025).

who called the police during a domestic violence incident and was wrongly taken into custody before being promptly released.[13]

## CHALLENGED POLICIES

34.     The three policies challenged in this complaint are an outgrowth of the "Student Criminal Alien Initiative" and the list (or lists) that it created. Those policies are DOS's Visa Revocation Policy (the "Revocation Policy"), DHS's SEVIS termination policy (the "Termination Policy"), and DOS's policy relating to the issuance of letters (the "Intimidation Policy"). Each of these policies was pursued without conducting any individualized assessment to determine whether any agency action was warranted in each case beyond the students' names apparently appearing in the NCIC database.[14]

### *The Revocation Policy*

35.     After running 1.3 million international students' names through the NCIC database, ICE sent the list of roughly 6,400 international students whose records were present in the NCIC database to DOS, which pursued the Revocation Policy whereby it revoked many, if not all, of the students' visas that were valid at that time. DOS also identified the students on ICE's list whose visas had already expired and provided lists that subdivided the list ICE had provided into subgroups of (1) students whose visas it planned to revoke and (2) students without active visas in its reply to ICE.[15]

---

[13] Am. Immigr. Laws. Ass'n, *Policy Brief: The Scope of Immigration Enforcement Actions Against International Students* (Apr. 17, 2025), https://www.aila.org/library/policy-brief-the-scope-of-immigration-enforcement-actions-against-international-students.

[14] *See* Hr'g Tr., *Patel v. Lyons*, No. 1:25-cv-01096, Dkt. 18 (D.D.C. Apr. 29, 2025). As the government's actions towards these students occurred without explanation, only the testimony of ICE officials in the litigation have shed light on the process that unfolded in the last two months.

[15] *Id.*

36. Pursuant to the Student Criminal Alien Initiative, under DOS's Revocation Policy, students had their visas revoked based on alleged "hits" in the NCIC database. On information and belief, this was done in whole or in part at the direction of DHS to establish a pretextual basis to then terminate students' SEVIS status (and thereby exclude them from the benefits a student may receive through maintaining an active SEVIS record). This Revocation Policy was carried out with no individualized review or explanation for revoking students' visas, and, on information and belief, DOS did not engage in any individual fact investigation to determine whether a student's visa should be revoked.[16]

37. DOS's mass revocation of student visas was not grounded in any statutory authority, regulatory authority, or formal, written policy promulgated by the agency. Rather than engaging in an individualized assessment, DOS acted pursuant to an unwritten blanket policy that contravened existing law. In many cases, DHS did not notify either individual students or their schools about the visa terminations.

*The Termination Policy*

a. **Widespread SEVIS Terminations**

38. Upon receiving the subdivided list back from DHS, ICE proceeded to pursue its Termination Policy, whereby it terminated thousands of SEVIS records of international students whose names appeared in the NCIC database.[17] These SEVIS terminations shook campuses not only in Massachusetts, but also in at least 47 other states and Washington, D.C. The terminations impacted degree-seeking students in undergraduate and graduate-degree programs, and recent graduates working in the United States under OPT.

---

[16] *See id.*
[17] *Id.*

39.     As with the visa revocations, in many cases, DHS did not notify individual students or their schools about the SEVIS terminations that impacted them. Plaintiffs and many of their member institutions only discovered the termination of a student's record after a DSO happened to check the SEVIS database and noticed a change. The reasons cited in the SEVIS database for most students, as discovered by the DSOs, have been inconsistent and changed over time, but have included never-before-seen reasons such as "Otherwise Failing to Maintain Status" with the explanation "[i]ndividual identified in criminal records check and/or has had their visa revoked," and "Otherwise Failing to Maintain Status" with a narrative citing deportability provisions under 8 U.S.C. § 1227(a)(1)(C) (failure to maintain status) and/or 8 U.S.C. § 1227(a)(4)(C)(i) (foreign policy ground).

40.     On or about April 8, 2025, SEVP started updating notations in the system to state "OTHER – Individual identified in criminal records check and/or has had their visa revoked . . .". Upon information and belief, this code had never been used before in SEVP-initiated terminations. Around the same time, SEVP updated its "Termination Reasons" website to include a new "OTHER" category under "SEVP-Only Termination Reasons" described as follows: "[a] SEVIS adjudicator uses this termination reason when no other reasons apply."[18] Some students and DSOs reported that certain records included no notation or explanation at all.

41.     The widespread SEVIS terminations ICE conducted in March and April, based solely on inclusion in the NCIC database, took place without an individualized assessment of each student's criminal record to determine whether the student was *actually* convicted of a

---

[18] *Compare* Dep't of Homeland Sec., *Termination Reasons*, Study in the States (last updated Apr. 9, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons, *with* Dep't of Homeland Sec., *Termination Reasons*, Study in the States, https://web.archive.org/web/20250408211432/.

violent crime punishable by a sentence of more than one year. Defendants' policy of terminating SEVIS records en masse without individualized assessments therefore contravened 8 C.F.R. § 214.1(g) in two critical ways. First, since the NCIC database includes "criminal" records where the individual was not actually convicted, among other types of records, DHS terminated SEVIS statuses based on nonimmigrant students' pending charges, dismissed charges, and—in some cases—no criminal charge at all, despite the regulations permitting SEVIS terminations only for a "nonimmigrant's **conviction**." 8 C.F.R. § 214.1(g) (emphasis added). Second, since the NCIC database lists all types of criminal offenses regardless of violence or sentencing categories, DHS terminated SEVIS statuses for convictions that were not a "crime of violence for which a sentence of more than one year imprisonment may be imposed," in contravention of the express language of 8 C.F.R. § 214.1(g).

42.     DHS also purported to rely, in many instances, on DOS's visa revocation decision to support its SEVIS termination decisions. *But see* 8 U.S.C. § 1101; 8 C.F.R. § 214.1(e)-(g). As ICE's 2010 policy guidance explained "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."[19] On information and belief, ICE did not, at the time of its widespread SEVIS terminations, provide a basis or explanation for this novel and unsupported interpretation of its authority under long-standing and unchanged regulations.

43.     Neither of the reasons cited by ICE in support of the SEVIS terminations constitute a lawful basis for SEVIS record termination under federal regulations. *See* 8 C.F.R. §§ 214.1(d)-(g), 214.2(f).

---

[19] U.S. Immigr. & Customs Enf't, *Policy Guidance 1004-04 – Visa Revocations* (June 7, 2010), https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

b. **Broadcast Message**

44.     Weeks after the widespread SEVIS terminations and visa revocations occurred—and after numerous lawsuits were brought on behalf of individual students challenging their SEVIS terminations—DHS hastily reversed course on or around April 25, 2025, and announced that it would restore students' improperly terminated SEVIS records.[20] Although ICE stated it would restore many students' SEVIS status, DOS stated it would not reverse course on visa revocations, and ICE indicated the SEVIS restoration for many students might only be temporary, leaving students and institutions in limbo, with the looming possibility that it could re-terminate SEVIS statuses for international students in the near future.[21]

45.     The following day, on April 26, 2025, ICE issued new subregulatory guidance through a broadcast message emailed to "[a]ll SEVP Personnel," with the subject line "Policy Regarding Termination of Records," discussing the government's discretionary authority to terminate SEVIS records ("the Broadcast Message").[22] The Broadcast Message did not undergo notice and comment rulemaking and was not otherwise published in the Federal Register, nor was a policy Memorandum prepared and adopted. The Broadcast Message appears to retroactively codify the practice that ICE had already implemented while conducting widespread terminations of SEVIS status, *i.e.*, that SEVP can terminate SEVIS records for a variety of reasons, including a visa revocation by DOS that is "effective immediately," and that "[i]n its

---

[20] *See* Ben Brasch & Molly Hennessy-Fiske, *DHS Reinstates Foreign Students After Court Losses Pile Up*, Wash. Post (Apr. 25, 2025), https://www.washingtonpost.com/education/2025/04/25/international-students-records-visa-trump-dhs-sevis/.
[21] *See id*.; Nate Raymond, *Trump Administration to Restore Foreign Students' Legal Status, for now*, Reuters (Apr. 25, 2025), https://www.reuters.com/world/us/trump-administration-restore-foreign-students-legal-status-now-2025-04-25/.
[22] *Arizona Student Doe #2 v. Trump et al.*, No. 4:25-cv-00175-TUC-AMM, Dkt. 13-1 (D. Ariz., Apr. 28, 2025).

discretion, ICE may conduct further investigation or initiate removal proceedings pursuant to INA § 237(a)(1)(C)(i) based on evidence that a nonimmigrant student is not complying with the terms of their nonimmigrant status."[23] In substance, the Broadcast Message reflects an impermissible attempt by DHS rewrite its existing regulations that provide only limited permissible bases for SEVIS terminations, *see* 8 C.F.R. § 214.1(d), to expand the agency's discretionary authority to terminate a SEVIS record without input from, or notice to, an educational institution.

46.     ICE has publicly stated that the Broadcast Message will serve as its new policy going forward and is currently operative, marking the consummation of ICE's decision to authorize the revocation of SEVIS records in circumstances beyond those permitted by law and regulations.[24]

47.     Additionally, in many of the individual student cases, Defendant DHS took the position that the vast majority of student visa revocations were not "effective immediately," but instead are revocations that become effective only upon the student's departure from the United States. DHS has also taken the position that such visa revocations would not be a basis for SEVIS termination and would not render students removable. There is no statutory or regulatory basis for distinguishing between revocations that are "effective immediately" and those that are effective upon departure. This newly asserted position directly contradicts the prior communications DOS sent to students with revoked visas.

### *The Intimidation Policy*

48.     Compounding the above-described wrongs, DOS sent communications to students (or their families or legal representatives) in furtherance of its Intimidation Policy. Pursuant to

---

[23] *Id.*

[24] *See* Hr'g Tr., *Patel v. Lyons*, No. 1:25-cv-01096-ACR, Dkt. 18 (D.D.C. Apr. 29, 2025).

that policy, DOS misrepresented the consequences that flow from its unlawful visa cancellations to the students whose visas it revoked—and/or whose SEVIS statuses DHS terminated—in what appears to be a boilerplate email. On information and belief, DOS's purpose in sending this email was to intimidate these students and create a climate of fear that led to students voluntarily leaving the United States, even when they were not legally required to do so.

49. While not all international students have received communications from DOS notifying them that their visas have also been revoked, many did. Those letters ("DOS Letters") state, *inter alia*:

> On behalf of the United States Department of State, the Bureau of Consular Affairs Visa Office hereby informs you that additional information became available after your visa was issued. As a result, your F-1 visa . . . has been revoked under Section 221(i) of the United States Immigration and Nationality Act, as amended.

> The Bureau of Consular Affairs Visa Office has alerted the Department of Homeland Security's Immigration and Customs Enforcement, which manages the Student Exchange Visitor Program and is responsible for removal proceedings. They may notify your designated school official about the revocation of your F-1 visa.

> *Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.*

> Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

As soon as you depart the United States, you must personally present your
passport to the U.S. embassy or consulate which issued your visa so your visa can
be physically cancelled.

(emphasis added).[25]

50.     Not only was this communication inaccurate in implying that the visa revocation

placed an international student's F-1 status at risk, but it was also directly contrary to what DOS

knew to be true. Prior to the Intimidation Policy, in similar communications informing

international students of a visa revocation, DOS did not falsely insinuate that a visa revocation

terminated the student's F-1 status or impacted their ability to remain in the United States to

complete their course of study.[26] Rather, DOS previously (and correctly) explained that "the

revocation of your visa does not control the status granted to you … at the time of your entry, or

your ability to stay in the United States."[27] While it is still the case that—consistent with the law

and the federal government's own prior communications—students with revoked visas should be

permitted to maintain active SEVIS records, continue their studies, obtain new I-20s when they

transferred to a new school, and enroll in CPT or OPT, the government's recent communications

strongly represented otherwise.

51.     On information and belief, DOS continues to act pursuant to the Intimidation

Policy to send letters, emails, or communications to international students that are substantively

identical to the above letter and continues to misrepresent the law with respect to its visa

terminations.

---

[25] *See* Decl. of S. Tolchin, *Student Does #4 v. Noem*, 2:25-cv-03528 (C.D. Cal. Apr. 21,
2025), Dkt. 5-1, Exs. P & Q.
[26] *Id.*, Ex. Q.
[27] *Id.*; *see also id.* ("If you are already in the United States, the revocation of your visa does
not control the F-1 status granted to you by U.S. Customs and Border Protection ("CBP") at the
time of your entry and your ability to stay in the United States.")

**HARM CAUSED BY THE CHALLENGED POLICIES**

52.     Member colleges and universities of the Presidents' Alliance and AICUM are being severely impacted by the Student Criminal Alien Initiative as reflected in the Revocation Policy, the Termination Policy, and the Intimidation Policy.[28] In response to the challenged policies and the uncertainty created by these policies, Plaintiffs and their member institutions expended significant and varied resources to mitigate the myriad issues that arose.

*Harm to Plaintiffs*

53.     This spring, Plaintiffs were forced to funnel their attention to helping member institutions weather the sudden revocations and terminations, while member institutions had to provide round-the-clock counseling services for students and faculty experiencing extreme levels of emotional and psychological stress following their SEVIS terminations. Plaintiffs and their member institutions have felt the one-two punch of devoting resources to supporting students in this difficult time, while also dealing with the financial fallout of students leaving the United States out of fear of being detained and deported. This has had a profound impact on Plaintiffs' member institutions' bottom lines.

54.     As a result of the DHS's actions to terminate international students' SEVIS records pursuant to its Termination Policy, the Presidents' Alliance has been forced to divert significant time and resources away from its planned initiatives to respond to the resulting crisis. Staff who were previously engaged in proactive efforts to advance the Alliance's mission have

---

[28] *See, e.g.*, Jessica Priest & Ayden Runnels, *More than 250 international students' immigration statuses revoked across Texas universities*, The Texas Tribune (Apr. 9, 2025), https://www.texastribune.org/2025/04/09/texas-universities-international-students-legal-status/; Forward Pathway, *The International Student Visa Revocation Crisis in US Universities: Analysis, Impact, Responses, and Future Perspectives on Balancing Academic Freedom and National Security* (Apr. 13, 2025), https://www.forwardpathway.us/the-international-student-visa-revocation-crisis-in-us-universities-analysis-impact-responses-and-future-perspectives-on-balancing-academic-freedom-and-national-security.

instead been redirected to manage the surge of urgent concerns from member institutions. This includes preparing rapid-response materials, convening emergency briefings, issuing updated guidance to institutional leaders, and coordinating closely with external legal experts.

55.     The Presidents' Alliance has also experienced a surge in individualized requests for technical assistance, legal interpretation, and institutional messaging support from member institutions seeking clarity, coordination, and guidance in response to DHS's rapidly evolving actions. These extraordinary demands have forced the organization to reprioritize internal workflows and significantly increase coordination efforts with national partners. As a result, the organization's capacity has been pushed to exhaustion as it works to mitigate the widespread confusion and disruption caused by DHS's practices.

56.     Plaintiff AICUM learned of the SEVIS terminations when several member institutions reached out with concern or to inform it that some of their students and alumni had been impacted. It then conducted outreach to all member institutions to get a better understanding of the scope of the terminations. AICUM expended staff resources to survey its member institutions and also held follow-up calls and corresponded with members to better understand how it could provide support. AICUM diverted resources in order to conduct advocacy outreach to elected officials on behalf of its members. In addition, for the fiscal year beginning June 1, 2025, AICUM opted to forgo any increase in membership dues given immense financial strain the current federal regulatory landscape has created.

### Harm to Student Doe #4

57.     Plaintiff Student Doe #4 was forced to leave his STEM OPT employment following the unexplained termination of his SEVIS record on April 4, 2025. Although his record was reactivated   twenty-three days later, the termination and delayed reactivation cost him his job, and he now faces a looming deadline to find replacement employment or leave the

country by July 19, 2025, despite having no criminal history and maintaining lawful status throughout his studies and OPT period.

### *Harm to Member Institutions*

58. Member institutions of the Presidents' Alliance and AICUM, which consist of hundreds of public, private, two-year, and four-year college and universities in Massachusetts and around the United States, are also facing significant harms in the wake of SEVIS record terminations.

59. The Presidents' Alliance and AICUM member institutions include several large public research universities located across the United States, including in Massachusetts. Collectively, the Presidents' Alliance and AICUM member institutions enroll thousands of international students—often comprising a significant percentage of the member institutions' overall student populations, including undergraduate students, graduate students, and post-doctoral fellows—and sponsor hundreds more on OPT. In addition, smaller institutions enroll significant numbers of international students each year and regard them as central to their missions of ethical leadership, critical thinking, and global engagement. International enrollment at these institutions has already dipped below historical trends, and the uncertainty surrounding the F-1 visa policy has prompted colleges to provide summer housing and financial assistance to students now afraid to travel abroad. The ripple effects extend to institutional planning as well, as the erosion of international students in student populations imposes significant budgetary strain and substantially limits the intellectual diversity these member institutes value.

60. International students, who are integral to the academic and cultural vitality of all the member schools, are inundating DSOs and international student offices with questions and concerns about these terminations. But DSOs are unable to provide meaningful answers because DHS's terminations defy established regulations and have changed overnight without a lawful

basis. DSOs, who have long relied on settled regulations and guidance to advise students, are now effectively incapacitated. They do not know what the terminations really mean for their students, other than that the terminations mean they cannot provide the usual services such as endorsing I-20s for CPT, affirming eligibility for OPT, or reducing course loads for eligible students. The confusion is compounded by conflicting messages given by the government, both in the SEVIS termination database comments and also in response to ongoing SEVIS litigation in federal court.

61. The effects of Defendants' actions have been felt across a wide array of AICUM and Presidents' Alliance member institutions. DSOs at Presidents' Alliance member research universities discovered without prior notice that multiple students' SEVIS records had been unilaterally terminated; one university identified two such terminations in late-March 2025, while another confronted nine terminations spanning every degree level. None of the affected institutions received advance warning from the federal government, and they only learned of the terminations only after either a student received a visa-revocation e-mail or a DSO manually checked the SEVIS database. Responding to the crisis forced staff to abandon end-of-year obligations such as commencement planning, to prepare remote-instruction options for suddenly ineligible graduate assistants, and to devote countless hours to counseling frightened students and faculty. Similarly, at liberal arts member institutions around the country, Defendants' SEVIS record terminations between March through May 2025 triggered a significant surge in one-on-one immigration-advising appointments, compelled DSOs to work around the clock to support students, and required emergency arranging "Know Your Rights" trainings with outside counsel.

62.     Further, the Presidents' Alliance also counts among its membership over 110 community colleges, which also attract and enroll F-1 students. Campus staff at one community college Presidents' Alliance member first learned of SEVIS terminations only after seeing reports on professional listservs and then confirming twelve terminations in their own SEVIS database. Lacking any guidance from DHS or their SEVP Field Representative, DSOs at the community college scrambled to notify students, assess individual immigration options, and arrange online coursework for those who were just a few weeks shy of graduation. Approximately forty-to-sixty percent of international program staff time was diverted in March and April 2025 to crisis response, which included ad-hoc workshops for students and trainings for faculty.

63.     As a direct result of the widespread SEVIS terminations—which caused students and their institutions to fear impending deportations or removals—member institutions of the Plaintiff organizations have had students abruptly depart their campuses and the United States altogether. At least four students at a Presidents' Alliance member institution self-deported out of fear, and the Presidents' Alliance community college member institution now anticipates long-term damage to its reputation as a welcoming gateway for global education. At another university, several students left the United States altogether, one having sold nearly all personal belongings in anticipation of departure, while others now exceed the 90-day unemployment limit on OPT because they lost work authorization when their SEVIS records were unlawfully terminated.

64.     Given the unlawfulness and arbitrariness of DHS's actions, member institutions are unable to properly advise their international students on how to comply with federal law or ensure their own institutional compliance. These institutions fear even greater government

impact in the future, including the possibility of decertification and the future inability to recruit or admit international students if their schools are not perceived as both high quality and safe institutions.[29]

65.     Institutions have also started to see a significant drop in enrollment, both among current students and among future students choosing to commit to their universities. Many current students have chosen to depart their schools and the United States for fear of arrest, detention, deportation, or other negative personal or legal impacts. And this past spring, prospective students were put in the position of deciding where to enroll for college this coming fall in the shadow of the government's challenged policies, resulting in a decrease in international student enrollment at colleges and universities in the United States. Member colleges and universities are and will be significantly financially impacted by the government's current aggressive and unprecedented policies, and as such, the welcoming reputation of United States educational institutions is indelibly tarnished by DHS's actions.

66.     International students are a significant and dependable source of tuition revenue: approximately 80% pay full tuition, and they are required to demonstrate their ability to fund their tuition at the beginning of each academic year. In total, international students pay tens of billions of dollars in tuition to American universities and colleges every year. Estimated tuition revenues from international students at just the twenty top-ranked universities with the largest

---

[29] Taylor Romine, Nouran Salahieh, Hanna Park and Andy Rose, "*DHS threatens to revoke Harvard's eligibility to host foreign students amid broader battle over universities' autonomy*," CNN (April 18, 2025), https://www.cnn.com/2025/04/16/us/harvard-kristi-noem-international-students.

international enrollments exceed more than $7.3 billion a year.[30] The decline in enrollment is sure to place immense strain on institutions' budgets, leading to potential cuts and possible tuition hikes— which will lead to higher costs for American students.

67.     The termination of SEVIS records and resulting loss of international students also undermines the educational mission of universities. It deprives domestic students of the well-documented cognitive, social, and academic benefits that flow from an international student body.[31] It also affects universities' ability to teach students, given the vital role that international graduate students play at many institutions in academic instruction. Further, it has a significant impact on universities' research capabilities.

68.     Students who are working on research studies are being abruptly pulled away from their research as they can no longer work, all while academic research is already facing significant headwinds. International students make up a significant percentage of students in certain graduate programs, particularly in STEM. In some of the members' graduate programs, such as computer and information sciences or electrical engineering, international students make up over 70% of the enrolled students.[32] The disruption of their studies not only threatens the continuity of important academic projects but diminishes the pipeline of future researchers, teachers, and innovators. The average foreign-born STEM professional generates a net benefit to the American economy of $3 million over 20 years, and foreign-born Americans STEM talent

[30] *See* Brief for Am. Ass'n of Univ. Professors et al. as Amici Curiae in Support of Plaintiff's Motion for Preliminary Injunction, Apps. 1–2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass. filed Apr. 9, 2025), https://www.presidentsalliance.org/wp-content/uploads/2025/04/PA-brief.pdf.

[31] Jiali Luo & David Jamieson-Drake, *Examining the Educational Benefits of Interacting with International Students*, 3 J. INT'L STUDS. 2 (2013), https://www.ojed.org/index.php/jis/article/view/503.

[32] Nat'l Found. for Am. Pol'y, *International Students in Science and Engineering*, 1 (Aug. 2021), https://tinyurl.com/4ar264r5.

collectively accounted for 1.7 percent of U.S. Gross Domestic Product in 2019—over $367 billion.[33]

69.     International students are also key contributors to the innovation of the U.S. economy. Their research often leads to patents, start-ups, and university-based research, which in turn contributes to local economic ecosystems by creating high-skilled jobs and fostering business formation hubs. Alumni-founded companies contribute to each university's reputation, funding and research contacts, and create jobs for future alumni in highly skilled fields. These companies therefore enhance the university's reputation, attract funding, and strengthen academic and industry research collaborations that benefit students and the broader public. A study published by the Presidents' Alliance with partners concluded that eliminating OPT could cost the country $17.2 billion annually.[34] In Massachusetts alone, international students bolster the Commonwealth's economy by an estimated $4 billion annually and support nearly 36,000 jobs.[35]

70.     Finally, the uncertainty created by the abrupt and voluminous termination of SEVIS records has had—and continues to have—a profound impact on institutional planning and budgeting. The inability to forecast international student enrollment for the upcoming academic

[33] *See* Stuart Anderson, *Immigrant Entrepreneurs and U.S. Billion-Dollar Companies*, 1–3 Nat'l Found. for Am. Pol'y (Jul. 26, 2022) (noting that only 14% of America's billion-dollar companies, as of May 2022, had a majority of native-born founders), https://tinyurl.com/ 3ae3k4yu; Talent Mobility Fund, *The Return on Investment of TMF's U.S. STEM Track* (Jan. 2025), https://tinyurl.com/2vv9wsub.

[34] *See* Brief for Am. Ass'n of Univ. Professors et al. as Amici Curiae in Support of Plaintiff's Motion for Preliminary Injunction, App. 2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass. filed Apr. 9, 2025), https://www.presidentsalliance.org/wp-content/uploads/2025/04/PA-brief.pdf; Dominic Berardi et al., *Data Snapshot: The Essential Role of Practical Training in U.S. Higher Education and the Innovation Economy*, 11 (Shorelight 2024), https://tinyurl.com/yktd3r43.

[35] NAFSA, *The United States of America Benefits from International Students*, https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf.

year undermines efforts to responsibly allocate resources at impacted member colleges and universities. These institutions often rely on consistent tuition revenue from international students. A sudden decline or unpredictability in enrollment could lead to significant fiscal shortfalls, program cuts, and staffing reductions, threatening the long-term viability of some institutions.

71.     Plaintiffs accordingly challenge Defendants' policy and practice of misusing the SEVIS system to circumvent the law, strip students of their lawful immigration status, and drive them out of the country without process. Plaintiffs maintain that Defendants' policy and practice of revoking student visas as a pretext for terminating SEVIS status are procedurally deficient, contrary to law and regulation, and violative of the U.S. Constitution.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Administrative Procedure Act*
*(Arbitrary and Capricious Visa Revocation Policy)*

**Defendant DOS**

72.     Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

73.     This Court may review and set aside all final agency actions that are "arbitrary, capricious, . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

74.     Defendant Department of State adopted a policy of revoking visas en masse based on the presence of a student's name in the NCIC database. These revocations were carried out without any individualized inquiry. The NCIC database includes a wide range of records that do not establish a criminal history or any derogatory information. It includes individuals who have been arrested but not charged, individuals who received citations, individuals who are considered

missing persons, and individuals who are subject to a protective order. Revoking visas based on an NCIC "hit" lacks a rational connection between the facts relied upon and the decision made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

75. Defendant DOS's policy of widespread visa revocations also represents a sudden and unexplained departure from prior policy and practice in which DOS did not treat NCIC hits as an automatic basis for visa revocation.

76. Defendants' policy of revoking visas en masse based on NCIC hits is arbitrary and capricious, unsupported by reasoned decision-making, and violates the APA.

## SECOND CAUSE OF ACTION
### *Administrative Procedure Act*
### *(Unlawful SEVIS Termination Policy)*

### Defendants DHS and ICE

77. Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

78. This Court may review and set aside all final agency actions that are "otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

79. Defendants have adopted and implemented a policy and practice of terminating SEVIS records of students through means not authorized by statute or regulation. Without explanation or notice and to the best of Plaintiffs' understanding and belief, DHS has terminated SEVIS records based solely on visa revocations by DOS or factors that fall outside the legal framework for SEVIS terminations. The terminations pursuant to the joint process between ICE and DOS fall outside the only lawful means of termination: (i) the criteria set forth in 8 C.F.R. § 214.1(d) or (ii) because the student failed to maintain student status based on the criteria set forth

in 8 C.F.R. § 214.1(e)-(g). ICE's new policy, which permits SEVIS termination based on visa revocation, also falls outside the scope of the agency's authority under the regulations.

80.    Defendants' policy of terminating SEVIS records is not in accordance with law and exceeds the scope of its statutory and regulatory authority.

### THIRD CAUSE OF ACTION
*Administrative Procedure Act*
*(Arbitrary and Capricious SEVIS Termination Policy)*

**Defendants DHS and ICE**

81.    Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

82.    This Court may review and set aside all final agency actions that are "arbitrary, capricious, . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

83.    When an agency changes policy or creates a new procedure that deviates from prior procedures, as they have here in launching a vast program to terminate apparently over 4,000 SEVIS records and having never done so before, they cannot depart from a prior contrary policy *sub silentio* or otherwise disregard rules that are already in place. *FCC v. Fox Television Stations, Inc.* 556 U.S. 502, 515 (2009). If a prior rule or practice has engendered significant reliance issues, the agency must then provide a detailed explanation to uphold the significant deviation of the new policy and practice from the prior practice. *Id.* If a new policy relies on factual findings that contradict those which underly a previous policy, the agency must provide a detailed explanation. *Id.*

84.    Long standing law and the *Accardi* Doctrine requires administrative agencies to adhere to their "own internal operating procedures." *Church of Scientology of Cal. v. United*

*States,* 920 F.2d 1481, 1487 (9th Cir. 1990) (*citing United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 268 (1954)).

85.     Defendants' policy of widespread SEVIS terminations based upon requested and specious visa revocations or a database hit represents a sudden and unexplained departure from prior policy and practice, particularly because for decades, the policy of the U.S. government has been to distinguish a visa revocation from maintaining lawful status. As a matter of law and practice, a visa is the document issued to a student as a means for traveling to the United States whereas status refers to a set of conditions that a prospective and current student must satisfy. The distinction also means practically that a student in the United States can continue to maintain lawful status even where a visa has been revoked or expired. Only after the student leaves the United States would they have to re-apply for a visa in this scenario.

86.      The agency has failed to acknowledge or explain this shift, failed to identify any lawful justification for their actions, and has offered shifting and contradictory rationales when they have shared some small modicum of information explaining their complete turnaround on SEVIS policy.

87.     Defendants' policy of terminating SEVIS records is arbitrary and capricious, violates the "*Accardi* Doctrine" and requires government action without observance of procedure required by law.

## FOURTH CAUSE OF ACTION
### *Administrative Procedure Act*
### *(Promulgating a Rule Regarding Bases for SEVIS Termination Without Following Notice-and-Comment Rulemaking Procedures)*

### Defendants DHS and ICE

88.     Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

89.     Defendants' decision to issue a new ICE policy by way of an electronic broadcast regarding how and when to terminate student SEVIS records is a substantive rule that was required to go through notice-and-comment rulemaking.

90.     Defendants promulgated the policy as a rule without observance of the procedure outlined in 5 U.S.C. § 553.

91.     Despite Defendants' characterizations, the written codification of an agency policy to terminate students' SEVIS records for reasons that now include DOS's revocation of the individual's visa is, in all respects, a substantive rule. *See* 5 U.S.C. § 551(4) (defining "rule" as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

92.     Defendants' failure to follow notice-and-comment rulemaking requirements was not harmless. Defendants failed to provide a meaningful opportunity for notice-and-comment because they declined to provide necessary documents and information to allow stakeholders and the public to meaningfully comment on such a rule. Because Defendants failed to follow the proper procedures, the new ICE policy regarding SEVIS terminations should be vacated and set aside.

### FIFTH CAUSE OF ACTION
*Administrative Procedure Act*
*(Arbitrary and Capricious Intimidation Policy for Communication with Students)*

### Defendant DOS

93.     Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here

94.     This Court may review and set aside all final agency actions that are "otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

95.　　Defendant DOS has issued, and continues to issue, letters and emails directly to international students whose visas were revoked, falsely implying that the visa revocations automatically terminate students' lawful immigration status and required their immediate departure, inaccurately suggesting immediate detention, removal (along with a threat that this could include removal to a third country), or future immigration consequences should the student not depart the United States as directed.

96.　　The DOS Letters materially misstated immigration law, longstanding agency policy, and the position that DHS has taken up in other SEVIS-related litigation. The revocation of a visa has never constituted failure to maintain status, nor is it a basis identified in the regulations for termination.[36]

97.　　 The DOS Letters represent final agency action because they are not preliminary, and directly impact the rights and obligations of affected students by causing them to potentially prematurely abandon their studies and depart the United States, but in all cases requiring them to reapply for a new visa before reentering the United States.

98.　　Defendant DOS's transmission of these letters is arbitrary and capricious, is not in accordance with law, and exceeds the scope of its statutory and regulatory authority.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief:

(a)　　Declare unlawful, vacate, and set aside, DOS's policy of mass revocation of student visas based solely on entries in the NCIC database;

---

[36] U.S. Immigr. & Customs Enf't, *Policy Guidance 1004-04 – Visa Revocations* (June 7, 2010), https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

35

(b)        Enjoin Defendant DOS from pursuing a policy of mass revocation of student visas based solely on entries in the NCIC database;

(c)        Enjoin Defendant DOS from giving legal effect to any visa revocation effective upon departure that was issued pursuant to the unlawful Revocation Policy;

(d)        Declare unlawful, vacate, and set aside DHS's policy of terminating the SEVIS records of F-1 students, including Optional Practical Training applicants and participants, in contravention of the applicable statues and regulations;

(e)        Enjoin Defendants from pursing a policy of terminating SEVIS records for (1) all F-1 students and OPT applicants and participants affiliated with Plaintiff Organization's member institutions; and (2) all F-1 students and OPT applicants and participants in contravention of applicable statutes and regulations, or from giving any legal effect to or reliance upon such terminations;

(f)        Enjoin Defendants from promulgating a new policy regarding termination of SEVIS status without engaging in proper notice-and-comment rulemaking;

(g)        Declare unlawful, vacate, and set aside, DOS's policy of sending communications to international students that are inaccurate and misstate the law regarding the impact of visa revocations on students' lawful immigration status;

(h)        Award costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b); and

(i)        Order any further relief this Court deems just and proper.

DATED: June 27, 2025                    Respectfully submitted,

/S/  Kerry E. Doyle
Kerry E. Doyle (MA BBO #565648)
Stephen J. Antwine (Pa. Bar # 309379)*
GREEN & SPIEGEL, LLC
1524 Delancey Street, Floor 4
Philadelphia, PA 19102
Phone: (215) 395-8959
Fax: (215) 330-5311
kdoyle@gands-us.com
santwine@gands-us.com

*Counsel for Plaintiffs Presidents' Alliance on Higher Education and Immigration, Association of Independent Colleges and Universities in Massachusetts, and Student Doe 4*

Sirine Shebaya (D.C. Bar # 1019748)*
Khaled Alrabe (Cal. Bar # 349899)*
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: (617) 227-9727
Fax: (617) 227-5495
sirine@nipnlg.org
khaled@nipnlg

*Counsel for Plaintiffs Presidents' Alliance on Higher Education and Immigration and Association of Independent Colleges and Universities in Massachusetts*

David Zimmer (MA BBO #692715)
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
617.676.9421
dzimmer@zimmercitronclarke.com

*Counsel for Plaintiff Presidents' Alliance on Higher Education and Immigration*

*Motion for admission pro hac vice granted*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, I electronically filed the foregoing **First Amended Complaint for Declaratory and Injunctive Relief** with the Clerk of the Court using the CM/ECF system, and that in accordance with Fed. R. Civ. P. 5, all counsel of record shall be served electronically through such filing.

Respectfully submitted,


*/s/ Kerry E. Doyle*
Kerry E. Doyle, Esq.
MA Bar No. 565648
Attorney for Plaintiffs
Green & Spiegel, LLC
1524 Delancey Street, Floor 4
Philadelphia, PA 19102
Phone: (215) 395-8959
Fax: (215) 330-5311
kdoyle@gands-us.com