# EXHIBIT B

Testimony of Andre Watson, excerpted from April 29, 2025 full hearing transcript in *Patel v. Lyons*, No. 1:25-cv-1096-ACR (D.D.C.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AKSHAR PATEL,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )  CASE NO. 1:25-cv-01096-ACR
                                       )
TODD M. LYONS, Acting                  )
Director, U.S. Immigration             )
and Customs Enforcement,               )
                                       )
          Defendant.                   )
_____        )

        TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                     OR SUMMARY JUDGMENT
        **BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE**
                  Tuesday - April 29, 2025
                   10:05 a.m. - 11:00 a.m.
                     Washington, DC

**FOR THE PLAINTIFF:**
     Banias Law, LLC
     BY:  BRADLEY BRUCE BANIAS
     602 Rutledge Avenue
     Charleston, South Carolina 29403

     Reddy Neumann Brown, P.C.
     BY:  STEVEN A. BROWN
     10333 Richmond Avenue, Suite 1050
     Houston, Texas 77042


**FOR THE DEFENDANT:**
     U.S. Department of Justice, Civil Division
     BY:  JOHNNY HILLARY WALKER, III
     601 D Street, NW
     Washington, DC 20004

_____
                     **SONJA L. REEVES**
                **Registered Diplomate Reporter**
                **Certified Realtime Reporter**
                **Federal Official Court Reporter**
                 333 Constitution Avenue, NW
                   Washington, DC 20001
          Transcript Produced from the Stenographic Record

(Call to Order of the Court at 10:05 a.m.)

DEPUTY CLERK:  This is Civil Action 25-1096, *Akshar Patel versus Todd M. Lyons*.

Would the parties please come forward and identify themselves for the record.

MR. BANIAS:  Good morning, Your Honor.  Brad Banias and Steven Brown for the plaintiff.

MR. WALKER:  Good morning, Your Honor.  Johnny Walker with the United States Attorney's Office for the defendant. I'm joined at counsel table by Andre Watson, the assist director with Homeland Security; Macklin Everly, who is an associate legal advisor in the district court litigation section at ICE; and Annemarie Brennan-Linnan, chief of the district court litigation section at ICE.

THE COURT:  What a great name you have.

First of all, can anyone tell me why today is also an important day?  It's been on my calendar for a long time. Anyone?  No one?

Today is the day that Rick Atkinson has released his second book in the trilogy on the American Revolution.  If you haven't read his World War II trilogy, I highly recommend it. If you're at all interested in the founding of America and the constitutional system and the Revolutionary War, I highly recommend the first book.

The second book starts off in France with the King and

Marie Antoinette hanging out with Ben Franklin, and the precarious situation that the French were in because they hated England, they just lost the seven-year war and were super upset about that, so they wanted to support the U.S., but they didn't really want to be seen as supporting a bunch of rebels seeking republicanism against the monarchy.

So if you want to hear about how we got rid of the monarchy in the United States, I commend to you his second book.

With that, Mr. Walker, I have a number of questions for you about the administrative record that you filed last night.

MR. WALKER:  Certainly.

THE COURT:  And thank you for doing that.

First -- so the first thing I have is a Tuesday, April 1st, 2025 email at 4:58 p.m. from an Andre Watson to a Mr. Meyers.  And Mr. Watson is the assistant director for the U.S. Department of Homeland Security, ICE.  And he says, "In furtherance of our student criminal alien initiative, the attached letterhead," et cetera.

What is the student criminal alien initiative?

MR. WALKER:  I don't know precisely what the scope of that is.  I think what you see described in this record and throughout the administrative record is sort of the process that Mr. Watson described.

THE COURT:  Well, there was no process, just to be clear.  There was an email saying "here are the people," and an email saying "get rid of them all."  So we'll go through that process, but I want to know, what is the student criminal alien initiative?

MR. WALKER:  Like I said, I don't know the exact scope of what that is.

THE COURT:  Well, where is it?  Where can I find it?

MR. WALKER:  Where is the initiative?

THE COURT:  Yeah, where can I find it?

MR. WALKER:  I believe that that's just a term that is being used here by Mr. Watson to refer to what was described in the declaration where ICE ran a number of students through the NCIC, passed the hits along to the Department of State, and then the Department of State passed the information back to ICE about requesting that certain of those records be terminated in SEVIS, and the records were terminated in SEVIS based on the criminal record.

THE COURT:  Okay.  You're from DHS?

MR. WATSON:  Yes, ma'am.

THE COURT:  Do you know what the student criminal alien initiative is?

MR. WATSON:  Yes, ma'am.

THE COURT:  What is it?

MR. WATSON:  This initiative --

THE COURT:  First of all, come on up.  Are you an attorney?

MR. WATSON:  No, ma'am.

THE COURT:  Great.  You survived not having to go to law school, and, yet, here you are.

Give me your name again, sir.

MR. WATSON:  It's Andre Watson.

THE COURT:  Oh, we met last time.

MR. WATSON:  Yes, ma'am.

THE COURT:  Welcome to the DC area.

MR. WATSON:  Thank you.

THE COURT:  First of all, where can I find the student criminal alien initiative?

MR. WATSON:  This initiative is centered at DHS headquarters.

THE COURT:  Is it in writing anywhere?

MR. WATSON:  No, ma'am.

THE COURT:  It's just out there in the world?

MR. WATSON:  It's a name that was given by my staff to this specific effort to scrub records from SEVIS through NCIC to determine if there were positive criminality hits within NCIC.

THE COURT:  When you say -- tell everyone what NCIC is.

MR. WATSON:  National Crime Information Center.

THE COURT:  It's a database of people, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  It includes people who have been arrested but not tried, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  It includes people who have been arrested but not convicted, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  It includes people, I suppose, who have a ticket for reckless driving, even if those charges were not brought, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  It includes people who are missing, missing people records, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  So when we say the -- what did you call it again?  National -- what was it again?  National what?

MR. WATSON:  National Security Division.

THE COURT:  No, no, NCIC.

MR. WATSON:  National Crime Information Center.

THE COURT:  So when we say the National Crime Information Center, we don't mean that everyone in the database has committed a crime, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  I'm right about that?

MR. WATSON:  Yes, ma'am.

THE COURT:  For example, it would be inappropriate to run NCIC for a bunch of names, have them pop up and terminate them based on that reason alone, right?

MR. WATSON:  I'm sorry?

THE COURT:  It would be inappropriate to run through the SEVIS database a number of names, have them pop up as being in the database, and then terminate them on that reason alone, right?  Because it could be that they were never charged.  It could be that they were just there for speeding.  It could be that they were just missing persons, right?

MR. WATSON:  That's fair, but it's done on a case-by-case review, and that is what my staff endeavored to do based on the positive hits that were identified.  And as such, we categorized those positive hits based on the charge and any disposition.  And from there, the appropriate responses were categorized in spreadsheets that were then sent to the Department of State.

THE COURT:  How big of a staff did you have doing this?

MR. WATSON:  Rough order of magnitude, I would put it between 10 to 20 federal employees.

THE COURT:  What exactly did they do?  How did they start?

MR. WATSON:  I'm sorry, ma'am?

8

THE COURT:  What exactly did these 10 to 20 people do?

MR. WATSON:  These 10 to 20 people serve in various roles as analysts --

THE COURT:  I don't care what they do.  I mean, apparently what they did was not important enough to pull 10 to 20 federal employees to search a bunch of records for students who were in the U.S. legally.

Let's put aside what they do during their day jobs and just focus for me right now on what they did with respect to this effort.  You got them together and you told them to do what?

Were you in charge of this effort, sir?  You said it was your staff.

MR. WATSON:  My staff supported the effort, so --

THE COURT:  Who is in charge of the effort?  Who is like the head honcho on this effort?

MR. WATSON:  For my program office, that is acting executive associate director Robert Hammer.

THE COURT:  Hammer?

MR. WATSON:  Yes, ma'am.

THE COURT:  Appropriate last name given what has happened, but go ahead.

MR. WATSON:  So at the instruction of leadership, we, being ICE, took action --

THE COURT:  Leadership at DHS?

MR. WATSON:  Yes, ma'am.

THE COURT:  You, ICE, took action.

MR. WATSON:  To take the population of nonimmigrant students studying in the United States and run them through NCIC.

THE COURT:  So name by name, everyone had to be run through this database?

MR. WATSON:  Yes, ma'am.

THE COURT:  How many people did you run through this database?

MR. WATSON:  Just under 1.3 million.

THE COURT:  Are you telling me that with all of the cost-cutting that we have going on right now, because apparently we're spending too much money on the federal government doing things like, oh, I don't know, funding cancer research, can't afford to do that, that we had -- not "we," someone had 10 to 20 federal employees spend their time going name by name in a database to see what hits they got for 1.3 million people?  Is that what happened?  Yes or no.

MR. WATSON:  Yes, with contract support.

THE COURT:  Hold on.  And once you ran -- how long did that take?

MR. WATSON:  I would estimate between two to three weeks.

THE COURT:  Okay.  Now, humor me.  What were these

other people who were taken away from their jobs for two to three weeks putting names into a database to see what hits they would get, what other things would they normally be doing?

MR. WATSON:  This is part of our lines of effort.  So within my division annually, we are responsible for taking data from various sources to determine if in fact we have overstays or people that are out of status.

THE COURT:  When was the last time that the government made an effort to take a number of employees to put all students who are here on visas through the NCIC database?

How long have you been in your office?

MR. WATSON:  I've been in this role for over four years.

THE COURT:  In your four years in the role, how often has that happened, for the students -- to put all the students in the U.S. here on visas through the database, NCIC database?

MR. WATSON:  We do in addition to students.

THE COURT:  No, no, I'm just asking about students. When was the last time that there was an initiative somewhere along the line of the student criminal alien initiative?

MR. WATSON:  For specific students, I'm not aware of an effort at this magnitude.

THE COURT:  Now, of the 1.3 million people that 10 to 20 federal employees spent to two to three weeks -- I just want to make sure I understand this.

If I'm one of the federal employees, I would have a list of all the students here on F-1 visas, right?

MR. WATSON:  Uh-huh.

THE COURT:  And I would be given, I don't know, 1,000 of the names to handle.  And the first name would be Jane Smith.  So I would go to the NCIC database and put in the name Jane Smith, correct?

MR. WATSON:  In that instance, these were batch runs, so based on the capabilities that already exist within --

THE COURT:  How many batch runs were run?

MR. WATSON:  I don't have the exact number.

THE COURT:  But enough for us to be spending time going through 1.3 million people, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  And out of those 1.3 million people that 10 to 20 federal employees spent to two to three weeks tracking down in NCIC, how many of those came up as a hit in the NCIC system?

MR. WATSON:  Over 16,000, and then from there, the number went down to 13,900.

THE COURT:  And then what went down from there?  Hold on one second.  16,000 out of 1.3 million people?

MR. WATSON:  Yes, ma'am.

THE COURT:  You want to tell me what percent that is?

MR. WATSON:  I don't know off the top of my head.

THE COURT:  All right.  It's less than 1 percent. It's less than 100th of a percent.

Now, of those 16,000 people --

Sam, can you get me the right number since you're our math person?

Of those 16,000 people, what happened next?

MR. WATSON:  Continued analysis to, one, validate the match between what the NCIC record was against what the SEVIS record was.

THE COURT:  Because you might have a John Smith, then it would be a different John Smith?

MR. WATSON:  Yes, ma'am.

THE COURT:  So when we did that, how many people came out of the 16,000?

MR. WATSON:  Just over 6,400.

THE COURT:  So then we're down to 10,000.

MR. WATSON:  Below 10,000.

THE COURT:  What happened next with those 10,000?

MR. WATSON:  Those were consolidated on spreadsheets based on close of business activities, and then referred to the Department of State.

THE COURT:  What does "close of business activities" mean?

MR. WATSON:  How many you can do in one day.

THE COURT:  Oh, so batches would go to them?

MR. WATSON:  Correct.

THE COURT:  And then you sent that off to State?

MR. WATSON:  Yes, ma'am.

THE COURT:  And then what happened?

MR. WATSON:  State conducted their own analysis.

THE COURT:  Do you know what State did?

MR. WATSON:  No, ma'am.

THE COURT:  Okay.  Go ahead.  Do you know who you were interacting with at State?

MR. WATSON:  Primarily, John Armstrong.

THE COURT:  What's his role?

MR. WATSON:  But in his absence, there were delegates.

THE COURT:  Who is Mr. Armstrong?  What's his role at the State Department?

MR. WATSON:  He's the senior official for the Bureau of Consular Affairs.

THE COURT:  Consular affairs, that's diplomats?

MR. WATSON:  I don't know.

THE COURT:  You don't know.  Okay.

So then how many hits do you get back -- you don't know how many people at the State Department were running these 10,000 names, right?

MR. WATSON:  Not exactly, no, but I know we referred over 6,400 to them.

THE COURT:  6,400 is the number you referred to them?

MR. WATSON:  That's correct.

THE COURT:  Got it.  I made a mistake.  You referred to State 6,400 names out of the 1.3 million?

MR. WATSON:  Yes, ma'am.

THE COURT:  Sam, can you tell me what percentage that is when you get it?

MS. BLOND:  0.5 percent.

THE COURT:  So less than half of a percent?

MR. WATSON:  Yes, ma'am.

THE COURT:  How many names did State send back to you?

MR. WATSON:  All of the names came back, but there were some who had revocations based on a valid visa.

THE COURT:  Tell me what that means.  What's a revocation based on a valid visa?

MR. WATSON:  That they are in status for the purposes of the visa, but State conducted revocation.

THE COURT:  You mean State took the visa away?

MR. WATSON:  I think so.

THE COURT:  Okay.  And State didn't tell you why they did it?

MR. WATSON:  I did not see the State response to say why.

THE COURT:  It's just they gave you a bunch of names back -- one set of names they gave you back is these are visas we revoked, right?

How long did that turnaround take, by the way?  You gave them 6,000 names.  When did they give you back the names?

MR. WATSON:  The names came back as they completed their activities on specific spreadsheets.

THE COURT:  What was the time lag for the first rolling production?

MR. WATSON:  There was, I would estimate, within a weekly cadence of responses that occurred for at least three weeks.

THE COURT:  So we basically have another three weeks of work at the State Department?

MR. WATSON:  I believe that's accurate.

THE COURT:  So they send you back a list of names of people that you had sent them, and here people who were in status, their visas were fine, but now State has revoked them, right?

MR. WATSON:  There were some, yes.

THE COURT:  How many of those were there?

MR. WATSON:  By rough order of magnitude, over 3,000.

THE COURT:  3,000 people?

MR. WATSON:  Yes, ma'am.

THE COURT:  Who were in status, they were going about their days, you send a list to State, and State sends you a list of 3,000 people and we're going to revoke their visa, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  They told you to terminate those people in SEVIS, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  Who else did they send back?

MR. WATSON:  Those with expired visas.

THE COURT:  And then there were people with expired visas?

MR. WATSON:  Visas that are not valid, yes, ma'am.

THE COURT:  And so those people they didn't need to revoke because they were already expired and they told you to terminate in SEVIS, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  Do you have any understanding whether State reached out to any of those individuals before sending the list back to you to say, "Hey, we're about to terminate your visa," or, "Hey, why aren't you in status, why is this expired," or, "Hey, just as a heads-up, you're about to be getting, you know, a notice that you have been terminated from SEVIS and we want you to have the opportunity to tell us why you shouldn't have your visa revoked"?  Do you know if that happened?

MR. WATSON:  I would defer to State on that.

THE COURT:  Can you and I both agree that since you were getting these back within a week and within three weeks

total that there was no notice sent out?

MR. WATSON:  I think that's a case-by-case assessment.

THE COURT:  Mr. Walker, are you aware as to whether or not State sent a notice to anyone?

MR. WALKER:  I'm not aware, Your Honor.  I want to clarify one point on the discussion that was just had.  I just wanted to clarify that when we're talking about the State Department revoking visas, we're talking about the State Department revoking a travel visa to travel into the United States, not status.

THE COURT:  Okay.  So they were still in status?

MR. WALKER:  Yes, ma'am.

THE COURT:  Even though they were still in status and validly here on status, the State Department sent them back to you and told you to terminate them in SEVIS?

MR. WALKER:  Yes.

THE COURT:  All right.  Plaintiff's counsel, did Mr. Patel receive any notice from State that his visa was being revoked or he was about to be terminated?

MR. BANIAS:  No, Your Honor.  His visa was expired at the time this all happened.

THE COURT:  He was in status?

MR. BANIAS:  Yes, Your Honor.

THE COURT:  It's okay if your visa is expired because a visa just gets you into the country.  The question is whether

or not you're in status?

MR. BANIAS:  Correct, Your Honor.  He had legally and properly changed his status after entering the country.

THE COURT:  Got it.  Your represent a number of these plaintiffs, right?

MR. BANIAS:  Yes, Your Honor.

THE COURT:  How many do you represent about, approximately?

MR. BANIAS:  Probably about 125.

THE COURT:  Of those, are you aware of State sending or DHS or anyone sending them any kind of notice that these actions were about to occur?

MR. BANIAS:  Not a single one.

THE COURT:  So then State sends you back the list, and then what happens?

MR. WATSON:  We provided instructions to -- "we" being National Security Division, working group counterthreat lead development, provided instructions to the Student Exchange Visitor Program.

THE COURT:  Say that again.  I wasn't listening.  I apologize.

MR. WATSON:  The National Security Division counterthreat lead development unit passed the list from the Department of State to the Student and Exchange Visitor Program to action termination in SEVIS.

THE COURT:  So what happened was State gives it back to DHS and DHS says -- and State says terminate these people, and then you do?

MR. WATSON:  Yes, ma'am.

THE COURT:  I want to go through some timeline here for you so you can sort of help me out with this.

MR. WATSON:  Yes, ma'am.

THE COURT:  Does he have a copy of the administrative record?

MR. WALKER:  It's right here in front of him.

THE COURT:  Sir, the first email I see in the administrative record is from Tuesday, April 1, 2025 at 4:58 p.m.  Do you see that?

MR. WATSON:  Yes, ma'am.

THE COURT:  And you sent it to Shane Meyers?

MR. WATSON:  Yes, ma'am.

THE COURT:  Who is Shane?

MR. WATSON:  He is the acting principal deputy assistant secretary.

THE COURT:  For?

MR. WATSON:  The Department of State.

THE COURT:  So you send this list to State of 735 names.  This is part of the 6,000 names.  This would have been one batch?

MR. WATSON:  Yes, ma'am.

THE COURT:  And you send this to him April 1, 2025 at 4:58 p.m.?

MR. WATSON:  Yes, ma'am.

THE COURT:  Okay.  And then if you look down, there is an email on April 2nd, 2025 at 3:35 p.m. from someone at State to someone at DHS.  Do you see that?

MR. WATSON:  No, ma'am.

THE COURT:  If you go to page -- at the bottom you will see AR023.

MR. WATSON:  Yes, ma'am.

THE COURT:  So you see that on April 2nd, 2025, 3:35 p.m., someone from State sends an email to someone from DHS.

Do you see that?

MR. WATSON:  Yes, ma'am.

THE COURT:  Okay.  So this would be less than 24 hours after you sent your email to Mr. Meyers, right?

MR. WATSON:  Appears to be the case, yes, ma'am.

THE COURT:  And in your email, you said, "Here is 735 foreign students submitted for your review and any action deemed appropriate," right?

MR. WATSON:  Yes, ma'am.

THE COURT:  And the reason I have this email from you, this particular email, is because Mr. Patel, the plaintiff in this case, came up in this spreadsheet, right?

MR. WALKER:  We have unredacted that portion.

THE COURT:  And then he responds within less than 24 hours, "We have run the delta data against our systems.  The first tab lists individuals with valid visas.  How would you like us to prioritize revocation of these visas?"

Do you see that?

MR. WATSON:  I do.

THE COURT:  The second tab is, "Students without a valid visa, we request that DHS terminate SEVIS status for these individuals, as there is no valid visa for us to revoke and they are admitted under duration of status."

Do you see that?

MR. WATSON:  I do.

THE COURT:  So then someone at Homeland Security Investigations -- is that DHS or is that State, National Security Division?

MR. WATSON:  That's DHS.

THE COURT:  So someone sends back -- that's not you though, right?

MR. WATSON:  That's correct.

THE COURT:  So someone at State, the division chief -- who is the division chief?

Mr. Walker, why is this redacted?

MR. WALKER:  We have redacted the level of certain employees.  Some are not redacted, but it's just a privacy interest.

THE COURT: Well, you know I could go online and find out who the division chief is, right? You can assume I have asked my clerk to do that. So you want to just tell me the name?

MR. WALKER: I don't know that, Your Honor. It may or may not be online.

THE COURT: Who was it?

Oh, Mr. Hammer. Robert Hammer would be the person who communicated back to you.

MR. WATSON: This Exhibit 17?

THE COURT: Yeah.

MR. WATSON: Well, the division chief is not me.

THE COURT: No, no, no. I'm sorry. Someone responded to --

MR. WATSON: Yes, that is a subordinate employee within the National Security Division.

THE COURT: Okay. And that person sent back the response on April 2nd, 2025 at 3:50 p.m. Do you see that?

MR. WATSON: I do.

THE COURT: So a question goes out. We have 700 names here, because the list from April 2nd, 2025 is also the list -- the same list from the day before because it also contains Mr. Patel, right?

MR. WATSON: I believe so.

THE COURT: Thank you. So with less than 24 hours,

someone has run this list through something, and says, "We have people with a valid visa.  How would you like us to prioritize revoking these visas?"

And then we have another person -- we have groups without valid visas because they are expired.  And State says, "Terminate both of these," right?  "Terminate the people without the valid visa from SEVIS," right?

MR. WATSON:  Yes, ma'am.

THE COURT:  State does not ask that the people in the first tab be terminated from SEVIS, right?

MR. WATSON:  I don't see that in the instruction.  I don't see that in the email.

THE COURT:  All right.  And then somebody, Mr. Hammer, within 15 minutes of careful thought and consideration, says, "Please terminate everyone in SEVIS," right?

MR. WATSON:  Ma'am, that's not Mr. Hammer.  He doesn't serve as the division chief.

THE COURT:  Well, whoever.  Someone at National Security Division, Homeland Security Investigations division chief -- and, Mr. Walker, I want a name of that by the time we leave today, so if someone can get on that -- sends, after careful consideration for 15 minutes, "Terminate everybody," right?

MR. WATSON:  Yes, ma'am.

THE COURT:  Can you and I agree that nowhere in this

entire process has anyone done an individualized determination of any of these individuals before their names were terminated in SEVIS?

MR. WATSON:  When you say "individualized determination," that is --

THE COURT:  I mean no one looked at Mr. Patel's case and said, "Yeah, here is somebody who should no longer be in the United States," right?

MR. WATSON:  Ma'am, my team --

THE COURT:  To your knowledge, no one did an individualized assessment as to whether or not Mr. Patel should be or should not be in the United States, right?

MR. WATSON:  Individualized assessment of every person?

THE COURT:  Yes.

MR. WATSON:  Each record was scrutinized based on the criminal history.

THE COURT:  Yeah, but Mr. Patel got a citation for reckless driving, which is a misdemeanor in Texas.  By the way, it's also a misdemeanor in Virginia.  If you go over 70 miles an hour, you actually have a criminal defense case against you. Don't ask how I know that.

And he was pulled over for, quote-unquote, "reckless driving," which just meant he was speeding, and no charges were ever brought.  In fact, when I looked at his record that you

sent me in the administrative record, it said very clearly, "case dismissed," right?

MR. WATSON:  Following a complaint being filed and him meeting the terms of the agreement, yes.

THE COURT:  Well, can you and I both agree that if we deported every single individual in this country who has been tagged for speeding, there would be very few people left and almost all of them would not have driver's licenses?

MR. WATSON:  I don't know that we have the capacity at this present time to do that, Your Honor.

THE COURT:  But you and I both know that Mr. Patel is not a criminal, right?  And anyone looking at the record would know that he's not a criminal, right?

In fact, Mr. Patel tells me, and I assume you have no reason to not believe him, that he had disclosed the speeding ticket at least two times to government agencies when seeking to keep in status.  He was quite forthright about it, and, obviously, the government people said, "Fine.  People speed. Let's all move on."  They weren't tagged.

By the way, did you know that?  Was there an individualized assessment with Mr. Patel where you knew or State knew that the government, the United States government had already assessed this speeding ticket and had found it not to be a reason to take him out of status?

MR. WALKER:  Just to clarify, Your Honor, Mr. Patel

was not taken out of status.  His SEVIS record was terminated.

THE COURT:  But upon termination, the law they cite me says he has to leave the country.

MR. WALKER:  Your Honor, one of the questions you wanted us to answer today was, was Mr. Patel lawfully present in the United States?  Is he now and was he at the time that his SEVIS record was terminated?  The answer to that is yes.

THE COURT:  Did the termination require him upon termination to leave the country immediately?

MR. WALKER:  It did not.  He was lawfully present in the United States.

THE COURT:  No, no, no.  You're not answering my question.  I want to know what the effect is of a termination of SEVIS.  They are telling me based on the law that the actual law is he has to either leave the country immediately or get it changed somehow, which I assume is legally, through the court system.

MR. WALKER:  No.  Upon the termination of a record in SEVIS, he remains lawfully present in the United States.

THE COURT:  So what are his obligations?

MR. WALKER:  It depends on how the school reacts to the termination of the record in SEVIS.  The school may require --

THE COURT:  We're going to get into the merits of this later, because I know that they disagree with everything that

you're saying right now.  Let's keep on the non-process process here for a bit.

Mr. Patel and 6,000 other people with 15 minutes of consideration by people after they hear from State and less than 24 hours of consideration by State, thousands of people get terminated from SEVIS, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  Students?

MR. WATSON:  Yes, ma'am.

THE COURT:  Students who are in the country studying, right?

MR. WATSON:  Yes, ma'am.

THE COURT:  A number of them, if not thousands of them, who were legally in status and had no issue with their being in the country, right?

MR. WATSON:  To the best of my knowledge.

THE COURT:  To the best of your knowledge, right?

MR. WATSON:  Yes.

THE COURT:  Okay.  Let's do a quiz today.  Anyone know where the due process clause from the Fifth Amendment comes from?  Anybody?  Nobody knows where the due process clause or the Fifth Amendment comes from?  Not my clerks?  We're going to have discussions afterwards.

It comes from Article -- Chapter, Article, whatever you want to the call it, 39 of the Magna Carta.  That's where

it first appeared. It appeared as the law of the land. It was amended in the 1300s to be due process, but the due process comes from the Magna Carta.

Anyone want to remind me what century the Magna Carta was in? It was in the 1200s. So when I say, or when the courts say due process is important, we're not unhinged, we're not radicals; we are literally trying to enforce a process embodied in probably the most significant document with respect to peoples' rights against tyrannical government oppression. That's what we're doing here. Okay?

I'm not on a lark questioning why students who have been here legally, who paid to be in this country by paying their universities, who have studied to try to become better people if they stay in the U.S. or when they go back to their homes or countries, people who are trying or months away from getting engineering degrees, and they are cut off with less than 24 hours of consideration and no notice whatsoever.

So, Mr. Walker, we're going to have a long discussion about that.

Mr. Watson, is there anything else -- and I may have questions for you later on. Is there anything else about the process that I should know about?

MR. WATSON: Your Honor, I would just note that with the terminations, that is a red flag, and it is a red flag to determine if the student is still in compliance with their F

and/or M visa.

THE COURT:  But you didn't have to terminate people in SEVIS to do that, right?  You could have sent a letter to all the universities that had these students and said, "These people have come up on a hit, you may want to check them out," because termination is -- well, all right.  I understand your view.  Thank you.

Mr. Watson, I will say I know that this isn't pleasant for you, because you're on the end of a bunch of questions, but I have to say I have found you both last hearing and this hearing to be very on top of what's going on and very forthright and very helpful.  So thank you.

MR. WATSON:  Thank you, Your Honor.

THE COURT:  You can be seated.  I can't promise you won't be up here again.

MR. WALKER:  Your Honor, the name you asked for is Antoine Rines (ph).

THE COURT:  Thank you.

Can I get the plaintiffs up here.  Actually, let me do this.  Let me go through these questions I had for you.

Since I'm from Kentucky, you'd probably be doing a lot better with me if your name was "Maker's Mark."

MR. WALKER:  I'm also from Kentucky.

THE COURT:  Where are you from?

MR. WALKER:  I was born in Louisville and went to

MR. WALKER:  Understood.

THE COURT:  You guys have a week to get that language to me.  If you need more time, let me know.  If there is an issue that you guys can't agree, before you file something, email my chambers.  We'll have a quick call and we'll see where to go from there.

The TRO expires on Thursday.  I assume, Mr. Walker, you can represent that nothing is going to happen to Mr. Patel while you two are working this out, right?

MR. WALKER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, everyone.

(Proceedings concluded at 11:00 a.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of April, 2025.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER