# EXHIBIT C

Testimony of Andre Watson, excerpted from May 5, 2025, full hearing transcript in *Bushireddy v. Lyons*, No. 1:25-cv-1102-SLS (D.D.C.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
MANSI REDDY BUSHIREDDY,

                                CA No:  1:25-cv-01102-SLS

        Plaintiff,

                                Washington, D.C.
                                Monday, May 5, 2025
v.                              10:04 a.m.

TODD M. LYONS,

        Defendant.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiff:       **BRADLEY BRUCE BANIAS, ESQ.**
                         **BANIAS LAW, LLC**
                         602 Rutledge Avenue
                         Charleston, SC 29403
                         (843) 352-4272
                         brad@baniaslaw.com

                         **STEVEN A. BROWN, ESQ.**
                         **REDDY NEUMANN BROWN, P.C.**
                         10333 Richmond Avenue, Ste 1050
                         Houston, TX 77042
                         (713) 429-4793
                         steven@rnlawgroup.com

For the Defendant:       **HEATHER D. GRAHAM-OLIVER, ESQ.**
                         **JOHN CUONG TRUONG, ESQ.**
                         **U.S. ATTORNEY'S OFFICE FOR D.C.**
                         555 Fourth Street, NW
                         Washington, DC 20530
                         (202) 252-2520
                         heather.graham-oliver@usdoj.gov
                         john.truong@usdoj.gov

Court Reporter:          Lisa A. Moreira, RDR, CRR
                         Official Court Reporter
                         U.S. Courthouse, Room 6718
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         (202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY:  This is Civil Matter 25-1102, *Mansi Reddy Bushireddy v. Todd M. Lyons.*

Starting with plaintiff's counsel, please identify yourself for the record.

MR. BANIAS:  Good morning, Your Honor, may it please the Court; Brad Banias and Steven Brown for the plaintiffs.

THE COURT:  Good morning, Counsel.

MS. GRAHAM-OLIVER:  Good morning, Your Honor, may it please the Court; Heather Graham-Oliver on behalf of the government.

THE COURT:  Good morning, Counsel.

All right.  We're going to start with the government.  I hope everyone had a good weekend.  I have read all of the many filings.  Thank you for getting them done on short timelines.

So I've got a bunch of questions for you, Ms. -- is it Ms. Graham-Oliver?  Is that right?

MS. GRAHAM-OLIVER:  Yes, Your Honor.

THE COURT:  Or is it just Oliver?

MS. GRAHAM-OLIVER:  That's fine.

THE COURT:  Okay.  Great.

So I want to just zoom out from this case and talk about this mass termination program.  I have been calling it

a mass termination program.  Now I see from the administrative record that the government calls it the Student Criminal Alien Initiative, so I just want to zoom out and talk about that before we talk about the facts of this case.

So tell me about this Student Criminal Alien Initiative.  How did it come about?

MS. GRAHAM-OLIVER:  Your Honor, I do not know how it came about.  It's not a program per se, but it's a name that was given by ICE National Security Division staff to this specific effort to scrub records from SEVIS through NCIC to determine if there were any positive hits within NCIC.

THE COURT:  So, Counsel, do you have your declarant here to tell me about this if you don't know the answer to how this program came about?  Does the government have witnesses here to answer my questions about the program?

MS. GRAHAM-OLIVER:  Your Honor, we do not have a declarant here.  I can call the agency.  I do not have a declarant here, no, Your Honor.

THE COURT:  Counsel, I know you were not before me last week, but I assume Mr. Carilli briefed you and you reviewed the transcript from the last proceeding about the questions that I had and my request that you show up here

today prepared to answer them or bring someone who could answer the questions.  Did you review that?

MS. GRAHAM-OLIVER:  Yes, Your Honor, I did.  Yes.

THE COURT:  And yet you're showing up here telling me you don't know the answers to the questions, and your declarant is not here.

MS. GRAHAM-OLIVER:  Your Honor, I don't know how it came about; however, it's a name that was given by ICE National Security Division staff.  And what happened is that they said that they scrubbed the records from SEVIS through --

THE COURT:  Counsel, we have another hearing at 11:30.  I'm going to give you a minute to talk to who you need to talk to, and I would like you to have people here who can answer the questions that I asked two weeks ago of the government.  And then you can come back to the podium.

MS. GRAHAM-OLIVER:  Yes, Your Honor.

Are there any --

THE COURT:  And I will continue questioning you, but I want to make sure that someone can show up here at my next hearing to answer those questions.

MS. GRAHAM-OLIVER:  I'm going to have to go out and make a phone call.

THE COURT:  Sure.

(Pause)

say I'm like a grad student, and I --

THE COURT:  No, I understand.  I just want to walk through and understand how this works.  Stop me when you think I'm wrong.

ICE ran these lists against the NCIC.  It generated a long list.  How long was that list?

MR. HUDAK:  Mr. Watson, who just joined us, probably has the number handy.  I believe it is -- I think it was 6,400 names.  Is that correct, Mr. Watson?

THE COURT:  Why don't we turn to Mr. Watson since he's here.  Thank you, Mr. Hudak.

Mr. Watson, thank you for coming.

MR. WATSON:  Good morning, Your Honor.

THE COURT:  Thank you, and thank you for joining on short notice.  I'm not going to swear you in.  I'm just looking for some answers to my questions that I am hoping you can provide.

So I am trying to understand the Student Criminal Alien Initiative, and I will start back at the beginning.  Tell me what you know about how this mass termination effort, which is called in this email the Student Criminal Alien Initiative, how did it come about?

MR. WATSON:  So, Your Honor, this initiative came about following an examination of the executive order regarding anti-semitism activities in the United States.

THE COURT:  Oh.

MR. WATSON:  So we went from noncitizen aliens that were within the scope of the executive order on anti-semitism, and we shifted from that focus then to F-1 and M-1 students that were currently studying in the United States.  And the question was with this population of students how many of them have derogatory information known.

So the requirement was for us to run that population of students through NCIC, and we did so.  So the rough order of magnitude for that population was just under 1.3 million F and M visa holders.  And from that population run, Your Honor, we came up with about 16,000 records that showed a positive result in NCIC.

And from that 16,000, my division was responsible then for checking the data against the actual records.  And from those checks of the 16,000, the population went down to about 13,900.  And then from that population, we then brought it down to 6,400 individuals that had a positive NCIC record or an encounter with law enforcement officers.

From that 6,000 --

THE COURT:  Okay.

MR. WATSON:  Yes, ma'am, I'm sorry.

THE COURT:  Actually, finish with the numbers, and then I'll go to my questions.

MR. WATSON:  Yes, ma'am.  So with that 6,400,

ma'am, we generated lists, and the lists were generated based on what I'll call productivity in the day.

So we didn't do one list for the entire 6,400. As our contract staff went through the list and compared the records against the SEVIS records and the identities, when we had a confirmed match, we then categorized that information on spreadsheets, and those spreadsheets were provided to the Department of State Bureau of Consular Affairs for action as deemed appropriate.

So --

THE COURT: Okay. Let's stop there, then, with where you send stuff to the State Department. Let me understand your process.

So 1.3 million visa holders. You matched that against this NCIC list, and that came -- you came up with 16,000 records. And then what kind of checks are your staff doing with that 16,000? Like how did you get the 16,000 down to 13,900, and then what additional checks are you doing to get it down to 6,400?

MR. WATSON: So the checks that were done on the 16,000 were to match the names and any PII, personally identifiable information. So there were instances where there were not name matches due to misspellings in names or due to misspellings in the NCIC records. So our contract staff is responsible for matching the NCIC record and the

person lists therein against the SEVIS record and the person therein.

So if we had a positive match on a name and a date of birth, then the second part to it was to see what the NCIC record had in terms of an arrest encounter.  So if we could see that there was an arrest based on an encounter with the law enforcement officer whereby this student was charged, the question was then what was the charge?

So we would check the NCIC record to see what was entered by the arresting agency.  So it could be a charge like shoplifting.  It could be a DUI.  Whatever charge we saw applicable to that student we then put in a spreadsheet.

We also looked at whether or not there was a disposition on the charge, whether or not it was a conviction, whether or not it was unknown, whether or not it was either dismissed or nolle prosse'd.  All of that information, when it was available, was categorized on the spreadsheet so that anyone seeing the spreadsheet would know we have a match, this is the charge and, if the disposition was known, what the disposition was.

My staff even went one step further internally to color-code the individuals to show if there was a disposition versus one that required additional investigation versus one that did not have a disposition, meaning dismissed or nolle prosse'd that was actionable.

THE COURT:  So why, if someone is arrested like one of my plaintiffs -- I'm not making this up.  If someone was arrested for violating a traffic law, the officer went back, looked at the video, found out that that person, in fact, did not violate the traffic law, it was a mistake so thus never brought charges, so you're going to look that person up.  It says arrested, no charges ever brought, and that person stays on your list for potential termination even though that person was mistakenly arrested or at least it's clear to you from looking at NCIC that that person never had had charges brought against them?

MR. WATSON:  So, ma'am, that wasn't a mass list of terminations.  It was a list of referrals for State Department consideration.  That's what the list was for, and that's what we provided to the Department of State.

THE COURT:  Got it.  So you guys generated -- let me ask my question again.

So you guys generated a list not for termination, just to identify people who had any law enforcement interactions, and those law enforcement interactions would not actually lead to a termination of someone's F-1 status.  But you generate that list, and then you refer it to the State Department because they've got a lot of discretion to revoke visas, and then they decide what they're going to do.  Visas get revoked, and it comes back to you, and then you

terminate the SEVIS record, thus essentially like terminating these people's F-1 status.

That was this Student Criminal Alien Initiative in furtherance of the President's -- okay.

MR. WATSON:  The list that we generated -- I'm sorry, Your Honor.  Forgive me.  I didn't mean to overspeak.

THE COURT:  No, go ahead.  You can finish.

MR. WATSON:  The list that we generated for State Department consideration were those students that had a record of a positive interaction with law enforcement.  It was referred to the Department of State for their consideration as it relates to their visa.

The results that were returned back to us by the Department of State as to whether or not they either revoked the visa or the visa had expired, okay, was then given to us.  And based on the existence of derogatory information and the request from the Department of State, the records were terminated.

THE COURT:  Okay.  I now have a very clear understanding of how this Student Criminal Alien Initiative happened, and I thank you for answering those questions, Mr. Watson.

Let me ask you a question I've been asking for a long time.  The government's position, which the plaintiffs clearly don't find credible, is that a SEVIS termination has

no impact whatsoever on a student's F-1 status here.  What is the purpose of a SEVIS termination if it has no impact whatsoever on students' F-1 status?

MR. WATSON:  It serves as a red flag and could lead to further investigation by those having access to SEVIS, and that includes academic institutions.

THE COURT:  And based on what you've seen, academic institutions have, in fact, taken action based on SEVIS terminations, kicking students out of classes, terminating their OPT training programs, telling them they can't -- they can no longer go to work, correct?

MR. WATSON:  Ma'am, I don't have that level of granularity as it relates to those outcomes.

THE COURT:  Okay.  Thank you.

Let me ask you.  So everyone you got back from the State Department having their visa revoked, you did the SEVIS termination based solely on the revocation of the visa or based on, as you call it, derogatory information in that person's file, or both?

MR. WATSON:  Both.  But if the State Department also requested the termination, we executed on that.

THE COURT:  So of the 6,000 people or so that went over to the State Department, how many requests for SEVIS terminations did you get back?

MR. WATSON:  I can't give you an exact number on

the request of terminations, but I can tell you that the revocations were in excess of 3,200.

THE COURT:  Okay.  And did you only terminate records where the State Department requested that you do so, or did you also terminate records based on the derogatory information you found in the NCIC system?

MR. WATSON:  Your Honor, we terminated records that had visas revoked or at the recommendation of the Department of State.  And that rough order of magnitude was over 5,500 records that were terminated prior to the issuance of TROs.

THE COURT:  So you did not terminate any records based on your own assessment.  All of the terminations were done based on either a request or a recommendation from the Department of State.

MR. WATSON:  I know that the records that were terminated were done under those two parameters.  I cannot speak to anything outside of that, ma'am.

THE COURT:  Okay.  You are not aware of any terminations that occurred in cases other than where the State Department either revoked a visa or recommended termination.

MR. WATSON:  That is correct, Your Honor.  I'm not aware of anything beyond that.

THE COURT:  Okay.  Thank you, Mr. Watson.  I

appreciate you being here today.

MR. WATSON:  You're welcome, Your Honor.

THE COURT:  Okay.  Counsel, since we are well behind, we are going to adjourn in this case.  I am going to ask my courtroom deputy to call the next case on the calendar.  I will enter an order in this case later this afternoon.

MS. GRAHAM-OLIVER:  Thank you, Your Honor.

MR. BANIAS:  Thank you, Your Honor.

MR. HUDAK:  Your Honor, one question, if I may?

THE COURT:  Who is speaking?

MR. HUDAK:  This is Brian Hudak from the U.S. Attorney's Office.

THE COURT:  Yes, Mr. Hudak.

MR. HUDAK:  Do you require Mr. Hicks and Mr. Watson to stay on the line and be available for the next hearing?

THE COURT:  No.  I am going to assume that all of their answers would be the same in this hearing, so I don't need them to stay.  Thank you for checking.

MR. HUDAK:  Great.  Thank you, Your Honor.

THE COURT:  And thank you, Mr. Hicks, as well for being here.

(Whereupon the hearing was.

adjourned at 11:58 a.m.)

**<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**


I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 5th day of May, 2025.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this ^  day of ^ , 2025.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001