# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; and ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; the DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in his official capacity as Secretary as Secretary of State; and the DEPARTMENT OF STATE,<br><br>*Defendants*. | Case No. 25-cv-11109-PBS<br><br><br><br><br><br>Leave To File Excess Pages Granted on August 14, 2025 |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .........................................................................................1

FACTS .................................................................................................................................2

ARGUMENT........................................................................................................................4

I.      THE GOVERNMENT'S CHALLENGE TO STANDING FAILS ....................................4

II.     COUNTS II AND III ARE NOT MOOT.........................................................................14

III.    THE SEVIS TERMINATION POLICY IS UNLAWFUL AND REVIEWABLE..........17

IV.     THE VISA REVOCATION POLICY IS REVIEWABLE ...............................................20

V.      ICE'S NEW POLICY VIA THE BROADCAST MESSAGE SHOULD HAVE BEEN
        SUBJECT TO NOTICE AND COMMENT RULEMAKING.........................................26

VI.     THE STATE DEPARTMENT LETTERS ARE A FINAL AGENCY ACTION.............29

VII.    CONCLUSION................................................................................................................30

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Adams v. Bowater Inc.*,
313 F.3d 611 (1st Cir. 2002) ................................................................................16

*Adams v. Watson*,
10 F.3d 915 (1st Cir. 1993) ..................................................................................13

*African Communities Together*,
2019 WL 5537231(D. Mass. Oct. 25, 2019)...........................................................7

*Akebia Therapeutics, Inc. v. Becerra*,
548 F. Supp. 3d 274 (D. Mass. 2021) ...................................................................24

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019)..................................................................25

*Alianza Americas v. DeSantis*,
727 F. Supp. 3d 9 (D. Mass. 2024) ...........................................................4, 5, 7, 9

*Allende v. Shultz*,
845 F.2d 1111 (1st Cir. 1988)..........................................................................15, 17

*American Assocation of University Professors*,
780 F. Supp. 3d, 350 (D. Mass. 2025) ...............................................6, 7, 9, 13, 25

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2021) ................................................................................14

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ......................................................................28, 30

*Bark v. United States Forest Service*,
37 F. Supp. 3d 41 (D.D.C. 2014) .....................................................................25, 26

*Bennett v. Spear*,
520 U.S. 154 (1997)...............................................................18, 23, 24, 29, 30

*Boston Alliance of Gay, Lesbian, Bisexual & Transgender Youth v. Department of
Health & Human Services*, 557 F. Supp. 3d 224 (D. Mass 2021) ...........................8

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024)..................................................................................................22

*Casa De Maryland v. Deparment of Homeland Security*,
924 F.3d 684 (4th Cir. 2019) ...............................................................................22

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ................................................................................................9

*Competitive Enterprise Institute v. FCC*,
    970 F.3d 372 (D.C. Cir. 2020) ..............................................................................14

*Connor B. ex rel. Vigurs v. Patrick*,
    771 F. Supp. 2d 142 (D. Mass. 2011) ....................................................................12

*Conservation Law Foundation, Inc. v. Academy Express, LLC*,
    129 F.4th 78, 90-91 (1st Cir. 2025) .......................................................................12

*Corrigan v. Boston University*,
    98 F.4th 346 (1st Cir. 2024) ..................................................................................16

*Craker v. Drug Enforcement Administration*,
    44 F.4th 48 (1st Cir. 2022) ....................................................................................26

*Department of Homeland Security v. Regents of the University of California*,
    591 U.S. 1 (2020) ..................................................................................................21

*Department of Homeland Security v. Thuraissigiam*,
    591 U.S. 103 (2020) ..............................................................................................20

*Doe v. Jaddou*,
    2024 WL 2057144 (D. Md. May 8, 2024) ...........................................................22

*Doe v. Noem*,
    778 F. Supp. 3d 1151 (W.D. Wash. 2025) ......................................................18, 19

*Doe v. Trump*,
    2025 WL 1467543 (N.D. Cal. May 22, 2025) ......................................17, 18, 21, 27

*Doe #1 v. Noem*,
    781 F. Supp. 3d 246 (D.N.J. 2025) .........................................................................3

*Doe #1 v. Trump*,
    2025 WL 1341711 (N.D. Ill. May 8, 2025) ..........................................................18

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016) ......................................................................................12

*Drewniak v. Customs and Border Protection*,
    554 F. Supp. 3d 364 (D.N.H. 2021) .......................................................................11

*Du v. Department of Homeland Security*,
    2025 WL 1549098 (D. Conn. May 31, 2025) ...................................................16, 18

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ...............................................................6

*Equal Means Equal v. Ferriero*,
  478 F. Supp. 3d 105 (D. Mass. 2020) ...................................................8

*Fair Emploment Council of Greater Washington, Inc. v. BMC Marketing Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994) .............................................................6

*Farrell v. Tillerson*, 315 F. Supp. 3d 47 (D.D.C. 2018) ...............................24

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)..........................................................5, 7, 8, 13, 23

*Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*, 528 U.S. 167
  (2000)............................................................................................16

*General Land Office v. Biden*,
  71 F.4th 264 (5th Cir. 2023) ........................................................13, 14

*Geneva College v. Sebelius*,
  929 F. Supp. 2d 402 (W.D. Pa. 2013)...................................................14

*Gonzalez v. Cuccinelli*,
  985 F.3d 357 (4th Cir. 2021) .............................................................23

*Greater Boston Chamber of Commerce v. City of Boston*,
  772 F. Supp. 696 (D. Mass. 1991) .......................................................10

*Guilford College v. Wolf*,
  2020 WL 586672 (M.D.N.C. Feb. 6, 2020)......................................27, 28

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,
  484 U.S. 49 (1987)............................................................................16

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)....................................................................5, 7, 8

*Holistic Candlers & Consumers Association v. Food and Drug Administration*,
  664 F.3d 940 (D.C. Cir. 2012)..................................................19, 24, 25

*In re Ruiz*,
  83 F.4th 68 (1st Cir. 2023).................................................................17

*Janfeshan v. U.S. Customs & Border Protection*,
  2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017)..........................................8

*Jie Fang v. Director Immigration & Customs Enforcement*,
  935 F.3d 172 (3d Cir. 2019)..........................................................18, 24

*Jimenez v. Cronen*,
  317 F. Supp. 3d 626 (D. Mass. 2018) ................................................................26

*Kashikov v. Noem*,
  2025 WL 2320319 (D. Alaska Aug. 12, 2025) ..................................................17

*Kenney v. Glickman*,
  96 F.3d 1118 (8th Cir. 1996) ............................................................................22

*Kestenbaum v. President & Fellows of Harvard College*,
  743 F. Supp. 3d 297 (D. Mass. 2024) ...............................................................10

*Kucana v. Holder*,
  558 U.S. 233 (2010) ..........................................................................................21

*Liu v. Noem*,
  780 F. Supp. 3d 386 (D.N.H. 2025) ....................................................18, 20, 27

*Louis D. Brandeis Center for Human Rights Under Law v. President & Fellows of*
  *Harvard College*,
  2024 WL 4681802 (D. Mass. Nov. 5, 2024) .....................................................11

*Madan B. K. v. Noem*,
  2025 WL 1318417 (W.D. Mich. May 7, 2025) ..................................................16

*Make the Road N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ..........................................................................23

*Massachusetts v. Trump*,
  2025 WL 1836592 (D. Mass. July 3, 2025) .......................................................24

*Massachusetts v. Department of Health & Human Services*,
  923 F.3d 209 (1st Cir. 2019) ...............................................................................7

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ..........................................................................................21

*MediNatura, Inc. v. FDA*,
  496 F. Supp. 3d 416 (D.D.C. 2020) ..................................................................22

*Mohd v. Department of Homeland Security*,
  2025 WL 2112425 (E.D.N.Y. July 28, 2025) .............................................17, 18

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm*
  *Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) ............................................................................................18

*National Assocation of Consumer Advocates v. Uejio*,
  521 F. Supp. 3d 130 (D. Mass. 2021) ....................................................................4, 5, 8, 9, 13

*National Coalition Against Violent Athletes v. Department of Education*,
  2020 WL 13876913 (D. Mass. Dec. 3, 2020) ...........................................................................6

*National Education Association v. Department of Education*,
  779 F. Supp. 3d 149 (D.N.H. 2025) ........................................................................................29

*Nava v. Department of Homeland Security*,
  435 F. Supp. 3d 880 (N.D. Ill. 2020) ......................................................................................25

*Natural Resources Defense Council, Inc. v. EPA*,
  824 F.2d 1258 (1st Cir. 1987) ............................................................................................26, 27

*New Hampshire Hospital Association v. Azar*,
  887 F.3d 62 (1st Cir. 2018) ................................................................................................26, 28

*New York v. Department of Justice*,
  2025 WL 2618023 (D.R.I. Sept. 10, 2025) .............................................................................27

*New York v. Trump*,
  767 F. Supp. 3d 44 (S.D.N.Y. 2025) .......................................................................................25

*Ortega Gonzalez v. Noem*,
  2025 WL 1355272 (D. Or. May 9, 2025) ...........................................................................15, 16

*Osny Sorto-vasquez Kidd v. Mayorkas*,
  2021 WL 1612087 (C.D. Cal. Apr. 26, 2021) .........................................................................25

*Parra Rodriguez v. Noem*,
  2025 WL 1284722 (D. Conn. May 1, 2025) ............................................................................16

*Perez v. Mortgage Bankers Association*,
  575 U.S. 92 (2015) ...................................................................................................................26

*Pharmaceutical Research & Manufacturers of America v. Becerra*,
  2021 WL 5630798 (D.D.C. Dec. 1, 2021) ...............................................................................12

*Philadelphia Yearly Meeting of Religious Society of Friends v. Department of
  Homeland Security*,
  767 F. Supp. 3d 293 (D. Md. 2025) .........................................................................................14

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) .................................................................................................24

*R.F.M. v. Nielsen*,
  365 F. Supp. 3d 350 (S.D.N.Y. 2019) ....................................................................................23

*Rhea Lana, Inc. v. Department of Labor*,
  74 F. Supp. 3d 240 (D.D.C. 2014) .......................................................................20

*Roe v. Healey*,
  78 F.4th 11 (1st Cir. 2023) ...................................................................................11

*Sackett v. EPA*,
  566 U.S. 120 (2012)........................................................................................19, 30

*Sexual Minorities Uganda v. Lively*,
  960 F. Supp. 2d 304 (D. Mass. 2013) ..................................................................5, 6

*Shaik v. Noem*,
  2025 WL 2307619 (D. Minn. Aug. 11, 2025) .......................................................16

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)................................................................................................5

*Student 1 v. Noem*,
  2025 WL 1431186 (D.N.J. May 19, 2025) ............................................................18

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .................................................................................27

*Trump v. Hawaii*,
  585 U.S. 667 (2018)...............................................................................................23

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016)...............................................................................................30

*Union of Concerned Scientists v. Wheeler*,
  954 F.3d 11 (1st Cir. 2020)....................................................................................22

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996).................................................................................................9

*Utah v. Evans*,
  536 U.S. 452 (2002)...............................................................................................13

*Victim Rights Law Center v. Cardona*,
  552 F. Supp. 3d 104 (D. Mass 2021) ......................................................................6

*Vyas v. Noem*,
  2025 WL 1351537 (S.D.W. Va. May 8, 2025)......................................................17

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council*,
  589 F.3d 458 (1st Cir. 2009)............................................................................12, 13

*Yunsong Zhao v. Virginia Polytechnic Institute & State University*,
  2018 WL 5018487 (W.D. Va. Oct. 16, 2018)...........................................................................19

## DOCKETED CASE

*Patel v. Lyons*,
  No. 1:25-cv-01096-ACR (D.D.C. Apr. 29, 2025) ......................................................................29

## STATUTES, RULES, AND REGULATIONS

8 C.F.R. § 214.1(d)-(g) ........................................................................................................17, 18

8 U.S.C. § 1225(b)(1)(A)(iii)(I)...................................................................................................23

5 U.S.C. § 553...............................................................................................................................26

8 U.S.C. § 1201(i)...........................................................................................................20, 21, 22, 23

## OTHER AUTHORITIES

O'Reilly, James T., Administrative Rulemaking § 3:49,
  *Effect of the Agency's Chosen Name for the "Rule"* (2023 ed.) .............................................27

## PRELIMINARY STATEMENT

Throughout March and April 2025, the U.S. Department of Homeland Security ("DHS") and the U.S. Department of State ("DOS") conducted a nationwide initiative that resulted in thousands of students having their Student and Exchange Visitor Information System ("SEVIS") records improperly terminated by the U.S. Immigration and Customs Enforcement ("ICE") and their visas revoked by DOS without individualized adjudication. These actions severed students from the very mechanism by which the government recognizes and maintains F-1 status: the SEVIS record. As Plaintiffs plead—and as agency practice and guidance confirm—SEVIS is the operational system that evidences and governs student status and related benefits; when a SEVIS record is terminated, students effectively lose their F-1 status. The SEVIS system is thus not, as the government tries to characterize it, a simple "database."

ICE's after-the-fact reactivation of SEVIS records and its subregulatory broadcast message that should have undergone notice and comment rulemaking do not cure—and, if anything, emphasize—the legal defects behind DHS's policy and the ongoing harms that Plaintiffs continue to suffer. Nor has DOS taken any steps to alter its policy on visa revocations or reinstate the visas it previously revoked. The actions Plaintiffs challenge in this litigation—comprised of illegal conduct and confusing and coercive communications—demonstrate Defendants' concerted effort to drive international students out of the country.

In light of these actions and the harms they caused to institutions of higher education, Plaintiffs Presidents' Alliance on Higher Education and Immigration (the "Presidents' Alliance") and the Association of Independent Colleges and Universities in Massachusetts ("AICUM") filed suit seeking to enjoin and set aside DHS and DOS's unlawful policies. Defendants now move to

dismiss. Defendants' arguments, however, collapse against Plaintiffs' well-pleaded allegations and the legal framework governing their claims. The motion should be denied.

### FACTS

SEVIS is the centralized system through which the Student Exchange Visitor Program ("SEVP") and Designated School Officials ("DSOs") manage, validate, and report events for F-1 students. AC ¶ 20.[1] Institutions must comply with SEVIS reporting to maintain SEVP certification and the ability to enroll foreign students. *Id.* The government treats the SEVIS record as the "definitive record of student … **status** and visa eligibility," and agencies and higher education institutions rely on an active SEVIS record as the indicator that a student is maintaining nonimmigrant status and may access work authorization, transfer, and travel/readmission. AC ¶ 21 (quoting 9 FAM 402.5-4(B)). Conversely, the termination of a SEVIS record terminates status for the student (and their dependents), removes employment authorization, and carries significant immigration consequences. AC ¶ 22.

DHS's termination of a SEVIS record—including terminations premised on visa revocations[2]—is a final agency action with immediate legal consequences, and there is no administrative path to contest such termination. AC ¶ 30. DHS's own public statements acknowledge that once a SEVIS record is terminated, enforcement may follow, underscoring the status-determinative nature of the SEVIS record. AC ¶ 30.

In mid-March 2025, DHS, working in concert with DOS, launched what the agencies called the "Student Criminal Alien Initiative," under which specifically assigned ICE personnel ran the

---

[1] Citations to "AC" refer to Plaintiffs' Amended Complaint, ECF No. 14, and citations to "Defs.' Mem." refer to Defendants' Memorandum in Support of Defendants' Motion to Dismiss, ECF No. 30.

[2] A visa revocation does not constitute a failure to maintain status and cannot lawfully serve as the basis for terminating a student's SEVIS record. AC ¶ 29.

names of approximately 1.3 million international students through the National Crime Information Center ("NCIC") database. AC ¶ 32. That bulk query produced roughly 6,400 "hits," including many students with no criminal history but whose names were in the NCIC database as victims, witnesses, or individuals who had been arrested but never charged with a crime. AC ¶ 32-33. Of the 6,400 hits, more than 3,000 students had active visas when ICE conducted the search. AC ¶ 32. ICE then summarily terminated the SEVIS records of thousands of students nationwide based solely on the NCIC hits, while DOS terminated their visas en masse. AC ¶ 38.

Most institutions and many students learned of the mass SEVIS terminations only when DSOs happened to check SEVIS and saw status changes accompanied by codes such as "Otherwise Failing to Maintain Status" with boilerplate removability citations, and later an "OTHER — Individual identified in criminal records check and/or has had their visa revoked" notation, a code that had previously never existed or been used. AC ¶¶ 39-41. These actions occurred without individualized assessment or lawful authority to equate a visa revocation or an NCIC hit with failure to maintain status. AC ¶¶ 38-41.

After a deluge of lawsuits challenging DHS's SEVIS terminations, DHS announced on or about April 25, 2025, that it would reactivate the SEVIS records it had improperly terminated. AC ¶ 44. However, although ICE stated it would restore students' SEVIS status, it indicated that, for many students, SEVIS restoration might only be temporary. *Id*. ICE also made clear that it was unwilling to update the SEVIS system itself; thus, the gaps that were created in thousands of student records between when the SEVIS record was terminated and when it was reactivated would remain permanently without any explanation. *See Doe #1 v. Noem*, 781 F. Supp. 3d 246, 254 (D.N.J. 2025); Dkt. No. 30-5 at 3. DOS also maintained that it would not reverse visa revocations triggered by DHS's NCIC system review. AC ¶ 44.

On April 26, 2025, ICE issued an unsigned broadcast message ("the Broadcast Message") to "[a]ll SEVP Personnel" effectively codifying the unlawful practice of widespread terminations of SEVIS status, *i.e.,* that SEVP can terminate SEVIS records for a variety of reasons, including a visa revocation by DOS that is "effectively immediately," and that "[i]n its discretion, ICE may conduct further investigation or initiate removal proceedings pursuant to INA § 237(a)(1)(C)(i) based on evidence that a nonimmigrant student is not complying with the terms of their nonimmigrant status." AC ¶¶ 18-19. Plaintiffs allege that the Broadcast Message functions as operative policy yet was issued without notice-and-comment rulemaking, expanding grounds for terminating SEVIS records beyond those permitted by regulation. AC ¶¶ 45-47, 88-92. For their part, Defendants seek to evade this lawsuit by asserting that ICE reactivated affected SEVIS records, that the reactivations would be retroactive with no lapse in status, and that ICE would not terminate based solely on NCIC hits or a visa revocation effective upon departure. Defs.' Mem. at 16. Plaintiffs maintain those after-the-fact half-steps fail to moot their claims or remedy the injuries from the mass terminations and revocations. AC ¶¶ 44-47.

## ARGUMENT

## I.    THE GOVERNMENT'S CHALLENGE TO STANDING FAILS

The Presidents' Alliance and AICUM have demonstrated both (1) organizational standing, by showing that each organization has standing to sue on its own, and (2) associational standing, by showing that each organization's members would have standing to sue on their own. *See Nat'l Ass'n of Consumer Advocates v. Uejio*, 521 F. Supp. 3d 130, 141 (D. Mass. 2021).

### A.  Plaintiffs Have Organizational Standing

Organizational standing is analyzed "under the same inquiry as individual standing." *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 47 (D. Mass. 2024). Plaintiffs have shown that

they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Defendants challenge only Plaintiffs' injury in fact here, not traceability or redressability.[3] Contrary to Defendants' claim that Plaintiffs' injuries are not "sufficiently concrete," *see* Defs.' Mem. at 9, Plaintiffs allege at least four concrete injuries.

*First*, Plaintiffs were forced to suddenly divert resources from their ordinary projects and business goals to counteract Defendants' actions in March 2025. AC ¶ 54 (describing time and resources diverted away from "planned initiatives" and "proactive efforts" to manage "surge of urgent concerns from member institutions"); AC ¶ 55 (discussing need to "reprioritize internal workflows" due to "extraordinary demands" in order to "significantly increase coordination efforts with national partners"). Such allegations are plainly sufficient to plead injury in fact: "when a defendant's actions impede an organization's ability to carry out its responsibilities, the plaintiff has suffered an injury in fact." *Uejio*, 521 F. Supp. at 142. For example, in *Havens Realty Corp. v. Coleman*, the court found injury in fact where an organization had to divert resources from providing counseling and referral services to "counteract" defendants' actions. 455 U.S. 363, 379 (1982); *see also Alianza Americas*, 727 F. Supp. 3d at 49 (injury in fact established where organization's "ability to provide its regular programming and resources to immigrant communities and immigrant-serving organizations [was] impaired by the need to specifically address" defendants' actions); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324 (D.

---

[3] Plaintiffs have established "but for" causation, a higher standard than the "fairly traceable" standard. *Alianza Americas*, 727 F. Supp. 3d at 51. Causation and redressability are "flip sides of the same coin," and Plaintiffs have thus also established redressability: a favorable ruling would reduce the uncertainty that international students and member institutions face due to Defendants' actions, and it is reasonable that a reduction in uncertainty would decrease the need for Plaintiffs to divert resources. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024).

Mass. 2013) (injury in fact where need for plaintiffs to respond to "[d]efendant's campaign of repression … impaired [p]laintiff's ability to carry out its own organizational objectives").

*Second*, and relatedly, the uncertainty caused by Defendants' actions has required Plaintiffs to respond to a surge of requests for help, which can itself be an injury where the surge is overwhelming and impacts a business's ability to adequately address all requests. *See Nat'l Coal. Against Violent Athletes v. Dep't of Educ.*, 2020 WL 13876913, at *4 (D. Mass. Dec. 3, 2020) (injury in fact where organization saw "a surge in the number of clients and members seeking help, … [as] a direct result of the DeVos Rules"); *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). Defendants are therefore incorrect that the injuries here "consist of each organization executing their respective missions as opposed to the obstruction of their ability to carry out the same." Defs.' Mem. at 10.

*Third*, Plaintiffs' overall business interests have been harmed due to a decreased need for their services such as "support[ing] post graduate pathways." AC ¶ 5. Among other things, self-deportations caused by Defendants' unlawful actions have led to fewer international students on member campuses. AC ¶ 63. This decreased demand for services can itself constitute an injury in fact. *See e.g.*, *Victim Rights Law Center v. Cardona*, 552 F. Supp. 3d 104, 126 (D. Mass 2021); *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 380 (D. Mass. 2025). Even a small reduction in the need for services is enough to show injury in fact. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021) ("One less client that they may have had but-for the Rule's issuance is enough.").

*Fourth*, AICUM faces reduced profits due to the economic impact to downstream customers of Plaintiffs' services. As the Supreme Court has explained, government action that "may cause downstream or upstream economic injuries to others in the chain" can satisfy both the

6

injury in fact and causation elements of standing. *All. for Hippocratic Med.*, 602 U.S. at 384-86. Here, Defendants' actions have financially impacted member institutions that had to provide summer housing and financial assistance to students afraid to travel abroad, AC ¶ 59, and that face budgetary strain from lower enrollments, AC ¶¶ 65, 66. This financial impact on member institutions flowed upstream to injure AICUM when AICUM had to forgo an increase in membership dues because of the financial strain on member institutions. AC ¶ 56. This is a recognized injury in fact. *See Am. Ass'n of Univ. Professors*, 780 F. Supp. 3d at 379 (finding organizational standing despite plaintiffs "not claim[ing] that they [we]re being regulated directly, but rather focus[ing] on downstream harms from others' action"). And "in the First Circuit, '[i]t is a bedrock proposition that a relatively small economic loss -- even an identifiable trifle -- is enough to confer standing.'" *African Communities Together,* 2019 WL 5537231, at *4 n.5 (quoting *Massachusetts v. Dep't of Health & Human Servs.*, 923 F.3d 209, 222 (1st Cir. 2019)).

Defendants ignore these well-pled injuries and instead assert that Plaintiffs have "spen[t]" their way into standing. Defs.' Mem. at 9-11. Not so. An organization can establish injury in fact when its mission is "frustrated" by defendants' conduct and that the organization "expended resources to combat it." *Alianza Americas*, 727 F. Supp. 3d at 47; *Havens*, 455 U.S. at 369. This is not spending one's way into standing because Plaintiffs did not merely oppose Defendants' actions as a matter of policy or invent a new mission in response to Defendants' conduct. Instead, Defendants' conduct directly interfered with Plaintiffs' ability to carry out their preexisting mission, forcing Plaintiffs to spend money to continue serving its members. That is exactly the type of injury that courts have recognized as conferring standing in cases like *Havens Realty*.

*Alliance for Hippocratic Medicine* does not hold otherwise; there, the plaintiffs engaged in public advocacy because of a mere institutional interest in opposing the FDA's actions, *not* because

of any impact that the FDA's actions had on "the medical associations' advocacy businesses." 602 U.S. at 394-96. Here, Plaintiffs' injury is not that they opposed Defendants' conduct as a matter of policy, but rather that they had to pause their ordinary business operations to provide round-the-clock services to support member institutions. AC ¶ 53-54. And organizational standing requires just a "perceptible" impairment to Plaintiffs' businesses, which is "not a demanding standard," and easily met here. *Uejio*, 521 F. Supp. at 142. Relatedly, expending resources to combat mission frustration, is more than a setback to an abstract social interest. *See Havens*, 455 U.S. at 379. Unlike *Equal Means Equal v. Ferriero*, where plaintiff "assert[ed] no injury other than an injury to its advocacy," Plaintiffs here suffered unique harm "distinct from an interest in the problem"— and distinct from the harms suffered by their member institutions—because they bore direct impacts *to their own organizations* as a result of Defendants' actions, including diverting their staff, resources, and time to help member institutions endure the tumultuous revocations and terminations. 478 F. Supp. 3d 105, 121-22 (D. Mass. 2020); *see also* AC ¶¶ 53-56.

Defendants also object that there are no ongoing injuries. Defs.' Mem. at 11. This is incorrect. Plaintiffs **have** pled ongoing harms: for example, AICUM is suffering from reduced profits, and both Plaintiffs are suffering from the continued diversion of their resources to address the fallout from the SEVIS terminations and visa revocations. AC ¶¶ 54-56; *see Janfeshan v. Customs & Border Prot.*, 2017 WL 3972461, at *7-8 (E.D.N.Y. Aug. 21, 2017) (finding ongoing injury because plaintiff "continue[d] to experience adverse effects from [defendant's] actions").

The Government also ignores that a plaintiff can demonstrate standing if it can show there is a "substantial risk" that a harm will recur. *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224, 235, 239 (D. Mass. 2021) (finding substantial risk that insurers would deny reimbursement for future treatment based on history of

8

using similar exclusions).  Plaintiffs have plainly done so here by alleging a likelihood that the Government's conduct will recur in the future, for example, because ICE has publicly announced that its Broadcast Message is the Government's new policy for unilateral SEVIS terminations, raising the very real possibility that Defendants will once again terminate SEVIS records without due process or notice in the future.  AC ¶¶ 44-47.  Plaintiffs have therefore pled far more than the "highly attenuated chain of possibilities" rejected in *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013); *see also Alianza Americas*, 727 F. Supp. 3d at 50-51 (finding substantial risk of Defendants' repeat conduct sufficient to allege ongoing injuries).

B. <u>Plaintiffs Have Associational Standing</u>

If this Court agrees that Plaintiffs have organizational standing, it need not address associational standing.  *Uejio*, 521 F. Supp. 3d at 141.  But if the Court reaches the question, Plaintiffs clearly have demonstrated associational standing as well.

An organization can sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996); *see also Am. Ass'n of Univ. Professors*, 780 F. Supp. 3d at 375.  Defendants do not contest, because they cannot, that the interests Plaintiffs seek to protect are germane to Plaintiffs' purpose nor that member institutions need to participate in this

litigation.[4]  The only issue Defendants raise is whether member institutions have standing to sue in their own right.  They do.

### 1.  Injury in Fact

Plaintiffs' member institutions have suffered and continue to suffer a variety of harms because of Defendants' actions (both SEVIS terminations and visa revocations).  Like Plaintiffs, the member institutions suddenly had to divert their own time and resources away from their usual business activities—for example, by unexpectedly having to provide counseling services to students fearing detention and deportation and forcing staff to abandon their typical tasks, such as planning for commencement in May 2025.  AC ¶¶ 53, 61, 62.  Member institutions have also been financially impacted in multiple ways: they spent additional money on summer housing and financial assistance, AC ¶ 59, and have experienced and continue to experience lower enrollment, which impacts the ability to responsibly budget and allocate various resources for both present and future school years.  AC ¶¶ 59, 63, 65, 66, 70.  Member institutions also face a substantial risk of decertification by ICE due to an inability to properly advise their international students how to comply with federal law, AC ¶ 64, and they have experienced harms including decreased intellectual diversity on campus, AC ¶¶ 59, 67, and negative impacts to their reputation as welcoming institutions for international students, AC ¶ 63.

---

[4] The "germane … interests" inquiry is a simple one: is a lawsuit "consistent with" the plaintiff's mission?  *Greater Boston Chamber of Commerce v. City of Boston*, 772 F. Supp. 696, 699 (D. Mass. 1991).   Presidents' Alliance's mission is to "address immigration issues impacting students, campuses, and communities" (AC ¶ 5), and AICUM's mission is "protecting the interests of international students on its member campuses" (AC ¶ 6).  This lawsuit is clearly "consistent with" those missions.  And there is no need for member institutions to participate where, as here, the requested relief will inure to the benefit of all members of an association.  *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 306 (D. Mass. 2024).

Defendants do not argue that these injuries are insufficiently concrete, nor could they. Instead, the Government merely argues the injuries are not ongoing, and that the past harms are moot.  Defs.' Mem. at 12.  But many of the above injuries to member institutions *are* ongoing: the intended ramifications of the still-in-effect Revocation and Termination policies.  *See, e.g.*, AC ¶¶ 59, 60, 63-65, 66, 70; *see also Louis D. Brandeis Ctr. for Human Rights Under Law v. President & Fellows of Harvard Coll.*, 2024 WL 4681802, at *4 (D. Mass. Nov. 5, 2024) (ongoing harm sufficient to seek prospective injunctive relief where complaint "paint[ed] a picture of a campus environment … to this day [] filled with antisemitic and anti-Israeli rhetoric" even though there were only "two discrete instances of alleged discrimination").

In addition to the ongoing harms documented by Plaintiffs, there remains a sufficient threat that the injury will recur, which independently establishes injury in fact.  *See supra* Section 1.A; *see also Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023) (standing to seek forward-looking relief satisfied by "ongoing injury *or* a sufficient threat that the injury will recur") (emphasis added). Defendants claim there is no threat of recurrence because ICE reversed course and stated that it would not "re-terminate SEVIS records based solely on the NCIC record that led to the initial termination or solely on any related visa revocation that is effective upon departure," Defs.' Mem. at 12.  That is cold comfort when ICE maintains that it has the authority to terminate records on this basis, especially given ICE's historical conduct, which is probative of future misconduct.  AC ¶ 45.  ICE's Broadcast Message, in fact, confirms that ICE intends to resume its policy and practice of retaining authority to unilaterally re-terminate SEVIS status in the future.  *See Drewniak v. Customs & Border Prot.*, 554 F. Supp. 3d 348, 364-65 (D.N.H. 2021) (rejecting similar reassurances by a government agency that it would not harm plaintiff in the future where defendant did not affirmatively disclaim its practices or explain *why* they were being discontinued).

Defendants also claim that Plaintiffs lack associational standing because they did not identify a member institution that suffered injuries. Defs.' Mem. at 11. But Plaintiffs have identified all member institutions of both Presidents' Alliance and AICUM, *see* AC ¶ 5, n.1; ¶ 6, n.2, all of whom suffered injuries, and Plaintiffs need not specify each named member's injury to satisfy associational standing. *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (explaining that at least one member must be named but not that each named member's injury must be separately alleged); *Pharm. Rsch. & Mfrs. of Am. v. Becerra*, 2021 WL 5630798, at *5 (D.D.C. Dec. 1, 2021) (complaint linking to website with member list adequately identified members).

### 2. Traceability

Defendants' argument that lower enrollment of international students is not traceable to SEVIS terminations because of other potential causes, such as rising higher education costs and uncertainty in the financial markets, Defs.' Mem. at 13-14, misunderstands the traceability requirement. Traceability does not require that a defendant's conduct be the ***only*** cause of plaintiff's injury.[5] *See, e.g.*, *Conservation Law Found., Inc. v. Acad. Express*, LLC, 129 F.4th 78, 90-91 (1st Cir. 2025) (holding "geographic proximity" can satisfy traceability "even if 'other sources' may have 'contributed to' the complained-of pollution"); *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 467-68 (1st Cir. 2009) (similar). Nor does traceability "require a tort-like showing of proximate causation," *Conservation Law Found.*, 129 F.4th at 90, as harm that flows indirectly from a defendant's action can still be fairly traceable. *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 152 (D. Mass. 2011). The financial harms to Plaintiffs and its member institutions are traceable to Defendants' actions. As a result of

---

[5] Nor does redressability, since traceability and redressability are closely linked. *See infra* Section I.B.3; *see also Lively*, 960 F. Supp. 2d at 327 (enjoining defendant provided redress even though defendant's actions were not only thing causing harm to plaintiffs).

Defendants' visa revocations and SEVIS status terminations, international students were forced out of legal status (even if only temporarily), causing many to decline to return to school, to disenroll, and/or to self-deport to avoid feared detention. AC ¶ 63. Many future students also chose not to come to the United States for college, withdrawing from American universities in favor of other countries' universities where student visas were not being threatened and detention was not a foreseeable threat. AC ¶ 65. This, in turn, impacted member institutions' financial bottom line—a traceable injury. AC ¶ 66; *see Lively*, 960 F. Supp. 2d at 325 ("Defendant's actions need not be 'the very last step in the chain of causation for the injury. It suffices if the plaintiff can show injury produced by determinative or coercive effect upon the action of someone else.'") (quoting *Weaver's Cove Energy*, 589 F.3d at 467); *All. for Hippocratic Med.*, 602 U.S. at 384.

### 3. Redressability

Defendants' argument that Plaintiffs' injury is not sufficiently redressable also fails. *All. for Hippocratic Med.*, 602 U.S. at 380-81 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."). Defendants wrongly argue it is "speculative" that Plaintiff's requested relief would restore enrollment. *See Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) ("All predictions are conjectural to a degree."). But given that the SEVIS terminations and visa revocations caused a drop in enrollment, it is not speculative to think that the *absence* of SEVIS terminations would bring back some students.[6] *See Gen. Land*

---

[6] Defendants argue that the requested relief would have no effect because ICE reactivated terminated SEVIS records and changed its guidance on terminations. Defs.' Mem. at 14. But ICE's new policy still allows for SEVIS terminations based on visa revocations effective immediately, and there is a substantial risk of future SEVIS terminations. The requested relief would prevent unlawful future action and reduce fear and uncertainty about the potential for unlawful future action. *See American Ass'n of Univ. Professors*, 780 F. Supp. 3d, 350 at 378-79 (2025) (redressability requirement met where it was "substantially likely" that the President and other executive and congressional officials would abide by "authoritative interpretation") (quoting *Utah v. Evans*, 536 U.S. 452, 460 (2002)); *Uejio*, 521 F. Supp. 3d at 147-48.

*Office v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (finding that it was not mere speculation that absence of a border wall would result in more illegal immigrants seeking benefits and that injunctive relief would provide redress where presence of a wall had historically reduced immigration). At a minimum, a favorable ruling here could "***potentially*** lessen" Plaintiff's injury. *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2021) (emphasis added). And injuries can still be redressable even where they depend in part on the actions of third parties where there is a "predictable effect" of Government action on those third parties' decisions. *See e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019); *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384-85 (D.C. Cir. 2020) (collecting cases). It is reasonably predictable that at least some international students will not enroll due to Defendants' actions. *See Philadelphia Yearly Meeting of Religious Soc'y of Friends v. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 318-19 (D. Md. 2025) (finding that lower attendance in religious settings was reasonably predictable where enforcement actions were causing "fear and concern" among congregants).[7]

## II.    COUNTS II AND III ARE NOT MOOT

Defendants claim that Counts II and III, which challenge the SEVIS Termination Policy, are moot. Defs.' Mem. at 15-17. They are wrong.

*First*, contrary to Defendants' contention, Plaintiffs do not challenge isolated SEVIS terminations. Defs.' Mem. at 16. Plaintiffs challenge the SEVIS Termination Policy itself, which

---

[7] Defendants do not challenge traceability and redressability as to the other ongoing injuries and/or substantial risk of injuries that member institutions suffer, including: diversion of resources to provide support for students, AC ¶¶ 53, 61, 62; a need to provide housing and financial assistance to students afraid to leave the country, AC ¶ 59; and decertification, AC ¶ 64. Defendants also fail to address that member institutions are harmed by uncertainty itself, which has "a profound impact on institutional planning and budgeting." ¶ 70; *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 420 (W.D. Pa. 2013) (finding standing where college "faces uncertainty in preparation and substantial planning costs for upcoming plan years").

remains in effect and thus continues to present a live controversy. Regardless, courts have found that even mootness of a challenge to a specific agency action does not necessarily moot a challenge to the underlying policy that authorized the action. *See, e.g.*, *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 530 (D.C. Cir. 2025); *Allende v. Shultz*, 845 F.2d 1111, 1115 n. 7 (1st Cir. 1988) (concluding that although the specific application of a visa policy against Plaintiff is moot, the "validity of that [visa] policy in general remains a live controversy").

The SEVIS Termination Policy, which was unlawfully extended by the Broadcast Message, continues to harm Plaintiffs by allowing Defendants to terminate SEVIS status for the very same reasons as during the widespread terminations. *See Ortega Gonzalez v. Noem,* 2025 WL 1355272, at *4 (D. Or. May 9, 2025) (finding that new SEVIS termination policy after the Broadcast Message is "substantially the same" as before). Contrary to Defendants' assertion, Defs.' Mem. at 16, Plaintiffs have never alleged that the policy was "superseded" by the Broadcast Message. Indeed, the Broadcast Message expanded the initial policy: it listed grounds for unilateral termination of SEVIS status, conceded that the list is non-exhaustive, omitted any prohibition on relying on NCIC hits for terminations, and authorized SEVP to terminate a nonimmigrant's SEVIS record immediately upon visa revocation, despite the fact that legally the two are distinct elements of a student's visa status. Dkt. 30-7. Defendants attempt to minimize the harm of the pervasive policy by underscoring that SEVIS database records were restored and that ICE has claimed it will not "re-terminate the SEVIS records based solely on the NCIC hits that led to the initial termination." Defs.' Mem. at 16. But Plaintiffs continue to face harm because ICE, through its policy, retains the authority to revoke SEVIS status en masse. *See supra* Sections I.A-B.

*Second*, Counts II and III fall squarely within the voluntary cessation exception to mootness, which prevents defendants from evading judicial review by temporarily ceasing their

conduct. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66-67 (1987). This exception applies where, as here, "there exists 'a reasonable expectation'" that the challenged conduct will recur and when a defendant "ceases the challenged practice in order to moot the plaintiff's case." *Corrigan v. Boston Univ.*, 98 F.4th 346, 353 (1st Cir. 2024).[8] Thus, a case should not be mooted if there is a "high likelihood" that the challenged action will recur. *Adams v. Bowater Inc.*, 313 F.3d 611, 613 (1st Cir. 2002).

Defendants bear a "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 190 (2000). They cannot do so. There is not *just* a high likelihood of recurrence—ICE has now codified its subregulatory practice through its Broadcast Message such that nothing in its current policy "prohibits the allegedly unlawful terminations." *Ortega*, 2025 WL 1355272 at *4. Indeed, multiple courts have found that despite reactivation of SEVIS records, the government failed to show that the challenged conduct cannot reasonably be expected to recur. *See e.g.*, *Parra Rodriguez v. Noem*, 2025 WL 1284722, at *9 (D. Conn. May 1, 2025) (finding new policy "would allow Defendants to terminate [plaintiff's] SEVIS record *again*"); *Du v. Dep't of Homeland Sec.*, 2025 WL 1549098, at *5 (D. Conn. May 31, 2025) (similar); *Madan B. K. v. Noem*, 2025 WL 1318417, at *9 (W.D. Mich. May 7, 2025) (similar). Hollow reassurances from the government that conduct will not recur—like statements from DHS official Andre Watson (Dkt. 30-4)—cannot support a mootness argument. *See e.g.*, *Du*, 2025 WL 1549098, at *6 (statements from the government leave "open the glaring possibility that, absent

---

[8] Defendants do not discuss the second prong of the voluntary cessation exception—that Defendants' alleged reversal of the SEVIS termination policy occurred "in order to moot the plaintiff's case," *Corrigan*, 98 F.4th at 353. That prong is satisfied, *see Ortega*, 2025 WL 1355272 at *4 (finding that Defendants changed SEVIS policy in response to lawsuits around the country), and Defendants point to no other reason for their alleged reversal.

[preliminary injunction], ICE may invoke a new (but still improper) justification to terminate Plaintiffs' records"); *Shaik v. Noem*, 2025 WL 2307619, at *7 (D. Minn. Aug. 11, 2025) (similar); *Mohd v. Dep't of Homeland Sec.*, 2025 WL 2112425, at *12 (E.D.N.Y. July 28, 2025) (similar); *Vyas v. Noem*, 2025 WL 1351537, at *7 (S.D.W. Va. May 8, 2025) (similar).

*Third*, Defendants cannot manufacture mootness where the challenged conduct is capable of repetition but evading review—that is, when: (1) the challenged action is of a short duration and cannot be fully litigated before it ceases, and (2) there is a reasonable expectation that the action will recur. *In re Ruiz*, 83 F.4th 68, 74 (1st Cir. 2023). In *Allende*, the First Circuit found that a challenge to defendants' policy of excluding noncitizens presented an issue capable of repetition yet evading review because (1) the policy burdened Plaintiff's First Amendment rights and (2) any time plaintiffs challenged a visa denial, the government could grant the visa and evade judicial review. 845 F.2d at 1115. Similarly, a SEVIS termination policy can be imposed, then quickly reversed before litigation concludes. That would allow the government to deter international students from coming to this country while avoiding any judicial scrutiny of its action. And as explained *supra* Sections I.A-B, the challenged conduct is reasonably expected to occur.

## III.    THE SEVIS TERMINATION POLICY IS UNLAWFUL AND REVIEWABLE

### A.    SEVIS Termination Policy Contravenes DHS's Own Regulations

ICE's SEVIS Termination Policy contravenes DHS's own regulations, which provide the only bases for SEVIS record termination. *See* 8 C.F.R. § 214.1(d)-(g). Defendants' argument that those regulatory provisions relate to nonimmigrant status and are irrelevant to SEVIS records, Defs.' Mem. at 22, has been rejected by a "growing number of courts." *See, e.g.*, *Doe v. Trump*, 2025 WL 1467543, at *6 (N.D. Cal. May 22, 2025) (citing cases); *Kashikov v. Noem*, 2025 WL 2320319, at *1 (D. Alaska Aug. 12, 2025). Courts have rejected this position because DHS

representations have made clear that DHS officials and agencies "construe a student's SEVIS record as the equivalent of his actual F-1 student status." *Doe*, 2025 WL 1467543, at *6 (quoting *Liu v. Noem*, 780 F. Supp. 3d 386, 398 (D.N.H. 2025)). Defendants cannot now put forth some rationale supplied after the fact by litigation counsel. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). It would also be "absurd" to accept that SEVIS operates independently of F-1 status when defendants' "own manuals and websites contradict this position." *See Doe #1 v. Trump*, 2025 WL 1341711, at *6 (N.D. Ill. May 8, 2025). Indeed, courts have not only rejected the argument that 8 C.F.R. § 214.1(d)-(g) is irrelevant, they have held that those regulatory provisions *govern* SEVIS records. *See Doe v. Noem*, 778 F. Supp. 3d 1151 (W.D. Wash. 2025) (barring government from terminating a student's SEVIS record absent a valid ground set forth in 8 CFR § 214.1(d)-(g)); *Mohd*, 2025 WL 2112425, at *10.

B.  The SEVIS Termination Policy Is A Reviewable Final Agency Action

The SEVIS termination policy is a reviewable final agency action because it (1) marked the consummation of the agencies' decision-making process and was not of a "merely tentative or interlocutory nature" and (2) determined rights or obligations from which legal consequences flowed. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

*First*, the SEVIS Termination Policy represents the consummation of DHS and ICE's decision-making process. *See infra* Section IV.C. Defendants take issue with the challenged action being a policy, but policies are regularly found to be final agency action.[9] *See, e.g., Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 496-97 (D. Md. 2025) (finding that government's policy of

---

[9] Courts across the country have also held that the underlying SEVIS terminations are final agency action. *See, e.g., Du*, 2025 WL 1549098, at *8 (collecting cases); *Student 1 v. Noem*, 2025 WL 1431186, at *7 n.12 (D.N.J. May 19, 2025) (holding "termination of a student's SEVIS record and F-1 status is a final agency action subject to judicial review"); *see also Jie Fang v. Dir. Immigr. & Customs Enf't*, 935 F.3d 172, 180 (3d Cir. 2019) (same).

allowing DOGE to access agency record systems was a final agency action).  And the later reversal of the SEVIS terminations does not mean the policy was non-final.  To allow an agency's ability to change course to negate an action's reviewability would undermine the purpose of the APA.  *See Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider… does not suffice to make an otherwise final agency action nonfinal.").  In arguing otherwise, Defendants appear to conflate their mootness, *see supra* Section II, and finality arguments.

Defendants' cited cases are not persuasive here either.  In *Holistic Candlers and Consumer's Ass'n v. FDA*, for example, the agency action at issue consisted of FDA warning letters which merely expressed the FDA's position and did not direct any action from either the sender or the recipient.  664 F.3d 940, 943 (D.C. Cir. 2012).  And Defendants' reliance on *Yunsong Zhao v. Virginia Polytechnic Inst. & State Univ.*, for the proposition that SEVIS record modifications are simply "clerical dut[ies]" ignores the context here:  in *Yunsong*, the defendant was a university, not a government entity, and the student-Plaintiff had dropped below the credit hours required to be a full-time student.  2018 WL 5018487, at *5 (W.D. Va. Oct. 16, 2018).

*Second*, the SEVIS Termination Policy directly impacted rights and obligations and had legal consequences.  The Policy affected the rights and obligations of the agencies, international students, and schools, as well as Plaintiffs.  Multiple courts have found that SEVIS terminations carry legal consequences.  *Doe*, 778 F. Supp. 3d at 1159 ("[I]t is apparent that the termination of

Plaintiff's SEVIS record is an agency action that implicates 'rights and obligations' and may well result in 'legal consequences.'"); *Liu*, 780 F. Supp. 3d at 398; *Doe*, 2025 WL 1467543, at *7.[10]

## IV.    THE VISA REVOCATION POLICY IS REVIEWABLE

### A.    Jurisdiction-Limiting Provision In 8 U.S.C. § 1201(i) Does Not Apply To Visa Revocation Policy

This Court has jurisdiction to review Plaintiff's claim that the visa revocation policy violates the APA.  The government's argument to the contrary rests on the jurisdiction limiting provision in 8 U.S.C. § 1201(i), which applies only to individual visa revocations:

> "After the issuance of *a visa* or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke *such visa* or other documentation. … There shall be no means of judicial review (including [habeas corpus]) of *a revocation* under this subsection."

8 U.S.C. § 1201(i) (emphasis added).  The statute's references to "a visa" and "such visa" illustrates that the statute refers to identifiable, discrete revocations.  Similarly, the provision limiting judicial review specifically limits review of "a revocation" and does not mention broader policies of visa revocations.  Nor does any regulation or guidance enacted pursuant to 8 U.S.C. § 1201(i) discuss policies of visa revocations or the policies underlying visa revocations.  *See* 9 FAM 403.11 (guidance issued pursuant to 8 U.S.C. § 1201(i) discussing instances of revocations and issuances of visas).  Even the statute's example of unreviewability—habeas corpus, a remedy concerned with "secur[ing] release from illegal custody," *see Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 117 (2020)—confirms that the jurisdictional bar pertains to individual cases and not agency

---

[10] Defendants appear to conflate the standing analysis with that of finality.  *See Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 64 (D.D.C. 2017); *Rhea Lana, Inc. v. Dep't of Lab.*, 74 F. Supp. 3d 240, 243 (D.D.C. 2014), *rev'd sub nom. on other grounds, Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023 (D.C. Cir. 2016) ("The standing analysis is thus separate and distinct from determining whether final agency action exists.").  It is sufficient to find that students' rights were affected, which other courts have already held.

policy.  This reflects the well-established presumption of judicial review under the APA, fully applicable in the immigration context.  *See Kucana v. Holder*, 558 U.S. 233, 251-52 (2010).

*McNary v. Haitian Refugee Center, Inc.* confirms that policy-based challenges remain reviewable even when individual actions are not.  There, the Supreme Court held that a similar jurisdictional bar did not preclude review of "practices and policies used by the agency in processing [Special Agricultural Worker] applications."  498 U.S. 479, 492-94 (1991).  The Court reasoned that the statute's "reference to a determination describes a single act rather than a group of decisions or a practice or procedure employed in making decisions."  *Id.* at 492.  Similarly, the language in Section 1201(i) that there "shall be no means of judicial review … of a revocation" is confined to a single act, making the practice or policy governing such a revocation reviewable.

Similarly, in *Department of Homeland Security v. Regents of the University of California*, the Supreme Court held that the jurisdiction stripping provision of 8 U.S.C. § 1252(b)(9), which barred review of "claims arising from 'action[s]' or 'proceeding[s] brought to remove an alien,'" did not preclude a challenge to the recission of DACA because plaintiffs were not challenging an individual removal order.  591 U.S. 1, 19 (2020) (alterations in original).  That reasoning applies with even more force here, as the judicial bar provision in *Regents* was broader than the one in 1201(i).  *Compare Regents*, 591 U.S. at 19 (concerning statutes barring review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien" and "arising from decisions … to commence proceedings") (alterations in original), *with* 8 U.S.C. § 1201(i) ("There shall be no means of judicial review … of a revocation ….").

B. <u>No Exception To APA Review Applies Here</u>

The government's attempt to rebut the presumption of reviewability by arguing that the challenged policy is committed solely to agency discretion is unavailing.  The government again

conflates a challenge to individualized revocations with a challenge to the underlying policies. The only discretion the statute confers on the Secretary of State is whether to authorize or revoke individualized visas. Courts consistently decline to treat challenges to policies as subject to agency discretion. *See e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996) (distinguishing "individual, case-by-base determinations of when to enforce existing regulations" with "permanent policies or standards" and concluding policy was reviewable under APA); *Casa De Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684, 697-701 (4th Cir. 2019) (rejecting argument DACA rescission was committed to agency discretion because "DACA's rescission involve[d] a broad enforcement policy, not an individual decision"); *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 444-46 (D.D.C. 2020); *Doe v. Jaddou*, 2024 WL 2057144, at *8 (D. Md. May 8, 2024).

None of the cases Defendants cite support the proposition that a *policy* of revoking visas en masse qualifies as an exercise of discretion under § 1201(i). Defs.' Mem. at 19-20. In fact, Defendants' own authority—*Union of Concerned Scientists v. Wheeler*—held that an agency-wide policy, unlike individual decisions, could *not* be considered committed to agency discretion. *See* 954 F.3d 11, 18 n.5 (1st Cir. 2020). The court reasoned "that the APA provides for judicial review of both procedure and substance," and where the agency "changed a long-standing practice," as it has here, the court could review the "decision-making process at issue," "even if the standards themselves preserve wide agency discretion." *Id.* at 19-20.

Defendants' remaining citations are equally unavailing or irrelevant. Defs.' Mem. at 19-20. Defendants rely on the language in *Bouarfa v. Mayorkas* concluding that there are no "threshold requirements" for the exercise of discretion over revocations of visa petitions (under a different statutory scheme), but the court did not opine on whether or when an agency has discretion to implement a policy. 604 U.S. 6, 8-9, 13, 15 (2024). *Department of State v. Muñoz*

did not concern a policy.  602 U.S. 899, 908 (2024) (discussing discretion "to admit or to exclude **an** alien") (emphasis added).[11]  Another of Defendants' cases relies on a provision that is distinct because it uses the words "any or **all** aliens,"[12] whereas Section 1201(i) only confers discretion for individualized visa revocations.  *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 633 (D.C. Cir. 2020) (quoting 8 U.S.C.A. § 1225(b)(1)(A)(iii)(I) (emphasis added)).[13]  And Defendants' final case is cited to support the misguided argument that because the statute confers both discretion to act and to decline to act, then there cannot be a "reversal in policy."  Defs.' Mem. at 19-20 (citing *Gonzalez v. Cuccinelli,* 985 F.3d 357, 371 (4th Cir. 2021)).  Defendants again conflate the exercise of discretion in individual visa cases with the policy being challenged and attempt to bootstrap their argument about the merits—*i.e.*, whether there has been a reversal in policy—into the threshold question of whether a reversal is judicially reviewable.  What's more, "sudden departure from its past practice" can demonstrate the existence of a new policy.  *See R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 374-75 (S.D.N.Y. 2019) (rejecting DHS argument that there was no new "policy" where agency "virtually stopped approving" certain special immigrant juvenile status petitions).

At bottom, Defendants' arguments about unreviewability are unsupported by the law.

C. <u>Visa Revocation Policy Constitutes Final Agency Action</u>

The visa termination Policy is a final agency action subject to the Court's review, as the consummation of the agency's decision-making process and one that determines rights and obligations.  *See supra* Section III.B (citing *Bennett*, 520 U.S. at 177-78).

---

[11] Defendants also reference *Trump v. Hawaii*, but there, the Court assumed without deciding that it had authority to review a challenge to a Proclamation placing entry restrictions on foreign nationals.  585 U.S. 667, 677, 682 (2018).

[12] This language allowed the Secretary to designate which "groups" would be subject to expedited removal.  *Make the Rd. N.Y. v. Wolf*, 962 F.3d at 619, 633.

[13] The APA exception for actions committed to agency discretion by law must be read narrowly, as Defendants' own case states.  *Id.* at 631.

As an initial matter, Defendants do not contest that significant legal consequences flowed from Defendants' visa revocation policy.  Nor could they—as a result of the policy, students whose visas were revoked cannot re-enter the country and fear detention and deportation.  *See* AC ¶¶ 19, 28, 29, 53, 63, 65; *Jie Fang*, 935 F.3 180 (second prong of *Bennett* "clearly satisfied" where "termination order ended the student's legal status in the United States").[14]

Further**,** the decision to revoke visas en masse based on NCIC hits was the culmination of the Student Criminal Alien Initiative, a process "centered at DHS headquarters," Dkt. No. 30-2, at 5, involving "10 to 20 federal employees," Dkt. No. 30-2, at 8, including senior officials who "spoke in the agency's voice."  *See* Dkt. No. 30-2, at 4, 9, 14; *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020) (consummation prong met where guidance spoke "in [the agency's] voice, setting forth the 'interpretation' and 'guidance' of the agency," and was "approved" by agency employee who was not a "mere subordinate").  At the "instruction of leadership" at DHS, staff at ICE "categorized" "positive hits" and sent spreadsheets to DOS, who "conducted their own analysis."  Dkt. No. 30-2, at 7-9, 13.  The decision-making process culminated when DOS terminated visas.  *See Farrell v. Tillerson*, 315 F. Supp. 3d 47, 61 (D.D.C. 2018) (finding final agency action where Department received request, reviewed request, and made final decision).

The visa revocation policy was not tentative or interlocutory in nature.  DOS stated that it will not reverse course on visa revocations.  AC ¶ 44; *compare Akebia Therapeutics, Inc. v. Becerra*, 548 F. Supp. 3d 274, 289 (D. Mass. 2021) (finding consummation prong satisfied where the "Government told Akebia, in no uncertain terms, that it would not change its position"); *with*

---

[14] The fact that the students could be granted new visas in the future does not alleviate the legal consequences.  *See Massachusetts v. Trump*, 2025 WL 1836592, at *11 (D. Mass. July 3, 2025) ("indefinite suspension" of permitting created legal consequences).

*Holistic Candlers*, 664 F.3d at 944 (warning letters provided opportunity to take corrective action before enforcement action). The consequences of DOS's decision were immediate: any student with a revoked visa who attempted to obtain entry into the country would be turned away for not having a valid visa. *See* AC ¶¶ 19, 28, 29. Students in the United States feared detention and deportation, and many left the United States in light of the DOS actions and email letter. AC ¶ 63.

Defendants incorrectly claim that Plaintiffs attach a "policy label" to a practice. Defs.' Mem. at 20. Though true that not all agency conduct qualifies as final agency action, Defendants do not explain how visa revocations are *at all* akin to "constructing a building, operating a program, or performing a contract." *See* Defs.' Mem. at 21. The visa revocations here are not mere "conduct" or "practice"—they demonstrate the existence of the unwritten policy. *See Am. Fed'n of Tchrs.*, 765 F. Supp. 3d at 496-97 (finding final agency action due to practice of allowing DOGE to access agency record systems); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1208 (S.D. Cal. 2019) (final agency action where alleged practice "point[ed] to the existence of an unwritten policy"); *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 901 (D. Ill. 2020) (similar); *Osny Sorto-Vasquez Kidd v. Mayorkas*, 2021 WL 1612087, at *8 (C.D. Cal. Apr. 26, 2021) (similar). Such a policy need not be written to qualify as final agency action. *See, e.g.*, *Am. Ass'n of Univ. Professors,* 780 F. Supp. 3d at 385 (unwritten policies can still satisfy the final agency action requirement); *New York v. Trump*, 767 F. Supp. 3d 44, 75-76 (S.D.N.Y. 2025).

Defendants' citation to *Bark v. U.S. Forest Service* is likewise unavailing. 37 F. Supp. 3d 41, 50 (D.D.C. 2014); Defs.' Mem. at 20. There, the court found that the issuance of five special use permits was not a final agency action. *Id.* at 51. The scope of the agency action here is distinguishable—thousands of visas were revoked, and prominent individuals in multiple agencies were involved. *See Nava*, 435 F. Supp. 3d at 903 (distinguishing *Bark* and other cases and finding

it relevant that ICE likely applied the policy in "numerous" cases).[15]  As such, the government's

argument that the visa revocations at issue here are not final agency action fails.

## V.    ICE'S NEW POLICY VIA THE BROADCAST MESSAGE SHOULD HAVE BEEN SUBJECT TO NOTICE AND COMMENT RULEMAKING

Defendants' argument that the Broadcast Message is exempt from notice and comment

rulemaking fails.  Notice of new rules must be published in the Federal Register, and agencies

must give "interested persons an opportunity to participate in the rule making" by providing

comments, which the agency must consider.  5 U.S.C. § 553(b)-(c).  Notice must be given *before*

a rule is effectuated.  5 U.S.C. § 553(d).  Changes to rules originally promulgated through notice

and comment need not go through the process again ***only if*** the changes are logical outgrowth" of

the original rule.  *See Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1258, 1283 (1st Cir. 1987)

(citations omitted).  Failure to follow these requirements renders a rule invalid.  *Craker v. Drug*

*Enforcement Admin.*, 44 F.4th 48, 55 (1st Cir. 2022).

The Broadcast Message is a substantive rule.  Substantive rules, also called legislative

rules, have the "force and effect of law" and are subject to the notice and comment rulemaking

process.  *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 655 (D. Mass. 2018) (citing *Perez v. Mortgage*

*Bankers Ass'n*, 575 U.S. 92, 92 (2015)) (other citations omitted).  Such rules "create[] rights,

assign[] duties, or impose[] obligations."  *New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62,

70 (1st Cir. 2018).  Rules are only exempt from the process if they are interpretive, procedural,

policy statements, or agency organization rules.  *See id.* (citations omitted).

The Broadcast Message is a substantive rule because it affects rights, obligations, and

interests.  It fundamentally alters how and why SEVIS records can be terminated—which has the

---

[15] *Bark* was also decided on a motion for summary judgment, where plaintiffs were unable to
demonstrate the existence of a policy *after* discovery.  *Bark*, 37 F. Supp. 3d at 44.

same effect as terminating an individual's legal status in the United States.  SEVIS records are "the equivalent of" an international student's F-1 status and not a mere "database" as Defendants claim. *Doe*, 2025 WL 1467543, at \*6 (quoting *Liu*, 780 F. Supp. 3d at 398 ); *see* Defs.' Mem. at 29. Defendants have done much more than "set[] … records to 'terminated' [as] a pronouncement guiding agency operations and nothing more."  Defs.' Mem. at 29.  By terminating Plaintiffs' SEVIS records, Defendants have "alter[ed]" individuals' legal status in the United States, therefore altering their rights, obligations, and interests.  *Doe*, 2025 WL 1467543, at \*7.  Defendants have unlawfully promulgated new rules which conflict with previously existing regulations—it cannot be said that the Broadcast Message is a mere change that is "in character with the original scheme" and "a logical outgrowth" of the original rule.  *See Natural Res. Def. Council, Inc.*, 824 F.2d at 1283 (citations omitted).  That SEVIS is called a "system of records" is semantics and does not nullify its function or ultimate impact on a student's legal status.

Defendants wrongly argue that the Broadcast Message is not substantive because of the Disclaimer on the second page: "It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law …." Dkt. 30-7, at 2.  But in determining whether a rule is substantive, "a disclaimer by an agency about what its statements do and do not constitute as a legal matter [is] not dispositive." *Guilford College v. Wolf*, 2020 WL 586672, at \*5 (M.D.N.C. Feb. 6, 2020) (alteration in original, citations omitted); *New York*, 2025 WL 2618023, at \*11.  Courts consider rulemakers' intentions and the record, not just "self-serving" labels.  *See Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) ("Our primary focus is 'whether the rule has binding effect on agency discretion or severely restricts it.'"); O'Reilly, Administrative Rulemaking § 3:49, *Effect of the Agency's Chosen Name for the "Rule"* (2023 ed.)

("[An] agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the force of law, but the record indicates otherwise.").[16]

Defendants' claim that the Broadcast Message was issued "to all SEVP personnel" and stated it was not a "rule or a final action" fares no better. Defs.' Mem. at 28. Indeed, courts have rejected this very argument. In *Guilford College*, the court held that a policy memorandum disclaiming that it was "intended solely for [internal] guidance" did not override the fact that the "text of the memorandum itself" was "compelling evidence" of a legislative rule. 2020 WL 586672, at *5; *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding that despite containing a disclaimer, "[t]hrough the Guidance, EPA has given the States their 'marching orders' and EPA expects the States to fall in line").

Defendants' argument that the Broadcast Message is an "interstitial, minor, or confirmatory pronouncement[] guiding agency operation" is equally unavailing. Defs.' Mem. at 28. The case Defendants cite, *New Hampshire Hospital Ass'n*, held that the rule at issue was subject to notice and comment rulemaking because it was a "new policy on a matter of some considerable import." 887 F.3d at 74. The court considered "the explanation or lack thereof given by the agency in adopting a policy," reasoning that if the Government were merely "interpreting the governing statute and regulation, then one would expect that the agency's justification for the rule would rely on an interpretive methodology." *Id.* at 71-72. Not only does the Broadcast Message not rely on interpretive methodology in expanding SEVIS termination authority, but ICE has publicly stated

---

[16] Defendants also argue that the rule is not substantive because "DHS further acknowledged that the two-page Broadcast Message may not answer all questions" and directed personnel to "contact the SEVP Response Center … [f]or additional information about SEVIS record terminations." Defs.' Mem. at 28; Dkt. 30-7, at 2. But they provide no explanation as to how those disclaimers prove that the rule is not substantive.

that the Broadcast Message **will serve as its new policy going forward** and is currently operative. *See* Hr'g Tr. at 36-37, *Patel v. Lyons*, No. 1:25-cv-01096-ACR, Dkt. 18 (D.D.C. Apr. 29, 2025).

## VI.    THE STATE DEPARTMENT LETTERS ARE A FINAL AGENCY ACTION

Defendants are incorrect that Plaintiffs "fail to identify any actual policy" related to DOS's letters. Defs' Mem. at 29.  Plaintiffs challenge DOS's standardized letters and emails—a uniform, coercive communications policy—that (i) falsely imply visa revocation automatically terminates lawful student status, (ii) direct immediate departure, (iii) threaten detention, fines, and deportation (including to a third country), and (iv) warn of "future immigration consequences."  AC ¶ 95; *see* ¶¶ 93, 98.  Plaintiffs also plead that these letters misstate settled law and policy, including that visa revocation has never constituted failure to maintain status.  AC ¶ 96.  That is a concrete, uniform policy and practice—not a one-off notice, and not a challenge to the revocations themselves.[17]

Defendants also err in arguing that the revocation notices are not final agency actions, while citing the right test from *National Education Association et al v. Dep't of Educ.*, 779 F. Supp. 3d 149, 184 (D. N.H. 2025): "an agency's action will be considered final if, looking to the practical effects, it appears on its face to be binding or if it is applied by the agency in a way that indicates it is binding." (internal quotations omitted).  Plaintiffs have alleged both.  AC ¶¶ 95-97.

*First*, Defendants incorrectly apply *Bennett v. Spear*, *see supra* Section III.B, and ignore controlling precedent in stating that the DOS Letters are not final agency action.  Defendants insist the letters are "purely advisory," but that ignores the text and the "practical effects" of the letters. The letters are the government's last word to recipients on what they "must" do and what will

---

[17] Nor should the Court take seriously Defendants' assertion that there is not "anything incorrect about the letters" because they suggest only that consequences "can" or "may" flow from loss of immigration status.  Defs' Mem. at 29-30.  When none of these consequences are relevant to the specific students to whom the messages were sent, such a message nonetheless is evidence that DOS *intends* to suggest that these consequences may apply to the students' circumstances.

happen otherwise. Nothing is tentative; nothing awaits further DOS review. AC ¶¶ 95-97. The DOS Letters clearly constitute the consummation of DOS's decision-making process. *See U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *Sackett*, 566 U.S. at 126-27.

*Second*, Defendants' assertion that the DOS Letters are "purely advisory" is contradicted by the complaint. The letters direct immediate departure, threaten enforcement, and require recipients to obtain a new visa to reenter, causing students to abandon studies and forego available lawful processes. AC ¶ 97; *see* AC ¶ 95. That is the textbook definition of "direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178. It is also the kind of practical binding effect courts recognize as final: when an agency's standardized communication is applied as binding by the agency and third parties, it is reviewable final action. *Appalachian Power Co.*, 208 F.3d at 1021-23. Defendants lean on *Roe v. Mayorkas* and *Beshir v. Holder* to claim that the letters do not create "direct and appreciable legal consequences," Defs. Mem. at 30, but *Roe* and *Beshir* addressed informational communications that did not compel conduct and were not applied as binding.

Ultimately, § 41.122(c) does not authorize DOS to promulgate a coercive, standardized script that misstates law, orders immediate departure, threatens detention, fines, and deportation, or suggests removal to a third country. Plaintiffs challenge that de facto rule, which is final and reviewable under *Bennett* and, alternatively, invalid under § 706(2)(D) as a binding legislative rule adopted without notice-and-comment. *Appalachian Power*, 208 F.3d at 1021-23.

## VII. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted,

/s/ Kerry E. Doyle
Kerry E. Doyle (MA BBO #565648)
Stephen J. Antwine (Pa. Bar # 309379)*
GREEN & SPIEGEL, LLC
1524 Delancey Street, Floor 4
Philadelphia, PA 19102
Phone: (215) 395-8959
Fax: (215) 330-5311
kdoyle@gands-us.com
santwine@gands-us.com

*Counsel for Plaintiffs Presidents' Alliance
on Higher Education and Immigration and
Association of Independent Colleges and
Universities in Massachusetts*

Sirine Shebaya (D.C. Bar # 1019748)*
Khaled Alrabe (Cal. Bar # 349899)*
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Phone: (617) 227-9727
Fax: (617) 227-5495
sirine@nipnlg.org
khaled@nipnlg.org

*Counsel for Plaintiffs Presidents' Alliance
on Higher Education and Immigration and
Association of Independent Colleges and
Universities in Massachusetts*

David Zimmer (MA BBO #692715)
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Plaintiff Presidents' Alliance on
Higher Education and Immigration*

*\*Motion for admission pro hac vice granted*

Dated: September 19, 2025

31

**<u>CERTIFICATE OF SERVICE</u>**

I, Kerry E. Doyle, certify that a copy of the foregoing document was served on all parties who have appeared through the Court's electronic docketing system.

*/s/ Kerry E. Doyle*

Kerry E. Doyle