**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| PRESIDENTS' ALLIANCE ON HIGHER ) | |
| EDUCATION AND IMMIGRATION and ) | |
| ASSOCIATION OF INDEPENDENT ) | |
| COLLEGES AND UNIVERSITIES IN ) | |
| MASSACHUSETTS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KRISTI NOEM, in her official ) | Civil Action |
| capacity as Secretary of Homeland ) | No. 25-cv-11109-PBS |
| Security; TODD LYONS, in his ) | |
| official capacity as Acting ) | |
| Director of U.S. Immigration and ) | |
| Customs Enforcement; the ) | |
| DEPARTMENT OF HOMELAND SECURITY; ) | |
| MARCO RUBIO, in his official ) | |
| capacity as Secretary of State; ) | |
| and the DEPARTMENT OF STATE, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM AND ORDER**

March 20, 2026

Saris, J.

**INTRODUCTION**

This lawsuit arises from the so-called "Student Criminal Alien Initiative" ("SCAI") undertaken by the federal government in the spring of 2025. U.S. Immigration and Customs Enforcement ("ICE") ran a criminal record check on all international students then in the United States via the National Crime Information Center ("NCIC") database. Approximately 6,400 names appeared in the

1

database. Some of those students had no criminal history or only infractions such as speeding tickets, while others were arrested for minor offenses but never charged in court. Once this list was compiled, the U.S. Department of State ("DOS") revoked en masse the nonimmigrant visas of students whose names appeared in the NCIC database. DOS then sent many of the affected students a letter or email notifying them of the visa revocation, implying that the revocation ended their lawful status in the United States, and suggesting that they self-deport.

After the visa revocations, ICE terminated the Student and Exchange Visitor Information System ("SEVIS") records of students whose names appeared in the NCIC database. SEVIS is a system used by ICE to administer its student visa program. According to DOS's Foreign Affairs Manual, "the SEVIS record is the definitive record of student . . . status and visa eligibility." 9 Foreign Affairs Manual ("FAM") 402.5-4(B)(a). As grounds for the terminations, ICE variously cited the student's failure to maintain status, identification in criminal records, and/or visa revocation.

Many affected students sued to challenge the termination of their SEVIS records. Soon thereafter, ICE agreed to reactivate the SEVIS records of all affected students retroactively to the date of termination. ICE also issued an internal broadcast message listing grounds for terminating a SEVIS record, including a visa

2

revocation (the "Broadcast Message"). DOS has not reinstated any of the revoked visas.

Plaintiffs Presidents' Alliance on Higher Education and Immigration ("Presidents' Alliance") and Association of Independent Colleges and Universities in Massachusetts ("AICUM" and, together with Presidents' Alliance, "Plaintiffs") are membership organizations representing colleges and universities across the nation and in Massachusetts, respectively. They filed suit in April 2025 to challenge the federal government's actions during the SCAI.[1] Plaintiffs' amended complaint names as defendants the Secretary of Homeland Security, the Acting Director of ICE, the Secretary of State, the U.S. Department of Homeland Security ("DHS"), and DOS. Plaintiffs bring five claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. These claims allege that DOS's policy of revoking visas based on NCIC hits without any individualized inquiry (the "Visa Revocation Policy") is arbitrary and capricious (Count I); that DHS and ICE's policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation (the "SEVIS Termination Policy") is contrary to law (Count II) and arbitrary and capricious (Count III); that ICE's Broadcast Message represents a rule unlawfully promulgated without

---

[1] The original complaint was also brought on behalf of five international students who each had their visa revoked and/or their SEVIS record terminated in the spring of 2025. These five individual plaintiffs have all dropped their claims.

notice and comment (Count IV); and that DOS's policy of sending communications to international students whose visas were revoked is arbitrary and capricious and contrary to law (Count V). Plaintiffs seek an order enjoining, vacating, and declaring unlawful these various policies.

Defendants now move to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack Article III standing, that Plaintiffs' claims relating to the SEVIS terminations are moot, that the APA does not permit judicial review of most of the challenged actions, and that Plaintiffs' claims otherwise fail on the merits. After hearing, the Court agrees that Count V does not challenge a final agency action but otherwise rejects Defendants' arguments. The Court therefore **ALLOWS IN PART** and **DENIES IN PART** Defendants' motion to dismiss (Dkt. 29).

## BACKGROUND

The Court first describes the statutory and regulatory framework governing student visas and SEVIS. The Court then explains the factual background of this case as pled in the amended complaint, see Cheng v. Neumann, 51 F.4th 438, 441 (1st Cir. 2022), with additional facts relevant to the issue of mootness taken from other portions of the record, see Nat'l Ass'n of Gov't Emps. v. Yellen ("NAGE"), 120 F.4th 904, 907 (1st Cir. 2024) (noting that courts "may look beyond the complaint when assessing mootness").

4

I.    **Student Visas and SEVIS**

    A.    **F-1 Student Visas and Status**

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., authorizes the issuance of a nonimmigrant visa to a noncitizen "who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established college, university, . . . or other academic institution." 8 U.S.C. § 1101(a)(15)(F)(i); see id. § 1201(a)(1)(B) (authorizing visas for noncitizens classified under § 1101(a)(15)). These student visas are commonly referred to as "F-1" visas. See 22 C.F.R. § 41.12; Makieh v. Holder, 572 F.3d 37, 39 (1st Cir. 2009). DOS "oversees the visa process abroad through its consular officers," 9 FAM 102.2-2, who may issue visas to qualifying noncitizens. See 8 U.S.C. § 1201(a)(1); 22 C.F.R. § 41.111(a). Consular officers, as well as the Secretary of State, also have discretion to revoke visas. See 8 U.S.C. § 1201(i); 22 C.F.R. § 41.122(a).

Admission to the United States as a nonimmigrant requires possession of a valid visa, see 8 U.S.C. § 1182(a)(7)(B)(i)(II), but a visa "does not guarantee entry," 9 FAM 401.1-2(a); see 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at

a port of entry in the United States, he is found to be inadmissible . . . ."). When an F-1 visa holder arrives at the border, he may be admitted if he 1) possesses a valid passport and visa, 2) presents a "Form I-20" issued by his school documenting his acceptance, 3) has evidence of adequate financial support, and 4) intends to attend the school specified on his visa. See 8 C.F.R. §§ 214.1(a)(3)(i), 214.2(f)(1)(i).

The admission of a nonimmigrant to the United States is "for such time and under such conditions as [DHS] may by regulations prescribe." 8 U.S.C. § 1184(a)(1). "The period of validity of a nonimmigrant visa is the period during which the alien may use it in making application for admission" and "has no relation to the period of time the immigration authorities at a port of entry may authorize the alien to stay in the United States." 22 C.F.R. § 41.112(a). Instead, an F-1 visa holder "may be admitted for a period up to 30 days before" his course of study begins and may remain in the country through the "[d]uration of status," that is, "the time during which an F-1 student is pursuing a full course of study at an [approved] educational institution . . . or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i); see Silva v. Gonzales, 463 F.3d 68, 69 (1st Cir. 2006). An F-1 "student is considered to be maintaining status if the student is making normal progress toward completing a course of study." 8 C.F.R. § 214.2(f)(5)(i). A student otherwise

fails to maintain status if he 1) engages in "unauthorized employment," 2) willfully provides false information to DHS, or 3) is convicted of "a crime of violence for which a sentence of more than one year imprisonment may be imposed." Id. § 214.1(e)-(g). Moreover, an F-1 student's nonimmigrant status "shall be terminated by the revocation of a waiver [of admissibility] authorized on his or her behalf under [8 U.S.C. § 1182(d)(3) or (4)]; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." Id. § 214.1(d).

"[A]n F-1 student who fails to maintain a full course of study without the approval of [his school] or otherwise fails to maintain status" does not receive a grace period to prepare for departure from the United States. Id. § 214.2(f)(5)(iv). Certain students who are out of status for no more than five months, however, may seek reinstatement by U.S. Citizenship and Immigration Services ("USCIS"). See id. § 214.2(f)(16)(i). USCIS's decision not to reinstate a student is unappealable. See id. § 214.2(f)(16)(ii).

**B.  SEVIS**

In 1996, Congress directed immigration authorities to "develop and conduct a program to collect from approved institutions of higher education" information about noncitizens with F-1 student status. Illegal Immigration Reform and Immigrant

7

Responsibility Act of 1996, Pub. L. No. 104-208, § 641(a)(1), 110 Stat. 3009, 3009-704 (codified as amended at 8 U.S.C. § 1372(a)(1)). This directive led to the creation of SEVIS, which is "the web-based system that [DHS] uses to maintain information" about F-1 students. Liu v. Noem, 780 F. Supp. 3d 386, 394 (D.N.H. 2025) (alteration in original) (quoting U.S. Dep't of Homeland Sec., About SEVIS, Study in the States, https://studyinthestates.dhs.gov/site/about-sevis (visited Apr. 29, 2025)), appeal dismissed, No. 25-1643, 2025 WL 3904829 (1st Cir. Aug. 14, 2025); see 22 C.F.R. § 62.2 (defining SEVIS as the "statutorily mandated system designed to collect information on non-immigrant students"). ICE administers SEVIS through its Student and Exchange Visitor Program ("SEVP") and uses SEVIS "to carry out [its] enforcement functions." 6 U.S.C. § 252(a)(4); see 9 FAM 402.5-4(A)(a).

The federal government employs SEVIS for various purposes related to international students. Schools apply via SEVIS for certification or recertification to host F-1 students. See 8 C.F.R. § 214.3(a)(1). Schools also issue in SEVIS a Form I-20 reflecting a foreign student's acceptance to a program of study to enable the student to obtain an F-1 visa. See id. § 214.2(f)(1)(iii); 9 FAM 402.5-5(D)(1)(a). According to DOS's Foreign Affairs Manual, "the SEVIS record is the definitive record of student . . . status and visa eligibility." 9 FAM 402.5-4(B)(a). As such, consular officers

"must always check an applicant's SEVIS status before issuing an F[-1] . . . visa," id.; see 22 C.F.R. § 41.61(d), and "[u]pon issuance of an F[-1] . . . visa, notification of such issuance must be entered into the SEVIS database," 22 C.F.R. § 41.61(d).

Additionally, SEVIS contains information about F-1 students' identity and address, entry into the United States, and enrollment and academic status in an educational program. See 8 U.S.C. § 1372(c)(1). Designated School Officials ("DSOs") at schools approved to host F-1 students "must . . . update and maintain student records in [SEVIS]." Kim v. Holder, 737 F.3d 1181, 1182 n.2 (7th Cir. 2013); see 8 C.F.R. § 214.3(l)(1)(iii) (tasking DSOs with ensuring "timely and complete recordkeeping and reporting to DHS"). For example, each term, DSOs must report whether an F-1 student has actually enrolled in a full courseload and confirm that SEVIS reflects the student's estimated program completion date. See 8 C.F.R. § 214.3(g)(2)(iii)(A), (D). DSOs must note in SEVIS any approval for a student to take a reduced courseload, to transfer to another school, or to engage in off-campus employment. See id. § 214.2(f)(6)(iii)(E), (8)(ii), (9)(ii)(D). DSOs also must update SEVIS to recommend that a student participate in optional practical training and to reflect any change in a student's name or address. See id. §§ 214.2(f)(11)(ii)(B), (17), 214.3(g)(2)(ii)(B). And schools must report when a student fails to maintain status, fails to complete his program, graduates early,

9

or is subject to disciplinary action due to a criminal conviction. See id. § 214.3(g)(2)(ii)(A), (C)-(D).

In 2010, SEVP issued guidance to DSOs to inform them "of the visa revocation process, how to record such an action in a [SEVIS] record, and how to respond to law enforcement inquiries involving students whose visas have been revoked." Student & Exch. Visitor Program, U.S. Immigr. & Customs Enf't, Policy Guidance 1004-04 – Visa Revocations 1 (June 7, 2010), https://perma.cc/ZM2S-R6Z6. This guidance stated that if an F-1 student visa is revoked "while the nonimmigrant is in the United States and in status," the "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." Id. at 3. ICE has removed this guidance from its website. See Öztürk v. Trump, __ F. Supp. 3d __, __ n.3 (D. Mass. 2025) [2025 WL 3514320, at *2 n.3], appeal filed, No. 26-1135 (1st Cir. Feb. 7, 2026).

## II.  Student Criminal Alien Initiative

In mid-March 2025, DHS and DOS undertook an effort referred to internally as the "Student Criminal Alien Initiative" ("SCAI"). Dkt. 14 ¶ 31. Over multiple weeks, ICE employees ran the names of the 1.3 million international students then in the United States through the NCIC database, which contains records of individuals' interactions with law enforcement such as convictions, arrests, charges, and citations. Approximately 6,400 of the names returned positive hits, and about 3,000 of those students had a valid visa

10

at the time. Among these students were individuals with no criminal history, individuals with only minor infractions such as speeding tickets, and individuals arrested for minor offenses but never charged in court.

ICE sent DOS a list of the 6,400 student visa holders whose names appeared in the NCIC database. DOS then revoked many, if not all, of the valid visas issued to those students. Plaintiffs allege that DOS revoked those visas solely because the students appeared in the NCIC database and not based on any individualized assessment of whether revocation was warranted. In some cases, DOS did not notify the student or his or her school about the revocation. In other cases, DOS sent a letter or email informing the student that his or her visa had been revoked and that DOS had notified ICE. The letter also stated the following:

> Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

> Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

Id. ¶ 49.

11

ICE then terminated the SEVIS records of thousands of international students whose names appeared in the NCIC database. The affected individuals included undergraduate and graduate students and recent graduates working in the United States via optional practical training. Plaintiffs again allege that ICE terminated these SEVIS records without any individualized assessment of whether each student had been convicted of a crime or whether termination was otherwise warranted. In many cases, DHS did not notify the affected students or their schools about the SEVIS terminations, which were instead discovered by the schools' DSOs. ICE listed a variety of reasons for the terminations in the SEVIS records, including "Otherwise Failing to Maintain Status" with either the explanation "[i]ndividual identified in criminal records check and/or has had their visa revoked" or a narrative citing deportability provisions for failure to maintain status and foreign policy grounds. Id. ¶ 39 (alteration in original). On or about April 8, 2025, ICE updated many terminated SEVIS records to include a new notation reading "OTHER - Individual identified in criminal records check and/or has had their visa revoked." Id. ¶ 40. Some terminated records contain no notation or explanation at all.

These visa revocations and SEVIS terminations triggered a nationwide tsunami of lawsuits filed by affected F-1 students. See, e.g., Mekarthi v. Noem, 796 F. Supp. 3d 488, 489-90 (N.D.

12

Ill. 2025); Doe v. Noem, 783 F. Supp. 3d 907, 917 (W.D. Va. 2025); Doe #1 v. Noem, 781 F. Supp. 3d 246, 258-59 (D.N.J. 2025); Doe 1 v. Bondi, 785 F. Supp. 3d 1268, 1276 (N.D. Ga. 2025); Liu, 780 F. Supp. 3d at 395; Doe 4 v. Lyons, 783 F. Supp. 3d 1281, 1286-87 (W.D. Wash. 2025); Doe #1 v. Trump, 785 F. Supp. 3d 575, 581 (D. Ariz. 2025); Beyhaqi v. Noem, 779 F. Supp. 3d 919, 921 (S.D. Tex. 2025). On April 26, 2025, ICE issued a "Broadcast Message" entitled "SEVIS Notice - Policy Regarding Termination of Records" to "All SEVP Personnel." Dkt. 30-7 at 2. The Broadcast Message states that "SEVP can terminate [SEVIS] records for a variety of reasons, including, but not limited to the following reasons: . . . U.S. Department of State Visa Revocation (Effective Immediately)." Id. The Broadcast Message later reiterates that if DOS "revokes a nonimmigrant visa effective immediately, SEVP may terminate the nonimmigrant's SEVIS record based on the visa revocation with immediate effect, as such a revocation can serve as a basis of removability under INA § 237(a)(1)(B)." Id. at 3. The Broadcast Message includes a disclaimer that it "is not . . . a rule or a final action by SEVP" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." Id.

SEVP then reactivated the SEVIS records that had been terminated during the SCAI. While the SEVIS records reflect the initial terminations and subsequent reactivations, the

13

reactivations are "retroactive to the date of the initial terminations, such that there is no gap or lapse in the affected SEVIS records." Dkt. 30-6 ¶ 13. SEVP mailed each student a letter stating that his or her SEVIS record had been reactivated and that ICE would not use the termination of a SEVIS record during the SCAI "as a basis for denial of future immigration benefits or a determination that one did not maintain his or her nonimmigrant status during that time period." Id. ¶ 15.

Significantly, DOS has not reinstated the revoked F-1 visas. An ICE official who oversees SEVP has stated under oath that "[c]onsistent with its new SEVIS policy, ICE will not re-terminate SEVIS records based solely on the NCIC record that led to the initial termination or solely on any related visa revocation that is effective upon departure." Dkt. 30-6 ¶ 11.

## III. __Presidents' Alliance and AICUM__

Presidents' Alliance is a nonprofit association of leaders from almost 600 public and private colleges and universities across the country. Its member institutions enroll over five million students, including international students. Presidents' Alliance convenes these leaders to address immigration issues impacting students and educational institutions, supports educational access and post-graduate opportunities at American institutions for immigrant and international students, and advocates for issues concerning immigrant and international students.

14

AICUM is an advocacy organization representing fifty-seven private colleges and universities in Massachusetts. More than 280,000 students, including international students, attend AICUM's member institutions annually. AICUM advocates on issues related to higher education, including protecting the interests of international students at its member institutions.

During the SCAI, DHS terminated the SEVIS records and revoked the visas of students at member institutions of both Plaintiffs. Plaintiffs expended resources to assist its members in responding to the visa revocations and SEVIS terminations. Presidents' Alliance has "divert[ed] significant time and resources away from its planned initiatives" in order to "manage the surge of urgent concerns from member institutions." Dkt. 14 ¶ 54. These efforts have "include[d] preparing rapid-response materials, convening emergency briefings, issuing updated guidance to institutional leaders, and coordinating closely with external legal experts." Id. Presidents' Alliance has responded to "a surge in individualized requests for technical assistance, legal interpretation, and institutional messaging support from member institutions seeking clarity, coordination, and guidance" about the federal government's actions. Id. ¶ 55. For its part, AICUM conducted outreach to its members to determine how it could provide support and contacted elected officials on behalf of its members. AICUM opted not to increase membership dues for the fiscal year

15

starting June 2025 due to the "immense financial strain the current federal regulatory landscape has created." Id. ¶ 56.

Staff at member institutions responded to the terminations by preparing remote instruction for graduate students with terminated SEVIS records, counseling international students and faculty with questions about the federal government's actions, and arranging trainings for international students. At one community college that is a member of Presidents' Alliance, twelve students had their SEVIS records terminated. The college's international program staff spent about half their time in March and April 2025 notifying affected students, assessing immigration options for individual students, arranging online coursework for students who had left campus, and conducting trainings for students and faculty. Some Presidents' Alliance and AICUM member colleges provided summer housing and financial assistance to international students afraid to travel abroad.

Following the SEVIS terminations, some international students at Presidents' Alliance and ACIUM member institutions left the United States out of fear of deportation, including at least four students at one member institution and several at another member university. Member institutions have faced a drop in enrollment among current students who have departed the United States and among prospective students seeking to begin a course of study in the fall of 2025. Approximately 80% of international students pay

16

full tuition, and the uncertainty created by the SCAI has affected member institutions' ability to plan and budget.

## DISCUSSION

Defendants move to dismiss the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim. The Court addresses these two sets of arguments in turn.

## I.    Jurisdiction

### A.    Article III Standing

Defendants first contend that Plaintiffs, both membership organizations, lack Article III standing to bring this action. The Court first lays out the legal standard for establishing standing and then applies that standard to the allegations in this case.

#### 1.    Legal Standard

Under Article III's case-or-controversy requirement, the plaintiff must possess standing to bring its lawsuit, i.e., "a '"personal stake"' in the case." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)). To meet this burden, the "plaintiff must show (i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id.

17

"An organization with individual members may establish Article III standing" in two ways. Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025), petition for cert. filed, No. 25-899 (U.S. Jan. 30, 2026); see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). First, the organization may "satisfy[] the three elements of . . . standing based on an 'injury in fact' of its own." Doe, 157 F.4th at 47 (quoting FDA v. All. for Hippocratic Med., 602 U.S. 367, 393 (2024)). This type of standing, known as organizational standing, requires that the organization itself "satisf[ies] the usual standards for injury in fact, causation, and redressability." All. for Hippocratic Med., 602 U.S. at 394. Alternatively, the organization "may establish 'associational standing' to sue in a 'representational capacity.'" Doe, 157 F.4th at 47 (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343, 345 (1977)). For this form of standing, "the organization must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. (quoting Hunt, 432 U.S. at 343). The first factor is satisfied if one member of the organization would have standing to sue on its own. See Housatonic River Initiative v.

18

U.S. EPA, 75 F.4th 248, 265 (1st Cir. 2023); Equal Means Equal v. Ferriero, 3 F.4th 24, 29 (1st Cir. 2021).

The plaintiff bears the burden of establishing standing and must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation." TransUnion, 594 U.S. at 431 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). When, as here, a defendant moves to dismiss for lack of standing based on the face of the complaint, courts credit all well-pleaded facts in the complaint, draw all reasonable inferences in the plaintiff's favor, and ask whether the plaintiff has plausibly alleged the three elements of standing. See Wiener v. MIB Grp., Inc., 86 F.4th 76, 83 (1st Cir. 2023). In a multi-plaintiff action, "only one plaintiff needs standing for a suit to proceed." Bost v. Ill. State Bd. of Elections, 146 S. Ct. 513, 519 n.3 (2026). But "plaintiffs must demonstrate standing for each claim that they press." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 85 (1st Cir. 2025) (quoting TransUnion, 594 U.S. at 431). Additionally, "[p]ast harm is insufficient to 'confer standing to seek forward-looking declaratory or injunctive relief'; there must be 'ongoing injury or a sufficient threat that the injury will recur.'" NAGE, 120 F.4th at 910 (quoting Roe v. Healey, 78 F.4th 11, 21 (1st Cir. 2023)). The Court measures Plaintiffs' standing as of the filing of the amended complaint in June 2025. See Conservation L. Found., 129 F.4th at 85-86.

19

*2.    Analysis*

Plaintiffs argue that they have adequately pled that both Presidents' Alliance and AICUM have organizational and associational standing. The Court holds that Plaintiffs have plausibly pled Presidents' Alliance's organizational standing and, thus, need not tackle Plaintiffs' other theories. See Bost, 146 S. Ct. at 519 n.3 (explaining that "only one plaintiff needs standing for a suit to proceed"); Am. Acad. of Pediatrics v. Kennedy, __ F. Supp. 3d __, __ (D. Mass. 2026) [2026 WL 33719, at *6] (noting that the court did not have to "address whether any [o]rganizational [p]laintiff ha[d] associational standing" after finding that one "ha[d] demonstrated organizational standing").

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n.7 (1st Cir. 2012). As one example, courts have long held that an organization has standing if "the challenged conduct frustrated [its] organizational mission[]" and it "diverted resources to combat that conduct." Town of Milton v. FAA, 87 F.4th 91, 99 (1st Cir. 2023) (quoting Friends of the Earth v. Sanderson Farms, Inc., 992 F.3d 939, 942 (9th Cir. 2021)); see Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). But "an organization may not establish standing simply based on the 'intensity of [its] interest,'" its "strong opposition to the

government's conduct," or "simply a setback to [its] abstract social interests." All. for Hippocratic Med., 602 U.S. at 394 (first quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 486 (1982); and then quoting Havens Realty, 455 U.S. at 379). It follows that "an organization cannot establish standing if the 'only injury arises from the effect of [a challenged action] on the organization['s] lobbying activities, or when the service impaired is pure issue-advocacy.'" Equal Means Equal, 3 F.4th at 30 (first alteration in original) (quoting People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1093-94 (D.C. Cir. 2015)).

The Supreme Court recently refined these principles of organizational standing in Alliance for Hippocratic Medicine. There, a number of pro-life doctors and medical associations sued the U.S. Food and Drug Administration ("FDA") to challenge its relaxation of regulatory requirements that facilitated access to mifepristone, an abortion drug. See All. for Hippocratic Med., 602 U.S. at 372-73. The Court held that the medical associations lacked standing to sue. See id. at 393-96. The associations argued that they had standing because "FDA ha[d] impaired their ability to provide services and achieve their organizational missions." Id. at 394 (cleaned up). The Court disagreed, explaining that the associations could not "assert standing simply because they object to FDA's actions." Id. The associations also claimed standing

"based on their incurring costs to oppose FDA's actions," including performing their own studies about mifepristone in order to "better inform their members and the public about mifepristone's risks," "drafting citizen petitions to FDA," and "engaging in public advocacy and public education." Id. These expenditures did not support standing, the Court concluded, because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Id.

In so concluding, the Court rejected both the associations' analogy to Havens Realty and their assertion that "standing exists when an organization diverts its resources in response to a defendant's actions." Id. at 395. The Court explained that Havens Realty addressed whether HOME, which both was "an issue-advocacy organization" and "operated a housing counseling service," had standing to sue an apartment building owner under the Fair Housing Act for providing false information about apartment availability to HOME's black employees. Id. HOME had standing, the Court stressed, because the owner's provision of false information to HOME's employees "directly affected and interfered with HOME's core business activities" of "provid[ing] counseling and referral services for low- and moderate-income homeseekers." Id. (quoting Havens Realty, 455 U.S. at 379). By contrast, "FDA's actions

22

relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses." Id.

In this case, Plaintiffs allege that Presidents' Alliance "supports the educational access, success, and post-graduate pathways of immigrants, refugee, and international students at U.S. colleges and universities." Dkt. 14 ¶ 5. Presidents' Alliance expended resources to assist member institutions in responding to the visa revocations and SEVIS terminations affecting their students. Specifically, Presidents' Alliance has "divert[ed] significant time and resources away from its planned initiatives" in order to "manage the surge of urgent concerns from member institutions." Id. ¶ 54. These efforts have "include[d] preparing rapid-response materials, convening emergency briefings, issuing updated guidance to institutional leaders, and coordinating closely with external legal experts." Id. Presidents' Alliance has responded to "a surge in individualized requests for technical assistance, legal interpretation, and institutional messaging support from member institutions seeking clarity, coordination, and guidance" about the federal government's actions. Id. ¶ 55.

The parties debate whether this diversion of resources is sufficient to establish standing under Alliance for Hippocratic Medicine. The issue is a difficult one, as the Supreme Court "left unclear the line that divides spending that satisfies Article III from spending that does not" in the context of organizational

23

standing. Tenn. Conf. of the NAACP v. Lee, 139 F.4th 557, 565 (6th Cir. 2025). One court has read Alliance for Hippocratic Medicine to foreclose any organizational standing argument that relies on a voluntary diversion of resources in response to the challenged conduct. See, e.g., Am. Fed'n of Gov't Emps. v. Ezell, No. 25-cv-10276, 2025 WL 470459, at *1-2 (D. Mass. Feb. 12, 2025) (rejecting, in the context of a motion for preliminary relief, the argument that labor unions representing government employees had standing to challenge a government employment directive that "subject[ed] them to upstream effects including a diversion of resources to answer members' questions about the directive"). Other courts have permitted such an injury to support standing post-Alliance for Hippocratic Medicine if the diversion of resources furthers a core business activity of the organization that is not issue advocacy or lobbying and, thus, is not merely an effort to oppose the challenged conduct. See, e.g., Am. Acad. of Pediatrics, __ F. Supp. 3d at __ [2026 WL 33719, at *5-6] (holding that a professional medical association had standing to challenge the federal government's changes to COVID vaccine recommendations and the vaccine advisory committee based on its diversion of resources to counsel its members about the changes in order to further its public health mission).

The Court adopts the latter reading of Alliance for Hippocratic Medicine. Before that case was decided, the First

24

Circuit had recognized an organization's standing if "the challenged conduct frustrated [its] organizational mission[]" and it "diverted resources to combat that conduct," Town of Milton, 87 F.4th at 99 (quoting Friends of the Earth, 992 F.3d at 942), as long as the harm was not to "the organization['s] lobbying" or "pure issue-advocacy" activities, Equal Means Equal, 3 F.4th at 30 (quoting People for the Ethical Treatment of Animals, 797 F.3d at 1093-94). Alliance for Hippocratic Medicine is not inconsistent with those principles, as the Supreme Court noted multiple times that the expenditure of resources in that case did not support standing because the expenditure solely represented opposition to the challenged conduct. See 602 U.S. at 394 (framing the medical associations' argument for standing as resting on "their incurring costs to oppose FDA's actions"); id. (stating that "an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action"); id. at 395 (refusing to recognize a theory of standing that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies").

The amended complaint plausibly alleges that Presidents' Alliance has standing to bring this lawsuit. Presidents' Alliance has not diverted resources merely to efforts to oppose the federal

25

government's visa revocations and SEVIS terminations, thereby manufacturing standing to sue. Instead, Plaintiffs allege that in addition to its advocacy work, Presidents' Alliance provides support to U.S. colleges and universities with respect to opportunities for international students. The visa revocations and SEVIS terminations have triggered a flood of requests for assistance from member institutions and caused the organization to divert resources from its other initiatives in order to offer guidance to its members on responding to the federal government's actions. In short, Presidents' Alliance's "diversion of resources goes beyond mere advocacy as to be sufficient for organizational standing." Am. Acad. of Pediatrics, __ F. Supp. 3d at __ [2026 WL 33719, at *6]. And this injury also satisfies the causation and redressability requirements: the visa revocations and SEVIS terminations predictably prompted the flood of requests for assistance from member institutions and the need for Presidents' Alliance to expend resources in response, and an order striking down the policies authorizing those revocations and terminations would reduce or eliminate those requests.

Defendants separately contend that Presidents' Alliance was not suffering an ongoing injury when the amended complaint was filed in late June 2025, and thus lacks standing to seek the prospective relief sought in this lawsuit, because ICE at that point had already reactivated the SEVIS records terminated during

the SCAI. See Conservation L. Found., 129 F.4th at 85-86 (measuring standing as of the date the operative amended complaint was filed). A fair reading of Plaintiffs' allegations indicates that Presidents' Alliance's diversion of resources to support its member institutions continued past ICE's reactivation of SEVIS records in late April and early May 2025. DOS has never reinstated the F-1 visas it revoked or withdrawn the letters and emails it sent to affected students about those revocations. And, as discussed in more detail below in the context of Defendants' arguments about mootness, ICE's reversal does not provide assurance that it will not again terminate SEVIS records based on an NCIC hit and/or a visa revocation. Indeed, the Broadcast Message, which ICE has never disavowed, expressly authorizes SEVP to terminate a SEVIS record based on a visa revocation.

While it is unnecessary to decide the issue of associational standing, the Court pauses to note one flaw in Plaintiffs' arguments on that issue. As noted, associational standing requires that at least one member of the organization would have standing to sue on its own. See Housatonic River, 75 F.4th at 265. In discussing this requirement, Plaintiffs assert that "at least one member must be named" but deny "that each named member's injury must be separately alleged." Dkt. 32 at 21. The First Circuit has explained, though, that an organization seeking to show associational standing "must, at the very least, 'identify a member

27

who has suffered the requisite harm,'" Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (cleaned up) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)), unless "all the members of the organization are affected by the challenged activity," Capen v. Campbell, 134 F.4th 660, 668 (1st Cir. 2025) (quoting Summers, 555 U.S. at 498-99). The contours of this obligation to name names are murky, but simply listing an organization's members by linking to a website and making general allegations of injuries suffered by some of those members is likely insufficient. See Fac., Alumni, & Students Opposed to Racial Preferences v. Harvard L. Rev. Ass'n, No. 18-12105, 2019 WL 3754023, at *6 (D. Mass. Aug. 8, 2019) (leaving open whether this rule "mandate[s] the naming of names at the pleading stage" but emphasizing that an organization must "supply some degree of descriptive information" about the standing of one or more specific members). Given the divided caselaw on the extent to which resource diversion can support organizational standing, Plaintiffs may wish to press associational standing at the summary-judgment stage. If so, they likely must either provide more detailed factual information about the harms suffered by one or more specific members of Presidents' Alliance and/or AICUM or present evidence that every member of one or both organizations has suffered harm from the challenged policies.

28

## B.    Mootness

Defendants next contend that the Court lacks jurisdiction over Counts II and III because those claims are moot. See Roe, 78 F.4th at 21 n.8 ("[M]ootness raises a jurisdictional question . . . ."). Counts II and III challenge ICE's SEVIS Termination Policy -- i.e., its alleged policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation -- as contrary to law and arbitrary and capricious. Defendants emphasize that ICE reactivated all the SEVIS records terminated during the SCAI by early May 2025 and made the reactivations retroactive to the date of termination. Defendants also stress that an ICE official has stated under oath that "ICE will not re-terminate SEVIS records based solely on the NCIC record that led to the initial termination or solely on any related visa revocation that is effective upon departure." Dkt. 30-6 ¶ 11.

"The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" Lowe v. Gagné-Holmes, 126 F.4th 747, 755 (1st Cir.) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003)), cert. denied, 145 S. Ct. 2795 (2025). Thus, "a case is moot when the issues presented are no longer live," when "the parties lack a legally cognizable interest in the outcome," or when "the court cannot give any effectual relief to the potentially prevailing party." Id. (quoting Bayley's

Campground, Inc. v. Mills, 985 F.3d 153, 157 (1st Cir. 2021)). The burden of demonstrating mootness rests "on the party raising the issue." Id. (quoting Bos. Bit Labs, Inc. v. Baker, 11 F.4th 3, 8 (1st Cir. 2021)).

A defendant cannot, however, "'automatically moot a case' by the simple expedient of suspending its challenged conduct after it is sued." FBI v. Fikre, 601 U.S. 234, 241 (2024) (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)). Under the voluntary cessation doctrine, a claim is not moot if two conditions are satisfied: (1) "a defendant voluntar[ily] ceases the challenged practice in order to moot the plaintiff's case" and (2) "'there exists a reasonable expectation that the challenged conduct will be repeated' after the suit's 'dismissal.'" NAGE, 120 F.4th at 912 (alteration in original) (quoting Bos. Bit Labs, 11 F.4th at 9); see Lowe, 126 F.4th at 758 (clarifying that both conditions must be met for this doctrine to save a claim from mootness). This rule "exists to stop a scheming defendant from trying to 'immuniz[e] itself from suit indefinitely' by unilaterally changing 'its behavior long enough to secure a dismissal' and then backsliding when the judge is out of the picture." NAGE, 120 F.4th at 912 (alteration in original) (quoting Bos. Bit Labs, 11 F.4th at 10). The defendant bears the burden of proving that one or both conditions of the voluntary cessation test is not satisfied. See Lowe, 126 F.4th at 756, 758. Put simply, "a defendant claiming

that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Corrigan v. Bos. Univ., 98 F.4th 346, 353 (1st Cir. 2024) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)).

Defendants have failed to meet this burden.[2] First, Defendants' reactivation of the SEVIS records and their disavowal of any intent to re-terminate those records were likely a result of pending litigation. Defendants' reversal followed the filing of a torrent of lawsuits about the SEVIS terminations during the SCAI, including this action, and numerous adverse judicial rulings. See, e.g., Doe 4, 783 F. Supp. 3d at 1300; Doe #1, 785 F. Supp. 3d at 588; Beyhaqi, 779 F. Supp. 3d at 923; Doe 1 v. Bondi, 780 F. Supp.

---

[2] Many district courts have held under the voluntary cessation doctrine that the reactivation of SEVIS records did not moot individual suits brought by students whose SEVIS records were terminated during the SCAI. See, e.g., Bushireddy v. Lyons, No. 25-1102, 2026 WL 759480, at *6-7 (D.D.C. Mar. 18, 2026); Doe v. Noem, No. 25-cv-00023, 2026 WL 562452, at *6-7 (W.D. Va. Feb. 28, 2026); Roe v. Noem, No. 25-cv-40, 2026 WL 194636, at *5-6 (D. Mont. Jan. 26, 2026); Saxena v. Noem, No. 25-cv-05035, 2026 WL 84248, at *5 (D.S.D. Jan. 12, 2026); Vemula v. Noem, No. 25-cv-04561, 2025 WL 3527141, at *4-5 (N.D. Ill. Dec. 9, 2025); Zhou v. Lyons, __ F. Supp. 3d __, __ (C.D. Cal. 2025) [2025 WL 3691816, at *6]; Du v. U.S. Dep't of Homeland Sec., No. 25-cv-644, 2025 WL 1549098, at *6-7 (D. Conn. May 31, 2025). But see He v. Noem, No. 25-cv-05333, 2026 WL 37999, at *2 (W.D. Wash. Jan. 6, 2026) (finding an individual student's suit to be moot without mentioning voluntary cessation and noting that the student did not oppose the motion to dismiss).

3d 1277, 1286 (N.D. Ga. 2025); Doe v. Noem, 781 F. Supp. 3d 1055, 1071 (E.D. Cal. 2025); Doe v. Noem, 778 F. Supp. 3d 1151, 1167-68 (W.D. Wash. 2025). Defendants argue that the fact that "ICE reactivated the SEVIS records across the board, regardless of whether the students were involved in pending litigation," demonstrates that their reversal had nothing to do with litigation. Dkt. 40 at 5. This argument is not credible, especially because the government was facing at least two lawsuits -- this action and one in the Northern District of California, see Chen v. Noem, No. 25-cv-03292, 2025 WL 1150697, at *4 (N.D. Cal. Apr. 18, 2025) -- seeking either policy-wide or nationwide relief. Cf. Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 122 (2025) ("Judges 'are "not required to exhibit a naiveté from which ordinary citizens are free."'" (quoting Dep't of Com. v. New York, 588 U.S. 752, 785 (2019))).

Second, Defendants have not proven "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Corrigan, 98 F.4th at 353 (quoting Friends of the Earth, 528 U.S. at 190). Plaintiffs challenge DHS's alleged policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation. The ICE official's declaration states that "ICE will not re-terminate SEVIS records based solely on the NCIC record that led to the initial termination or solely on any related visa revocation that is effective upon departure." Dkt. 30-6 ¶ 11. This

32

statement promises only that ICE will not use the past NCIC hits identified during the SCAI and the resulting visa revocations as grounds to re-terminate a SEVIS record; it makes no representation that ICE will not terminate SEVIS records in the future based on other existing or new NCIC hits or new visa revocations. In short, the government's ambiguous "declaration falls short of demonstrating that it cannot reasonably be expected to do again in the future what it is alleged to have done in the past." Fikre, 601 U.S. at 242. It is significant for the mootness inquiry that Defendants have not restored the visas that were revoked.

Additionally, the Broadcast Message, which reflects ICE's current position on SEVIS terminations, states that "SEVP can terminate [SEVIS] records for a variety of reasons, including, but not limited to the following reasons: . . . U.S. Department of State Visa Revocation." Dkt. 30-7 at 2. The Broadcast Message thus expressly authorizes ICE to terminate a SEVIS record based on a visa revocation and does not bar ICE from doing the same based on a student's minor interaction with the criminal justice system.

Accordingly, the Court concludes under the voluntary cessation doctrine that Counts II and III are not moot.[3]

---

[3] Because the voluntary cessation doctrine saves Count II and III from mootness, the Court need not address Plaintiffs' argument that the capable-of-repetition-yet-evading-review exception to mootness also applies to those claims.

33

## II.  **Merits**

Defendants also move to dismiss Plaintiffs' amended complaint for failure to state a claim under Rule 12(b)(6). To survive such a motion, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (cleaned up). This standard requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The court must then determine whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).[4]

---

[4] The First Circuit has held that this "plausibility standard does not apply to a complaint for judicial review of final agency action" under the APA and that a Rule 12(b)(6) motion in this context generally must "claim[] that the underlying premise of the complaint is legally flawed (rather than factually unsupported)." Atieh v. Riordan, 727 F.3d 73, 76 & n.4 (1st Cir. 2013). The

34

### A.    Visa Revocations (Count I)

In Count I, Plaintiffs challenge DOS's Visa Revocation Policy -- i.e., its alleged policy of revoking visas based on NCIC hits without any individualized inquiry -- as arbitrary and capricious under 5 U.S.C. § 706(2)(A). Defendants assert that judicial review of this claim is unavailable because 1) 8 U.S.C. § 1201(i) "preclude[s] judicial review," 5 U.S.C. § 701(a)(1); 2) visa revocations are "committed to agency discretion by law," id. § 701(a)(2); and 3) Plaintiffs have not identified a final agency action.[5] The Court addresses these three arguments seriatim.

### 1.    5 U.S.C. § 701(a)(1)

The APA contains a "strong presumption" that agency action is subject to judicial review. Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020) (quoting Mach Mining,

_____

plausibility standard may still apply, however, in APA cases where the scope of judicial review is not limited to the administrative record. See Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs., 557 F. Supp. 3d 224, 243 n.7 (D. Mass. 2021). The parties do not grapple with how Atieh's holding applies to this case and, regardless, the Court does not discern any fact-laden issue raised in Defendants' motion whose outcome would be different under Atieh's approach.

[5] Although Defendants raise these limitations on judicial review under Rule 12(b)(6), the First Circuit has sometimes framed them as implicating a court's jurisdiction. See, e.g., Doe v. Noem, 152 F.4th 272, 284 (1st Cir. 2025) (§ 701(a)(2)); Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 483-84 (1st Cir. 2016) (§ 701(a)(1)); Puerto Rico v. United States, 490 F.3d 50, 70 (1st Cir. 2007) (final agency action). For present purposes, it does not matter whether these limitations on judicial review affect the Court's jurisdiction or the merits of Plaintiffs' claims.

LLC v. EEOC, 575 U.S. 480, 486 (2015)). This "presumption may be rebutted," however, if a "relevant statute precludes review." Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018); see 5 U.S.C. § 701(a)(1) (barring APA claims "to the extent that . . . statutes preclude judicial review"). Defendants argue that 8 U.S.C. § 1201(i), which authorizes the Secretary of State and consular officers to revoke a visa, precludes review of Plaintiffs' claim challenging DOS's alleged policy of revoking visas based on NCIC hits. That provision states in relevant part as follows:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under [8 U.S.C. § 1227(a)(1)(B)]."

8 U.S.C. § 1201(i).

Plaintiffs do not deny that § 1201(i) may bar a claim seeking judicial review of DOS's decision to revoke an individual visa. See, e.g., Joorabi v. Pompeo, 464 F. Supp. 3d 93, 101 (D.D.C. 2020); Castellanos v. Pfizer, Inc., 555 F. Supp. 2d 1343, 1348 (S.D. Fla. 2008). But analogizing to McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), Plaintiffs contend that § 1201(i)'s prohibition on judicial review does not apply to their claim because they challenge DOS's alleged policy of revoking visas

36

based on NCIC hits rather than individual visa revocation decisions. The Court agrees.

In McNary, the Supreme Court was confronted with a provision that precluded "judicial review of a determination respecting an application for adjustment of status" under an amnesty program for certain agricultural workers. 498 U.S. at 491 (quoting 8 U.S.C. § 1160(e)(1)). Similarly, in Reno v. Catholic Social Services, Inc., the Court interpreted a provision limiting "judicial review of a determination respecting an application for adjustment of [temporary resident] status." 509 U.S. 43, 54 (1993) (quoting 8 U.S.C. § 1255a(f)(1)). In each case, the Court held that the jurisdictional bar at issue "applie[d] only to review of denials of individual . . . applications," id. at 56 (second alteration in original) (quoting McNary, 498 U.S. at 494), and not to "general collateral challenges to . . . practices and policies used by the agency" in reaching the individual decisions. McNary, 498 U.S. at 492; see Reno, 509 U.S. at 55-56. Critical to these holdings was the Court's reasoning that each statute's "reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." Reno, 509 U.S. at 56 (quoting McNary, 498 U.S. at 492).

The same logic applies here. Section 1201(i) refers to "the issuance of a visa," authorizes the revocation of "such visa," and then bars "judicial review . . . of a revocation under this

subsection." 8 U.S.C. § 1201(i) (emphasis added). As in McNary and Reno, this provision's consistent use of the singular makes manifest that it "describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." Reno, 509 U.S. at 56 (quoting McNary, 498 U.S. at 492). Plaintiffs' claim does not contest the revocation of any individual visa; instead, Plaintiffs challenge a group of decisions to revoke visas pursuant to a broad policy of doing so based on NCIC hits. Section 1201(i) does not preclude judicial review of this claim.

*2.    5 U.S.C. § 701(a)(2)*

Defendants further contend that judicial review is unavailable under the APA for Count I because the claim challenges "action . . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This "quite narrow[]" exception to judicial review does not encompass every action involving the exercise of agency discretion. Weyerhaeuser Co., 586 U.S. at 23. Rather, § 701(a)(2) "applies only to those rare administrative decisions traditionally left to agency discretion, or when the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." New York v. Trump, __ F.4th __, __ (1st Cir. 2026) [2026 WL 734941, at *9] (cleaned up) (first quoting Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 17 (2020); and then quoting Union of Concerned Scientists, 954 F.3d at 17). The agency actions to which the

38

Supreme Court has applied this exception to judicial review include "a decision not to institute enforcement proceedings" and "a decision by an intelligence agency to terminate an employee in the interest of national security." Dep't of Com., 588 U.S. at 772; see Weyerhaeuser Co., 586 U.S. at 23 (listing as other examples "the allocation of funds from a lump-sum appropriation" and "a decision not to reconsider a final action").

In Count I, Plaintiffs allege that DOS's Visa Revocation Policy is arbitrary and capricious under the APA because the policy "lacks a rational connection between the facts relied upon and the decision made" and "represents a sudden and unexplained departure from prior policy and practice." Dkt. 14 ¶¶ 74-75. Defendants assert that this claim is unreviewable under § 701(a)(2) because § 1201(i) gives DOS unfettered discretion to revoke a visa and provides no meaningful standard for a court to apply. Plaintiffs respond that § 701(a)(2) does not bar judicial review of this claim because they challenge a broad policy about visa revocations based on NCIC hits rather than a decision to revoke an individual visa governed by § 1201(i).

"[T]he APA provides for judicial review of both procedure and substance." Union of Concerned Scientists, 954 F.3d at 19; see 5 U.S.C. § 706(2)(A), (C)-(D). DOS's Foreign Affairs Manual, for example, provides guidance on the procedures and grounds for revocation of nonimmigrant visas by a consular officer or the

agency. See 9 FAM 403.11-3 to -5. The policy of revoking a student visa based solely on an NCIC hit without individualized review is plausibly contrary to these standards and implicates reliance interests of F-1 visa holders. Whether this guidance provides law to apply in adjudicating Plaintiffs' challenge to the Visa Revocation Policy is not addressed in the parties' briefing. Furthermore, as pled in the amended complaint, Count I appears to be a "pure APA" claim, i.e., a claim that "alleges a violation of the reasoned decision-making standards of the APA alone" without reference to "an additional set of statutory or regulatory requirements to guide [the court] in assessing the propriety of an agency's procedures in a matter." Union of Concerned Scientists, 954 F.3d at 21-22. The First Circuit has not decided whether courts may adjudicate such a claim, see id. at 22, and the parties have not briefed the issue. The Court denies the motion to dismiss Count I as unreviewable pursuant to § 701(a)(2).

### 3.   Final Agency Action

Defendants' last argument in support of dismissal of Count I is that Plaintiffs do not challenge a final agency action. While Defendants frame this argument in terms of the APA's test for finality, the crux of their position is that the alleged policy regarding visa revocations is not even a discrete "agency action," let alone a final one. Defendants point out that Plaintiffs do not challenge any DOS regulation or official guidance and contend that

40

their claim impermissibly concocts a policy out of DOS's general practices.

The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; see Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024), cert. denied, 145 S. Ct. 2867 (2025). The APA defines an "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The term "'action' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001). To be reviewable under the APA, however, an agency action must be "discrete." New York v. Trump, 133 F.4th 51, 67 (1st Cir. 2025) (quoting Norton v. S. Utah Wilderness All. ("SUWA"), 542 U.S. 55, 64 (2004)). A plaintiff therefore may not bring a "broad programmatic attack" under the APA, i.e., a challenge to "a variety of programmatic deficiencies" or to "'all aspects of' a program." Id. (first quoting SUWA, 542 U.S. at 64; and then quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 890 n.2, 891 (1990)); see New York v. Kennedy, 155 F.4th 67, 76 (1st Cir. 2025). Nor may an APA claim rest on "generalized complaints about agency behavior." Cobell v. Kempthorne, 455 F.3d 301, 307 (D.C. Cir. 2006).

Count I is not an impermissible programmatic attack or generalized complaint about agency behavior. Rather, Plaintiffs challenge a specific DOS policy of revoking visas based on NCIC hits without any individualized inquiry. At this stage, the Court may plausibly infer the existence of such a policy from the allegation that DOS revoked the F-1 visas of many students based on their inclusion on the list of NCIC hits generated by ICE even though some of those students had no more than a speeding ticket. See Garro Pinchi v. Noem, __ F. Supp.3d __, __ (N.D. Cal. 2025) [2025 WL 3691938, at *21] (relying on "circumstantial evidence" to find that an "informal or unwritten" agency policy likely existed); Nava v. Dep't of Homeland Sec., 435 F. Supp. 3d 880, 901-02 (N.D. Ill. 2020) (similar). This policy is a discrete agency action reviewable under the APA. See Am. Ass'n of Univ. Professors v. Rubio ("AAUP"), 780 F. Supp. 3d 350, 385 (D. Mass. 2025) (rejecting argument that the plaintiffs brought an impermissible programmatic attack because they "allege[d] a specific 'policy of revoking the visas and green cards of faculty and students engaged in pro-Palestinian advocacy,' not a constellation of independent decisions or a general drift in agency priorities"). Defendants stress that this policy is not memorialized in any regulation, official guidance, or other writing, but "[a]gency action generally need not be committed to writing to be final and judicially reviewable." Bhd. of Locomotive Eng'rs & Trainmen v.

42

Fed. R.R. Admin., 972 F.3d 83, 100 (D.C. Cir. 2020); see Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt., 786 F. Supp. 3d 647, 691 (S.D.N.Y. 2025); AAUP, 780 F. Supp. 3d at 385; Nava, 435 F. Supp. 3d at 902.

To the extent Defendants also contend that this agency action is not reviewable because it is not final, the Court again disagrees. For purposes of the APA, an agency action is final if two conditions are met: (1) the action "must mark the 'consummation' of the agency's decisionmaking process"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Harper, 118 F.4th at 116 (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)); see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024). Courts apply this test in a "pragmatic" fashion. U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 599 (2016) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 149 (1967)).

The Visa Revocation Policy satisfies both prongs of the test for finality. There is no indication that DOS's policy was "of a merely tentative or interlocutory nature." Harper, 118 F.4th at 116 (quoting Bennett, 520 U.S. at 178). Indeed, DOS proceeded to revoke many students' visas, which it has never restored. DOS's policy thus represents the conclusion of its decisionmaking on this issue. See New York, 155 F.4th at 76 (deeming an agency

43

statement to be a final action because "it was followed, just days later, by" agency conduct implementing the statement). And DOS's policy of revoking visas has immediate legal consequences for the affected students, as a noncitizen without a valid visa may not be admitted to the country. See 8 U.S.C. § 1182(a)(7)(B)(i)(II).

Accordingly, the Court denies Defendants' motion to dismiss Count I.

### B.   SEVIS Terminations (Count II-IV)

Plaintiffs bring two claims challenging DHS's SEVIS Termination Policy, that is, DHS's alleged policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation. Counts II and III allege that this policy is, respectively, contrary to law and arbitrary and capricious under 5 U.S.C. § 706(2)(A). Count IV also relates to SEVIS terminations, alleging that ICE promulgated the Broadcast Message without following the required notice-and-comment process.

Defendants raise three sets of arguments for dismissal of these claims. The Court first addresses an assertion about the nature of a SEVIS record that permeates Defendants' motion and then turns to Defendants' specific arguments.

### 1.   SEVIS Record vs. F-1 Nonimmigrant Status

Defendants' motion repeatedly distinguishes between an F-1 student's SEVIS record and nonimmigrant status. For example, Defendants claim that SEVIS "is a tool used by DHS and [DOS] to

44

support other functions" and that "[h]ow DHS maintains, modifies, and uses the records in its law enforcement database is separate and apart from nonimmigrant status." Dkt. 30 at 33. Defendants add that "[c]hanging a SEVIS record from 'active' to 'terminated' does not terminate a student's nonimmigrant status" and is instead "a record keeping action conducted under DHS's authority to collect information and maintain records under 8 U.S.C. § 1372." Id. at 35-36.[6]

The Court need not conclusively resolve Defendants' argument at this stage. At the very least, the argument presents "a factual dispute that cannot be resolved on a Rule 12(b)(6) motion." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 77 (1st Cir. 2014).[7]

---

[6] In support of this argument, Defendants have submitted declarations from two DHS officials reflecting this distinction. See Dkt. 30-5 ¶ 7 (USCIS official stating that "USCIS does not equate SEVIS record termination with termination of an alien's F-1 nonimmigrant status"); Dkt. 30-6 ¶ 9 (ICE official stating that "[t]erminating a record in SEVIS does not terminate an alien's nonimmigrant status in the United States" and that "SEVP did not terminate the nonimmigrant status of any alien by terminating the SEVIS record"). Courts normally may not consider declarations submitted with a motion to dismiss under Rule 12(b)(6). See Courthouse News Serv. v. Quinlan, 32 F.4th 15, 21 (1st Cir. 2022). The Court need not determine whether it is appropriate to consider the declarations submitted by Defendants for purposes of this argument because the outcome of this motion does not turn on their contents.

[7] The federal government has pressed this purported distinction between an F-1 student's SEVIS record and nonimmigrant status in defending against lawsuits filed by individual students whose SEVIS records were terminated during the SCAI. Courts have uniformly rejected the distinction in those cases. See, e.g., Shaik v. Noem, 801 F. Supp. 3d 825, 836 (D. Minn. Aug. 11, 2025),

45

Plaintiffs have specifically alleged that "an active SEVIS record is indispensable to -- or . . . the equivalent of -- an international student's F-1 status." Dkt. 14 ¶ 22 (cleaned up). This allegation is amply supported by various official sources promulgated by the relevant agencies. According to DOS's Foreign Affairs Manual, for instance, "the SEVIS record is the definitive record of student . . . status." 9 FAM 402.5-4(B)(a). An official DHS website with information on the rules governing international students states the following:

> Once [a DSO] terminate[s] a student's SEVIS record, the student is no longer in an authorized period of stay in the United States. Any associated F-2 . . . dependent records are also terminated. If the student is still in the United States, they lose all employment authorization they received while in student status. An F . . . student who is out of nonimmigrant status must leave the United States, while a student outside of the country cannot reenter the United States using the terminated SEVIS record.

U.S. Dep't of Homeland Sec., Maintaining Accurate SEVIS Records, Study in the States, https://studyinthestates.dhs.gov/schools/report/maintaining-accurate-sevis-records (last visited Mar. 20, 2026); see Melino v. Bos. Med. Ctr., 127 F.4th 391, 394 n.1 (1st Cir. 2025) (taking judicial notice of the contents of government websites). The same

---

appeal dismissed, No. 25-2981 (8th Cir. Jan. 26, 2026); Doe, 783 F. Supp. 3d at 924-26; Doe v. Trump, 784 F. Supp. 3d 1297, 1308-09 (N.D. Cal. 2025); Doe 4, 783 F. Supp. 3d at 1294; Doe #1, 785 F. Supp. 3d at 584-85; Doe, 781 F. Supp. 3d at 1066 n.1.

46

website reiterates elsewhere that "[w]hen an F-1[] SEVIS record is terminated," the "[s]tudent loses all . . . employment authorization," the "[s]tudent cannot re-enter the United States on the terminated SEVIS record," and "[ICE] agents may investigate to confirm the departure of the student." U.S. Dep't of Homeland Sec., Terminating a Student, Study in the States (May 19, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.   These agency sources suggest that the termination of a student's SEVIS record reflects the termination of his or her nonimmigrant status.

The events underlying this lawsuit point in the same direction. When ICE terminated SEVIS records during the SCAI, it listed "Otherwise Failing to Maintain Status" as the reason for the termination in many of the affected records. Dkt. 14 ¶ 39. DHS's website states that this termination reason is applicable if "[t]he student has not maintained status" and "[n]one of the other terminations reasons applies." U.S. Dep't of Homeland Sec., Termination Reasons, Study in the States (Apr. 9, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons.   Even ICE, then, apparently believed that terminating the students' SEVIS records reflected a change in their nonimmigrant status.

For these reasons, the Court cannot accept for purposes of this motion Defendants' distinction between an F-1 student's SEVIS

47

record and nonimmigrant status. With this in mind, the Court turns to the specific arguments Defendants raise in support of dismissal of Counts II, III, and IV.

### 2.    Final Agency Action

Defendants argue that Counts II and III should be dismissed because Plaintiffs have failed to identify a final agency action. Defendants contend that Plaintiffs have "fabricate[d] a policy from their own perception of agency practice" with respect to SEVIS terminations, that a final determination of a student's nonimmigrant status is only reached when an immigration judge issues a final order in removal proceedings, and that no legal consequences flow from a SEVIS termination. Dkt. 30 at 34.

For reasons similar to those discussed above with respect to Count I, the Court concludes that Counts II and III challenge a final agency action that is reviewable under the APA. Plaintiffs do not mount a broad programmatic attack on DHS's management of SEVIS or even to DHS's SCAI in the spring of 2025. Instead, these claims contest a discrete agency action: DHS's policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation based on an NCIC hit. Again, the Court may plausibly infer the existence of such a policy at this stage from the allegation that ICE terminated the SEVIS records of thousands of F-1 students with NCIC hits after DOS revoked their visas. And the absence of a written document that fully memorializes this policy

48

is not fatal to the availability of judicial review under the APA. See Bhd. of Locomotive Eng'rs, 972 F.3d at 100; AAUP, 780 F. Supp. 3d at 385.

This policy also satisfies the two-pronged test for finality. The fact that ICE terminated the SEVIS records of thousands of students over a brief period of time shows that DHS's policy was not "of a merely tentative or interlocutory nature" but, rather, "mark[ed] the 'consummation' of the agency's decisionmaking process." Harper, 118 F.4th at 116 (quoting Bennett, 520 U.S. at 178). Defendants contend that the "consummation of decisionmaking" does not occur until an immigration judge issues a final order in an individual student's removal proceedings. Dkt. 30 at 35. ICE need not, however, initiate removal proceedings against a student whose SEVIS record is terminated. See Jie Fang v. Dir. U.S. Immigr. & Customs Enf't, 935 F.3d 172, 183 (3d Cir. 2019). As discussed below, the student faces immediate consequences regardless of whether ICE opts to initiate removal proceedings.

Moreover, the policy "gives rise to 'direct and appreciable legal consequences,' thereby satisfying the second prong of" the test for finality. Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at 178). Defendants argue that the termination of a student's SEVIS record carries no legal consequences because it does not reflect termination of the student's nonimmigrant status. The Court does not find this argument persuasive at this stage for

49

the reasons discussed above. As noted, an official DHS website states that following termination of a student's SEVIS record, the student loses all employment authorization, cannot re-enter the United States, and may be investigated by ICE to confirm his or her departure. These immediate effects of termination of a SEVIS record are plainly direct legal consequences for the student.

Insofar as Counts II and III challenge the Broadcast Message as a final agency action separate from the SEVIS Termination Policy, the Court rejects at this stage Defendants' argument that the Broadcast Message is not final. The Broadcast Message's "boilerplate disclaimer[]" that it is not a final action and does not create any legal rights or benefits is not conclusive on the issue. S. Cal. All. of Publicly Owned Treatment Works v. U.S. EPA, 8 F.4th 831, 837 (9th Cir. 2021); see Valero Energy Corp. v. EPA, 927 F.3d 532, 536 (D.C. Cir. 2019). Setting aside this disclaimer, nothing in the Broadcast Message indicates that it is a preliminary or temporary statement of ICE's policy on SEVIS terminations, and the amended complaint alleges that ICE has publicly represented that the Broadcast Message "is currently operative" as a policy on SEVIS terminations, Dkt. 14 ¶ 46. The Broadcast Message thus seems to have "mark[ed] the 'consummation' of the agency's decisionmaking process." Harper, 118 F.4th at 116 (quoting Bennett, 520 U.S. at 178); see Cal. Cmtys. Against Toxics v. EPA, 934 F.3d 627, 636 (D.C. Cir. 2019) (finding an agency action to be

50

final where it "c[ould] only reasonably be described as [the agency]'s last word on" a topic).

Additionally, on a motion to dismiss, the Court cannot conclude that the Broadcast Message lacks direct legal consequences. In the context of agency guidance and directives, this prong of the finality test sometimes turns on whether the challenged action appears to bind the agency. See, e.g., Ctr. for Biological Diversity v. Haaland, 58 F.4th 412, 417-18 (9th Cir. 2023); Texas v. EEOC, 933 F.3d 433, 441 (5th Cir. 2019); Parsons v. U.S. Dep't of Just., 878 F.3d 162, 167 (6th Cir. 2017); Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA, 752 F.3d 999, 1007 (D.C. Cir. 2014). The Broadcast Message espouses a definitive statement of the reasons ICE may terminate a SEVIS record, some of which, like a visa revocation, extend beyond those provided in statute or regulation. See infra Section II(B)(3); see also Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas, 5 F.4th 997, 1010 (9th Cir. 2021) (finding that an action lacked legal effect where it "d[id] not . . . alter the legal regime to which [the agency] [wa]s subject"). While the Broadcast Message does not use "mandatory language" expressly directing ICE personnel to terminate SEVIS records under specific circumstances, it may "retract [ICE's] discretion to adopt a different view of" the legally permissible reasons to terminate a SEVIS record. Texas, 933 F.3d at 441-42. Determining whether the Broadcast Message "is

51

applied by the agency in a way that indicates it is binding" requires further factual development. Id. at 441 (quoting Texas v. United States, 809 F.3d 134, 171 (5th Cir. 2015)).

The Court thus holds that Counts II and III challenge a final action agency that is reviewable under the APA. See Jie Fang, 935 F.3d at 179-85 (holding that termination of a SEVIS record and F-1 student status was a final agency action); Öztürk, __ F. Supp. 3d at __ [2025 WL 3514320, at *6] (collecting cases holding that termination of a SEVIS record is a final agency action). As this is the sole merits argument Defendants raise with respect to Count III, the Court denies their motion to dismiss that claim.

### 3.    Contrary to Law

In Count II, Plaintiffs allege that DHS's policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation is "not in accordance with law." 5 U.S.C. § 706(2)(A). Specifically, Plaintiffs assert that this policy violates DHS's regulations, which establish the permissible grounds upon which ICE may terminate an F-1 student's SEVIS record. "An agency action . . . must be set aside as contrary to law when it is inconsistent with regulations." New York v. Trump, __ F. Supp. 3d __, __ (D. Mass. 2025) [2025 WL 3514301, at *14], appeal filed, No. 26-1174 (1st Cir. Feb. 17, 2026); see SUWA, 542 U.S. at 65 (noting that "law," as used in the APA, "includes . . . agency regulations that have the force of law"); Rotinsulu v. Mukasey,

52

515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations."). Defendants argue that Plaintiffs fail to state a claim in Count II because the regulations on which they rely concern only the termination of F-1 nonimmigrant status, not the termination of an F-1 student's SEVIS record.

DHS's regulations authorize the termination of an F-1 student's SEVIS record "in two scenarios: (1) a student fails to maintain status or (2) [DHS] terminates status." Doe #1, 781 F. Supp. 3d at 261. In the first scenario, an F-1 "student is considered to be maintaining status if the student is making normal progress toward completing a course of study." 8 C.F.R. § 214.2(f)(5)(i). "A student who drops below a full course of study without the prior approval of the DSO will be considered out of status," id. § 214.2(f)(6)(iii)," as will a "student who is unable to complete the educational program within the time listed on [his or her] Form I-20 . . . and who is ineligible for [a] program extension," id. § 214.2(f)(7)(iii). A student also fails to maintain status if he (1) engages in "unauthorized employment," (2) willfully provides false information to DHS, or (3) receives a "conviction . . . for a crime of violence for which a sentence of more than one year imprisonment may be imposed." Id. § 214.1(e)-(g). Under the second scenario, "the nonimmigrant status of an alien shall be terminated" under three circumstances: (a) "the revocation of a waiver [of admissibility] authorized on [the

53

alien's] behalf under [8 U.S.C. § 1182(d)(3) or (4)]"; (b) "the introduction of a private bill to confer permanent resident status on such alien"; or (c) "pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." Id. § 214.1(d).

Plaintiffs have stated a claim that DHS's policy of terminating SEVIS records based on an NCIC hit and/or a visa revocation is contrary to law. 8 C.F.R. §§ 214.1 and 214.2 do not provide that DHS may terminate a student's SEVIS record because his or her F-1 visa is revoked. Indeed, SEVP acknowledged in guidance issued to DSOs in 2010 that if an F-1 student visa is revoked "while the nonimmigrant is in the United States and in status," the "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." Policy Guidance 1004-04 – Visa Revocations, supra, at 3. And section 214.1(g) requires a "conviction . . . for a crime of violence for which a sentence of more than one year imprisonment may be imposed" before a student is deemed out of status based on his or her criminal history. 8 C.F.R. § 214.1(g). DHS's policy appears to exceed its authority under these regulations because it authorizes SEVIS terminations for students based on the revocation of their visas and on criminal histories that do not amount to a conviction for a felony crime of violence.

Defendants cite no statutory or regulatory authority to support ICE's termination of SEVIS records on such grounds. Instead, Defendants contend that these "regulations relate to nonimmigrant status and have nothing to do with modifying (including terminating) database records" in SEVIS. Dkt. 30 at 32. Put differently, Defendants assert that "[h]ow DHS maintains, modifies, and uses the records in [the SEVIS] database is separate and apart from nonimmigrant status and the laws and regulations governing such status." Id. at 33. Again, the Court cannot accept this contention at this stage. As pled in the amended complaint, DHS's SEVIS Termination Policy permits the termination of SEVIS records reflecting the termination of nonimmigrant status on grounds not authorized by law. Accordingly, the Court denies Defendants' motion to dismiss Count II.

### 4.    Notice and Comment

In Count IV, Plaintiffs allege that the Broadcast Message is invalid because ICE promulgated it without following the notice-and-comment process. Defendants move to dismiss this claim on the basis that the Broadcast Message is not a legislative rule subject to the requirements of notice and comment.

"The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the

proposal." N.H. Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). The term "rule" covers "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). A rule is "invalid" if the agency does not properly follow the notice-and-comment process. Craker v. U.S. Drug Enf't Admin., 44 F.4th 48, 55 (1st Cir. 2022).

Only some rules, however, are subject to the procedural requirements of notice and comment. See Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96 (2015). An agency must engage in the notice-and-comment process for any "legislative" or "substantive" rule, which is a rule "that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" N.H. Hosp. Ass'n, 887 F.3d at 70 (quoting La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992)). Such rules "have the 'force and effect of law.'" Azar v. Allina Health Servs., 587 U.S. 566, 573 (2019) (quoting Perez, 575 U.S. at 97). By contrast, the APA does not mandate notice and comment for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." N.H. Hosp. Ass'n, 887 F.3d at 70 (quoting 5 U.S.C. § 553(b)).

56

Defendants first argue that the Broadcast Message is not a substantive rule because it was distributed only internally to ICE personnel and itself states that it is not "a rule" and "does not . . . create any right or benefit, substantive or procedural, enforceable at law by any party." Dkt. 30-7 at 3. But "courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice-and-comment demands apply." Azar, 587 U.S. at 575. So while an agency's disclaimer about the effects of its statement is relevant to determining whether that statement amounts to a binding substantive rule, such a disclaimer is not dispositive. See Texas v. United States, 50 F.4th 498, 523 (5th Cir. 2022); Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207, 228 (D.C. Cir. 2007); Appalachian Power Co. v. EPA, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). Nor is the fact that the rule is memorialized in an internal agency document. See, e.g., R.J. Reynolds Vapor Co. v. FDA, 65 F.4th 182, 192-94 (5th Cir. 2023) (holding that an internal agency memorandum created a substantive rule unlawfully enacted without notice and comment); Hoctor v. U.S. Dep't of Agric., 82 F.3d 165, 168, 171-72 (7th Cir. 1996) (same).

Defendants also contend that the Broadcast Message merely provides guidance on SEVP's management of an internal database and, thus, is a "rule[] of agency organization, procedure, or practice" excepted from the notice-and-comment process. N.H. Hosp.

57

Ass'n, 887 F.3d at 70 (quoting 5 U.S.C. § 553(b)). This exception covers "internal house-keeping measures organizing agency activities." Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB, 57 F.4th 1023, 1034 (D.C. Cir. 2023) ("AFL-CIO") (quoting Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987)); see Salomon-Guillen v. Garland, 123 F.4th 709, 714 (4th Cir. 2024). Courts apply this exception if a rule is "primarily directed toward improving the efficient and effective operations of an agency." AFL-CIO, 57 F.4th at 1034 (quoting Mendoza v. Perez, 754 F.3d 1002, 1023 (D.C. Cir. 2014)). "[T]he critical feature of a rule that" fits into this "exception is that it covers agency actions that do not themselves alter the rights or interests of parties." Id. (alteration in original) (quoting James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 227, 280 (D.C. Cir. 2000)); see Gillette v. Warden Golden Grove Adult Corr. Facility, 109 F.4th 145, 157 (3d Cir. 2024); In re Chestek PLLC, 92 F.4th 1105, 1109 (Fed. Cir. 2024). But for the reasons discussed above, the Court cannot conclude at this stage that termination of a student's SEVIS record is an administrative act untethered to the student's nonimmigrant status. And if termination of a student's SEVIS record does reflect termination of the student's nonimmigrant status, then the Broadcast Message is not a rule of internal organization, procedure, or practice because it covers actions that affect students' substantive rights.

58

The question remains whether the Broadcast Message is a substantive rule subject to the requirements of notice and comment or either an "interpretative rule[]" or "general statement[] of policy" exempt from those requirements. N.H. Hosp. Ass'n, 887 F.3d at 70 (quoting 5 U.S.C. § 553(b)). Defendants have not adequately briefed these complex issues. Cf. id. (explaining that "the point at which a rule crosses th[e] line" from being interpretative to legislative "is a question 'enshrouded in considerable smog'" (quoting La Casa Del Convaleciente, 965 F.2d at 1177)). The Court therefore denies Defendants' motion to dismiss Count IV and will address the question of whether ICE had to promulgate the Broadcast Message via notice and comment at the summary-judgment stage, when it is hopefully better briefed.

### C.    Letters Regarding Visa Revocations (Count V)

Finally, Plaintiffs allege in Count V that DOS has an arbitrary and capricious policy of sending letters and emails to students whose visas were revoked with inaccurate information about the consequences of the revocation. Defendants move to dismiss this claim on the basis that the challenged policy is not a final agency action reviewable under the APA. Applying the two-pronged test for finality under the APA, see supra Section II(A)(3), the Court agrees with Defendants.

The policy challenged in Count V is neither "the 'consummation' of the agency's decisionmaking process" nor an

action "from which 'legal consequences . . . flow.'" Harper, 118 F.4th at 116 (quoting Bennett, 520 U.S. at 178). There is little doubt that DOS reached the end of its decisionmaking process when it decided to revoke the visas based on the NCIC hits and that this decision had legal consequences for the affected students. The agency action at issue in this claim, however, is not DOS's alleged policy of revoking visas based on NCIC hits (which is the subject of Count I) but, rather, its alleged policy of sending inaccurate communications to the students whose visas were revoked. Those communications "merely inform[ed]" the students of DOS's decision to revoke their visas. Sinclair Wyo. Refin. Co. v. U.S. EPA, 72 F.4th 1137, 1144 (10th Cir. 2023) (alteration in original) (quoting Cherry v. U.S. Dep't of Agric., 13 F. App'x 886, 890 (10th Cir. 2001)). In other words, the visa revocations, and not the communications, were the final agency action.

It is troubling that DOS's communications implied that the visa revocations stripped the students of lawful status, mentioned consequences the students could face for remaining in the country, and encouraged self-deportation. As discussed above, the implication that a student loses lawful status when his or her visa is revoked does not appear to accurately reflect the law. Cf. Policy Guidance 1004-04 – Visa Revocations, supra, at 3 (explaining that "while the nonimmigrant is in the United States and in status," a "[v]isa revocation is not, in itself, a cause for

termination of the student's SEVIS record"). But the communications phrased the possible consequences as ones a student "may" or "can" face, Dkt. 14 ¶ 49, indicating that the government had not concluded its decisionmaking process as to the students' legal status and whether any enforcement actions were appropriate. See Holistic Candlers & Consumers Ass'n v. FDA, 664 F.3d 940, 944 (D.C. Cir. 2012).

Moreover, this aspect of the communications did not determine rights or trigger legal consequences. This requirement for finality is not satisfied when, as here, the "agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 808 (D.C. Cir. 2006); see Advanced Integrative Med. Sci. Inst., PLLC v. Garland, 24 F.4th 1249, 1259 (9th Cir. 2022). The communications "impose[d] no obligations, prohibitions, or restrictions." Valero, 927 F.3d at 536; see Holistic Candlers, 664 F.3d at 944 (reaching the same conclusion even though the agency letter at issue said the recipient "should take prompt action to correct" its conduct and that not doing so "may result in regulatory action" (emphasis omitted)). Should an affected student not self-deport after receiving such a communication, he or she "would face liability only for [any] noncompliance with the underlying statutory [and regulatory] commands, not for disagreement with the agency's

61

determination" in the communication. Advanced Integrative, 24 F.4th at 1259 (quoting Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs, 543 F.3d 586, 594 (9th Cir. 2008)).

While the Court readily understands why the affected students would have been terrified upon receipt of these communications, DOS's policy of sending these letters is not a final agency action subject to judicial review under the APA. The Court therefore dismisses Count V.

## **ORDER**

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 29) is **ALLOWED** as to Count V and otherwise **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge